# Exhibit B

 Caution
As of: April 4, 2022 8:09 PM Z

# Joester Loria Group v. Licensing Co.

United States District Court for the Southern District of New York

April 29, 2011, Decided; April 29, 2011, Filed

10 Civ. 6742 (DLC)

**Reporter**
2011 U.S. Dist. LEXIS 46597 *; 2011 WL 1642736

THE JOESTER LORIA GROUP, Plaintiff, -v- THE LICENSING COMPANY LIMITED, Defendant.

**Counsel:** [*1] For The Joester Loria Group, LLC, Plaintiff: Jeffrey L. Laytin, LEAD ATTORNEY, Sullivan & Worcester LLP, New York, NY; Richard Brian Verner, Schiff Hardin LLP, New York, NY.

For The Licensing Company Limited, Defendant: Debra A. Karlstein, LEAD ATTORNEY, Spears & Imes, L.L.P., New York, NY.

**Judges:** DENISE COTE, United states District Judge.

**Opinion by:** DENISE COTE

# Opinion

### OPINION & ORDER

DENISE COTE, District Judge:

Plaintiff The Joester Loria Group ("Joester"), a licensing agent, brings this suit against its former licensing subagent for Chrysler's Jeep brand, The Licensing Company Limited ("TLC"), alleging that TLC misappropriated confidential information acquired during the course of its subagency and that TLC used this information to compete with Joester for a licensing contract. Because Joester has failed to adequately plead facts giving rise to a plausible claim for relief, TLC's motion to dismiss is granted.

## BACKGROUND

Joester's amended complaint (the "Complaint") asserts five causes of action: breach of contract, misappropriation of trade secrets, tortious interference with prospective economic advantage, unfair competition, and unjust enrichment. The Complaint principally asserts that TLC breached its contract [*2] with Joester when it used confidential, proprietary information acquired during the course of its service as subagent for Joester in a competition with Joester over which company would serve as the new licensing agent for the Chrysler brands.

Joester and TLC are both licensing agencies; Joester is based in New York, and TLC is a corporation organized under the laws of the United Kingdom. Licensing agents are granted limited rights to develop and sell products by brand owners in order to better promote consumer awareness of the brand.

From 1999 through July 31, 2010, Joester served as the licensing agent for the Chrysler and Jeep brands owned by the Daimler Chrysler Corporation and its successors (collectively "Chrysler"). On January 31, 2001, TLC contracted with Joester to serve as Joester's subagent for the Jeep Brand in the United Kingdom and France. The agreement (hereinafter the "Agreement") between the parties provided that

> AGENT [TLC] and its officers, employees and representatives shall maintain in confidence and not disclose to any third party (i) any information learned about JLG and Owner

[Chrysler] in connection with its representation hereunder and shall not use any such information [*3] to JLG's or Owner's detriment; or (ii) the contents of this agreement or any LICENSE AGREEMENT or LICENSED PROGRAM or any other agreement that AGENT becomes aware of. This obligation of confidentiality shall survive termination of this Agreement.

Joester alleges that during the course of TLC's service as subagent for the Jeep brand, TLC was provided with proprietary and confidential information concerning Joester's management of the Jeep brand and Joester's internal methods and strategies for providing licensing services. This confidential information included the concept, allegedly pioneered by Joester, of maintaining a revenue pool devoted solely to marketing activities in promotion of the brand, termed the Common Marketing Fund ("CMF") by Joester. The Agreement between TLC and Joester expired on October 31, 2009, and Joester confirmed by letter of November 19, 2009 that the Agreement would not be renewed.

Chrysler filed for bankruptcy on April 30, 2009. In early 2010, as part of its review of its existing licensing contracts, Chrysler issued a Request for Quote ("RFQ") inviting licensing agencies to submit proposals for the Chrysler and Jeep brands. Both Joester and TLC responded [*4] to the RFQ and both successfully passed the first round of the selection process. By letter of July 23, 2010, Chrysler informed Joester that its existing licensing agreements would not be renewed. Joester subsequently learned that TLC had been selected as the new licensing agent for the Chrysler and Jeep brands.

Joester notes in its Complaint that "the RFQ submissions were maintained in confidence by Chrysler, and were not shared by the participants." Thus, Joester admits that it has no knowledge of the contents of TLC's submissions to Chrysler in furtherance of its bid to win the licensing contract.

Nevertheless, Joester goes on to allege that

in analyzing the type of information requested by Chrysler in the RFQ, it is apparent that in responding to the RFQ successfully, TLC had to use proprietary and confidential information provided by [Joester] under the provisions of the Subagent Agreement and learned in the course of TLC's subagent relationship with [Joester]. Therefore, a successful response would have utilized confidential information, including business plans, program performance analyses, Chrysler's preferences and objectives, and Chrysler's unique licensing agent and subagent [*5] compensation structure, as well as information about the methods and processes for providing agency services developed by [Joester], such as details of the CMF program, licensee monitoring procedures and client reporting systems . . . .

(Emphasis supplied.)

Joester filed its original complaint on September 10, 2010. TLC moved to dismiss the original complaint on November 1, and Joester subsequently amended its complaint on December 10, 2010. TLC moved to dismiss the amended complaint on January 27, 2011. The motion was fully submitted on February 18, 2011.

DISCUSSION

TLC primarily argues that Joester's assertion that TLC "had to use" confidential information in responding to Chrysler's RFQ is too speculative and conclusory to survive a motion to dismiss. TLC further contends that the Agreement does not prohibit the disclosure of confidential information to Chrysler; that Joester has failed to allege any facts suggesting that TLC used "wrongful means" to interfere with Joester's prospective relationship with Chrysler; that there is no evidence that Joester would have won the Chrysler contract but for TLC's conduct; that the unfair competition claim must be dismissed as duplicative of the [*6] misappropriation claim; and that Joester's unjust enrichment claim cannot be sustained in the

face of a valid contract between the parties.

The Second Circuit has clarified that the Supreme Court's decisions in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), did not "heighten the pleading requirements." <u>Arista Records LLC v. Doe 3</u>, 604 F.3d 110, 120 (2d Cir. 2010). But "<u>Twombly</u> and <u>Iqbal</u> [do] require factual amplification where needed to render a claim plausible." <u>Id</u>. (citation omitted).

> The <u>Twombly</u> Court stated that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action will not do"; rather, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," <u>i.e.</u>, enough to make the claim "plausible." The <u>Twombly</u> Court stated that "asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [*7] of illegality."

<u>Id</u>. (citing <u>Twombly</u>).

Joester's Complaint lacks sufficient factual matter to support its claims that TLC used confidential information belonging to Joester in responding to Chrysler's RFQ. Joester's allegations amount to mere speculation that TLC "had to use proprietary and confidential information" in its submission to Chrysler solely by virtue of the fact that TLC was employed as Joester's subagent for the Jeep brand. Such guesswork is insufficient to state a claim. As in <u>Twombly</u>, where the Court found that the actions described in the complaint were "doctrinally consistent with lawful conduct," the award of the licensing contract to TLC is just as consistent with an alternative, lawful explanation of events — that TLC's submission was superior to that of Joester even without recourse to the confidential

information. Joester appears to suggest that TLC's submission could not have been superior to Joester's without the use of confidential information. But there is factual support in the Complaint for this conclusory allegation. Indeed, since the confidential information was available to Joester, it is unclear why using the information to respond to the RFQ would have [*8] given TLC an advantage over Joester.

CONCLUSION

TLC's January 27, 2011 motion to dismiss is granted. The Clerk of Court shall enter judgment for TLC and close the case.

SO ORDERED:

Dated: New York, New York

April 29, 2011

/s/ Denise Cote

DENISE COTE

United states District Judge

 Caution
As of: April 4, 2022 8:09 PM Z

# Johnson v. MediSys Health Network

United States District Court for the Eastern District of New York

April 28, 2011, Decided; June 1, 2011, Filed

10-CV-1596 (ERK)(VVP)

**Reporter**

2011 U.S. Dist. LEXIS 156828 *

MARGARET JOHNSON, Plaintiff, v. MEDISYS HEALTH NETWORK, et al, Defendants.

**Subsequent History:** Adopted by Johnson v. Medisys Health Network, 2011 U.S. Dist. LEXIS 156827 (E.D.N.Y., June 3, 2011)

**Counsel:** [*1] Margaret Johnson, Plaintiff, Pro se.

For MediSys Health Network, Brookdale Hospital Medical Center, Jamaica Hospital Medical Center, Neighborhood Health Provider LLC, Flushing Hospital Medical Center, The Board of Trustees on MediSys Health Network, The Board of Trustees of Jamaica Hospital Medical Center, The Board of Trustees of Brookdale Hospital Medical Center, The Board of Directors of Neighborhood Health Providers, The Board of Trustees of Flushing Hospital, Neil Foster Phillips, Judge Tim Dufficy, Dr. Alvin Kahn, Ph.d. Gerald M. Chapey, Mr. Joseph Ferrara, Robert W. Koop, Dr. Anthony DiMaria, Dr. Geoffrey Doughlin, Dr. Hector Estepan, Dr. Antonietta Morisco, Douglas W. Singer, Archie Spigner, John Marus, Edward Birnbaum, Hugh Greenberg, MD Ascher L. Mestel, R.C. Hugh Nelson, Richard Radutzky, Lowell M. Rubin, Alex Rovt, David I. Schachne, Edwin L Schulman, Al Silverman, Allen B. Swerdlick, David R. Wilkes, Laurence C. Zale, Honorable Darrell Towns, Esq. Steven Plotnick, Diane Simon, MD Richard J. Folger, Vito Buccellato, Bruce Flanz, Mounir Doss, Steve Bory, Mr. Michael J Russo, Mr. Robert Reichenbach, Mr. Dino Guiducci, MD Charles Balducci, Mr. Anthony Federici, Mr. Henry E. [*2] Froebel, MD Victor Guarneri, Mr. Max Kupferberg, MD Ahamed Moideen, DDS Alvin I Orlian, Mr. David P. Pagan, Mr. John E. Roe, Sr., William Lynch, Chris Y. Hwang, MD Peter Barra, MD Victor Orioli, NHP of Indiana LLCY Royal Health Care of Long Island LLC, doing business as Royal Health Care LLC, Royal Health Care Data Center LLC, NHP Holdings LLC, Linroc Community Services Corporation, Inc., The Schulman and Schachne Institute for Nursing and Rehabilitation, Inc., Amboy Properties Corporation, Rockreal Corporation, Amboy Properties Corporation, The Linden Foundation, Inc., Rockreal Corporation, Brookdale Family Care Centers, Inc., The Brookdale Hospital Center Hegeman Housing Company, Inc., The Brookdale Residence Housing Development Fund Corporation, LCSC Holdings, Inc., Jamaica Hospital Staff Housing Co., Jamaica Hospital Medical Center Diagnostic & Treatment Center Corp., Jamaica Hospital Meidcal Center Diagnostic and Treatment Cetner Corp., Jamaica Hospital Nursing Home Co, Inc., Hitech Medical Equipment Inc., FRR Recovery, TJH Medical Services, P.C., Medisys Management, LLC, Comprehensive Therapy Services, Medisys Ventures Inc., Medisys Services Corp., Jamaica Hospital Nursing Home [*3] Co, Inc., Medisys Management LLC, MHN Properties, Inc., Medisys IPA LLP, Medisys Home Care Inc., VWE Properties Corp., Queens Replacement LLC, Int'l Assoc. of Medical Bike Units, Brookdale Emergency Services, BHMC Enterprises, MediSys Service Corporation, Fred Beekman, Darrell Townes, Rainbow Pharmacy, Jamaica Pschiatric Services, P.C., Brookdale Rx, Defendants: Andrew Evan Rice, Kathleen Mary McKenna, Keisha-Ann

G. Gray, LEAD ATTORNEYS, Proskauer Rose LLP, New York, NY.

For David Rosen, Defendant: Catherine Foti, LEAD ATTORNEY, Morvillo, Abramowitz, Grand, Iason & Bohrer P.C., New York, NY; E. Scott Morvillo, Ellen M Murphy, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York, NY; Robert G. Morvillo, Morvillo LLP, New York, NY.

**Judges:** VIKTOR V. POHORELSKY, United States Magistrate Judge.

**Opinion by:** VIKTOR V. POHORELSKY

# Opinion

### REPORT AND RECOMMENDATION & ORDER

**TABLE OF CONTENTS**

⊞Go to table1

POHORELSKY,  [*4] Magistrate Judge:

Judge Kormart has referred this matter to me for a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), concerning the plaintiff's motion to remand the action to state court, the defendants' motion seeking dismissal of all but the eighth, eleventh, and sixteenth causes of action, and the defendants' motion for preliminary injunctive relief. This opinion also addresses the defendant's motion to seal the record in this case in whole or in part, which is before me for decision rather than report and recommendation. The plaintiffs claims are focused primarily on allegations that she was terminated and otherwise treated improperly because of her opposition to her employer's conduct in connection with a federal criminal investigation. I recommend (1) that the plaintiff's motion to remand should be denied, (2) that the defendants' motion to dismiss should be granted in part and denied in part, and (3) that the defendants' motion

for a temporary restraining order and preliminary injunction be granted. Finally, I order that the portions of the record containing the defendants' confidential information be sealed.

## BACKGROUND

### I. FACTS

The plaintiff Margaret Johnson ("the  [*5] plaintiff'), former General Counsel of defendant Medisys Health Network, Inc. and its affiliated entities ("Medisys"), asserts nineteen claims sounding in federal and state law against 90 defendants arising out of the plaintiff's employment and eventual termination.[1] Medisys is a New York not-for-profit organization. It serves as the supporting organization for three not-for-profit hospitals, namely Jamaica Hospital Medical Center, Flushing Hospital Medical Center and Brookdale University Hospital & Medical Center. Medisys is also the parent of a for-profit managed care insurance provider called Neighborhood Health Providers, LLC, Complaint ("Compl.") ¶¶ 2-6, as well as the corporate parent or sponsor of a large number of other health care entities identified in ¶¶ 62-90 of the Complaint. The plaintiff has sued Medisys, its three constituent hospitals as well as all of the other Medisys entities and many of their trustees and officers.

The relevant facts, as alleged in the Complaint are as follows. The plaintiff was hired as Senior Vice-President, General Counsel, and Assistant  [*6] Corporate Secretary of Brookdale Hospital in December 1995. Compl. ¶ 140. The plaintiff received several additional appointments over time, and eventually held the positions of Senior Vice-President, General Counsel, and Corporate Compliance Officer of Medisys and its affiliates. She also served on the Board of Trustees of

---

[1] While the plaintiff was previously represented by counsel, as of July 2010, she is proceeding *pro se*. Dkt. No. 64.

Brookdale Hospital and the Board of Directors of Neighborhood Health Providers. Compl. ¶¶ 93, 146.

In September 2008, Anthony Seminerio, a Queens Assemblyman, was charged by federal authorities with abusing his legislative office to improperly benefit entities from which he accepted bribes. Compl. ¶¶ 148-49. It was reported that Medisys, Medisys's CEO David Rosen, and other affiliates of Medisys were implicated in the allegations against Seminerio. Compl. ¶¶ 149-50.

[TEXT REDACTED BY THE COURT]

[TEXT REDACTED BY THE COURT]

On November 10, 2008, [TEXT REDACTED BY THE COURT]

[TEXT REDACTED BY THE COURT] As a result of that meeting, [TEXT REDACTED BY THE COURT] the plaintiff was terminated. Compl. ¶¶ 205. The plaintiff was thereafter prohibited from entering Brookdale's campus. Compl. ¶¶ 206-08.

In addition, and largely unrelated to the claims regarding her termination, the [*7] plaintiff alleges that from the beginning of her eight-year employment with Medisys, she was sexually harassed by defendant David Rosen, the company's President and CEO. The harassment consisted of lewd gestures and comments both at work and at other times, and repeated offers to engage in a romantic relationship. The plaintiff consistently refused these advances. Compl. ¶¶ 241-44, 245.

## II. Procedural History

The plaintiff commenced this action by filing a summons with notice in the Supreme Court of the State of New York, Kings County, on November 9, 2009, *Margaret Johnson v. MediSys Health Network et al*, Index No. 28352/2009. While Rosen acknowledges being served with the Summons and Complaint, the remaining defendants assert that they were never served with the Complaint and first

saw a copy of the Complaint when they appeared before the state court for a hearing on a motion to seal the record. Defs. Opp. to Mot. to Remand, ("Defs. Remand Opp."), at 3.

On March 19, 2010, the defendants moved by Order to Show Cause in state court for an order sealing the record and for a temporary restraining order and preliminary injunction prohibiting the plaintiff and her counsel from disclosing the [*8] defendants' confidential information. The state court issued an order temporarily restraining the plaintiff from publishing certain paragraphs of the Complaint to third persons. Defs. Remand Opp., at 3.

On April 8, 2010, the defendants removed the action to federal court pursuant to 28 U.S.C. 1441(b) and (c), and simultaneously moved in state court to dismiss certain claims in the plaintiff's complaint.[1] Defs. Rem. Opp., at 34. At an April 20, 2010 pre-motion conference, this court continued the state court order with respect to the motion to seal and ordered that certain paragraphs of the public record be redacted pending decision on the motion to seal.

## DISCUSSION

### I. Motion To Remand

The plaintiff has moved either to remand her entire action or only those claims sounding in state law. As set forth below, the court finds that it has jurisdiction over the plaintiff's federal claims and that it would be appropriate to exercise supplemental jurisdiction over the remaining claims.

### A. Motion For Total Remand

The plaintiff's motion for total remand should be

---

[1] Rosen did not join that motion to dismiss. Defs, Remand Opp., at 4.

denied because she has asserted federal claims in the Complaint. Where [*9] a complaint states a federal claim such that the court would have original jurisdiction under 28 U.S.C. § 1331, an action originally filed in state court can be removed to federal court. Thus, under 28 U.S.C. § 1441(b), an action can be removed to federal court if the complaint asserts federal constitutional or statutory claims or if there is diversity of citizenship:

> Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought.

Where federal claims have been properly removed to federal court, they should not be remanded. *See Ferreira v. New York Daily News*, No. 09-CV-1520, 2009 U.S. Dist. LEXIS 27451, 2009 WL 890577, at *4 (E.D.N.Y. Mar. 31, 2009) ("[T]he court has no discretion to remand federal claims but must exercise its jurisdiction over them"). In determining whether removal is warranted, the court will look to the allegations in the complaint [*10] at the time of removal, *Torah Soft Ltd. v. Drosnin*, No. 00-CV-0676, 2003 U.S. Dist. LEXIS 15584, 2003 WL 22077414, at *1 (S.D.N.Y. Sept. 8, 2003), but if at any time the court determines that it lacks subject matter jurisdiction, it must remand the case to state court. *See Biscone v. JetBlue Airways Corp.*, 681 F. Supp. 2d 383, 385 (E.D.N.Y. 2010).

The plaintiff concedes that she asserts claims under the United States Constitution and federal law in the sixteenth claim of her Complaint. *See* Pl. Mem. in Supp. of Remand, at 5, 10, 13; Johnson Aff. in Supp. of Mot. to Remand, ¶¶ 1, 6; Tr. of 4/20/10 Conf., Dkt. No. 25, at 39-40. This claim asserts violations of "the United State [sic] Constitution Equal Protection, Civil Rights and due process 28

USC Section 1331, 1341, USC Section 28, 42 USC Section 20000e [sic] by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein." Compl, ¶ 424. As a result, the court has jurisdiction over the plaintiff's federal claims and should not remand the entire case to state court.[2]

## B. MOTION FOR PARTIAL REMAND

The court is also not persuaded by the plaintiff's alternative argument that it should remand only her state-law claims. Where a federal court has original jurisdiction over only some of the claims, it may, in its discretion, exercise "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). In this analysis, the court can consider whether "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling [*12] reasons for declining jurisdiction." *Id.* at § 1367(c). The plaintiff argues that all except the third of these considerations should lead the court to remand.

The plaintiff's primary argument against the court's exercise of supplemental jurisdiction is that the state law claims substantially predominate over the federal claims under § 1367(c)(2). In this analysis, it is "not the ratio of state to federal claims that is determinative but the substance." *Dunlop v. City of*

---

[2] The plaintiff also moves to amend her complaint to remove references to her federal claims, but neither indicates which claims she would omit nor provides the court with a proposed [*11] amended pleading. The defendants do not oppose the motion to amend to drop the federal claims as long as they are terminated with prejudice. As discussed later in this opinion, the plaintiff should be permitted to file an amended complaint, which may provide an opportunity for eliding the federal claims.

*New York*, No. 06-CV-433, 2006 U.S. Dist. LEXIS 72315, 2006 WL 2853972, at *6 (S.D.N.Y. Oct 4, 2006); *Akwesi v. Uptown Lube & C/W. Inc.*, No. 07-CV-335, 2007 U.S. Dist. LEXIS 89605, 2007 WL 4326732, at *5 (S.D.N.Y. Dec. 3, 2007) ("not enough to point out that plaintiffs bring numerically more state law claims that [sic] federal claims"). Where "the state and federal claims derive from a common nucleus of operative fact, Section 1441(c) has no bearing on the issue of removal or remand." *Ferreira*, 2009 U.S. Dist. LEXIS 27451, 2009 WL 890577, at *4; *Dunlop*, 2006 U.S. Dist. LEXIS 72315, 2006 WL 2853972, at *6 (finding that although there were more state law claims than federal ones "the federal claims are not merely peripheral to the state claims" and presented "serious allegations of constitutional violations that are properly addressed [*13] in federal court"). "In determining whether state law claims predominate, courts must examine the type of proof necessary, the comprehensiveness of the remedies sought and the scope of the issues raised." *Ferreira*, 2009 U.S. Dist. LEXIS 27451, 2009 WL 890577, at *4. Moreover, where these factors favor a finding of a common nucleus of operative fact, policy would disfavor remand in order to prevent duplicative work for attorneys and the court system. *Dunlop*, 2006 U.S. Dist. LEXIS 72315, 2006 WL 2853972, at *6.

While it is true that eighteen of the plaintiff's nineteen claims allege violations of state law, as pleaded in the Complaint all of the plaintiff's claims including the claims under federal law rest, at least in part, on the circumstances leading up to and immediately following her termination. Many of the plaintiff's state law claims are duplicative, repeating the same facts and seeking the same recovery. The allegations supporting those claims also apply to the federal claims that the plaintiff asserts, including alleged constitutional violations; violations of the plaintiffs civil rights; and claims of discrimination and/or retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; all of which are asserted concurrently [*14] with the state law claims. *See* Compl. ¶¶ 131, 424. Thus, while the plaintiff asserts more state law claims than federal ones, all of her claims implicate, in some manner, the same set of core facts, and it would be more reasonable to resolve all of them in a single action.

The plaintiffs remaining arguments in favor of remand are unconvincing. She argues that the Complaint raises a novel question of state law under § 1367(c)(1) because the plaintiff "is attempting to pierce the corporate veil, of affiliated entities through reverse and triangular piercing of not for profit entities." Pl. Reply Mem. in Supp. of Remand, at 15. The plaintiff offers no argument as to what is "novel or complex" about these allegations nor how the attempt to pierce the veil of not-for-profit entities is any different than the analysis applied to private corporations. Veil piercing issues are regularly addressed by federal courts. *See, e.g., Network Enterprises, Inc. v. Reality Racing, Inc.*, No. 09-CV-4664, 2010 U.S. Dist. LEXIS 89598, 2010 WL 3529237, at *4-*7 (S.D.N.Y. Aug. 24, 2010)).

The plaintiff has also failed to provide the court with a persuasive reason to decline to exercise jurisdiction under § 1367(c)(4). She argues that "[u]nder [*15] the abstention doctrines, federal courts 'may decline to exercise their jurisdiction, in otherwise exceptional circumstances, where denying a federal forum would clearly serve an important countervailing interest.'" Pl. Mem. in Supp. of Remand, at 11 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996)). The abstention doctrine applies to avoid federal court encroachment on a question or area of compelling state interest. The Supreme Court has noted that examples of such cases are those where there is a pending state criminal proceeding, cases that involve questions of ambiguous or unsettled state law, cases where continuing in federal court would interfere with the administration of a state system for the collection of taxes, and cases that are duplicative of a pending state proceeding. *Quackenbush*, 517 U.S. at 716-17. The plaintiffs

argument in favor of abstention is that corporate compliance in the not-for-profit healthcare industry "is of great public importance to New York State," and that New York has a compelling interest in corporate compliance by non-profit healthcare providers that receive Medicaid funds. Pl. Reply Mem. in Supp. of Remand, at 11. In support, [*16] she cites the New York statute that governs corporate compliance in this area and quotes from an interview with New York State's Medicaid Inspector General. Pl. Reply Mem. in Supp. of Remand, at 11-14. While this demonstrates that New York has laws governing such compliance programs, it does not provide a basis for concluding that the state must be the exclusive enforcer of these principles (to the extent they are even implicated here). Indeed, the New York State official quoted by the plaintiff states that board members of not-for-profits should be concerned with compliance with both federal and state requirements related to the receipt of Medicaid funds. *Id*. at 13 (citing statements regarding requirements in IRS 990 information return and the Patient Protection and Affordable Care Act). Thus, even assuming that corporate compliance in the healthcare field is central to the plaintiff's case, this information only reaffirms that the federal courts have an equally appropriate role to play in enforcing it. The plaintiff has not provided any compelling reason for the court to abstain from its "strict duty to exercise the jurisdiction that is conferred upon [it] by Congress." *Quackenbush*, 517 U.S. at 716.[2]

The plaintiff also argues technical bases for remand. She argues that the defendants have not filed a complete copy of the state court records, as required by the court's local rules, but does not specify which documents have been omitted. *See* Pl. Mem. in Supp. of Remand, at 7, 11. "A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co. Inc*., 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted). That the defendants have not filed a complete copy of the state court records and proceedings is a technical, not a jurisdictional defect and can be cured. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 399 F. Supp. 2d 340, 348 (S.D.N.Y. 2005). [*18] Here, the defendants contend that they have filed or provided the court with the papers from the state court proceedings up to the date of removal. If either party is aware of documents that have not been provided, they should promptly advise the court and the defendants should provide those documents. Further, the fact that Rosen's counsel signed the notice of removal on behalf of the other defendants does not require remand, as he had consent to sign on behalf of all of the defendants. *See* Notice of Removal ¶ 16; *Beatie and Osborn LLP v. Patriot Scientific Corp*., 431 F. Supp. 2d 367, 383-84 (S.D.N.Y. 2006). Finally, the plaintiff argues that the defendants' service of a motion to dismiss in state court on the same day they removed the action to federal court renders removal defective. She offers no citation to authorities in support of the argument, however, and the court finds no fault with the defendants' effort to preserve their rights in state court pending a decision on jurisdiction in this one.

## II. MOTION TO DISMISS

The defendants have moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all of the plaintiffs claims except for the eighth, eleventh, and sixteenth causes [*19] of action. In addition to their arguments in support of the failure to state a claim, the joint defendants move to dismiss all the claims against (I) the defendants who are sued in their capacities as uncompensated directors, officers or trustees of not-for profit corporations pursuant to Section 720-a of the New York Not-for-

---

[2] The [*17] plaintiff also argues that a countervailing interest is the danger of the plaintiff losing "a number of her causes of actions, and/or her entire case." Pl. Mem. in Supp. of Remand, at 12. The potential for the dismissal of the plaintiff's claims in federal court is not an exceptional circumstance warranting remand. Otherwise, plaintiffs would always win remand motions on the argument that the pleading standards in federal court differ from those in state court.

Profit Corporations Law and (2) those individuals or entities who are not specifically alleged to have participated in any of the misconduct alleged in the Complaint.[3]

## A. LEGAL STANDARDS ON A MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civii Procedure 12(b)(6) tests the legal, not the factual, sufficiency of a complaint. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), *abrogated on other grounds [*20] by Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000) ("At the Rule 12(b)(6) stage, '[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.'") (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998)). At this stage, the court accepts as true all factual allegations in the complaint, views the complaint in the light most favorable to the plaintiff, and draws all reasonable inferences in her favor. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001). Even so, conclusory allegations or conclusions of law "couched" as factual allegations need not be accepted as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). To avoid dismissal, plaintiffs must plead facts that "nudg[e] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *Iqbal*, 129 S. Ct. at 1949 (requiring factual allegations that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct [*21] alleged"). Courts may also consider documentary exhibits or written instruments annexed to the complaint, documents integral to the parties' case and on which the complaint relies heavily, and matters subject to judicial notice. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*, 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007) (citing 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004 and Supp. 2007)); *ATSI Commc'ns, Inc. v. Shaar Fund*, 493 F.3d 87, 98 (2d Cir. 2007); *Int'l Audiotext Network, Inc. v. AT&T*, 62 F.3d 69, 72 (2d Cir. 1995); *Kramer v. Time Warner Inc*., 937 F.2d 767, 773 (2d Cir. 1991); *see also* Fed. R. Civ. P. 10(c).

Should dismissal be granted, "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Simmons v. Abruzzo*, 49 F.3d 83, 86-87 (2d Cir. 1995). This principle is particularly applicable to *pro se* plaintiffs. *See Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend." *Lucente v. International Bus. Mack Corp*., 310 F.3d 243, 258 (2d Cir. 2002) (citation omitted). [*22] The court will therefore deny leave to amend if amendment of the claim would be futile. *Id*.; *see also Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962).

## B. CLAIMS 1 AND 2 : BREACH OF CONTRACT AND IMPLIED CONTRACT

The plaintiffs' first and second claims are for "breach of contract" and "breach of implied contract" arising from her termination as General Counsel of Medisys. *See* Compl. ¶¶ 246-67. The plaintiff's alleges that she had either an express or implied agreement with the defendants as Medisys's chief legal officer where "MediSys would not impede or frustrate Plaintiff in

---

[3] The defendants' arguments are set forth in joint memoranda of law filed by all of the defendants except for Rosen (Joint MTD, Dkt No. 10 and Joint MTD Reply, Dkt No. 72) and in memoranda of law filed individually by Rosen in support of dismissal of the claims against him (Rosen MTD, Dkt No. 13, Rosen Supp. MTD, Dkt No. 30, Rosen MTD Reply, Dkt No. 71). The plaintiff responded to the defendants' arguments in a single memorandum (Pl. MTD Opp., Dkt No. 65).

[complying with New York's ethics rules] in the reasonable performance of her duties with the Defendants herein." Compl. ¶¶ 247, 258.

[TEXT REDACTED BY THE COURT] The defendants move to dismiss these claims on the basis that the plaintiff was an at-will employee and that there is no express or implied agreement that limited the defendants' right to terminate her with or without cause.

Under New York law, an at-will employee can be terminated for any reason unless the employer limits its right to do so by express agreement. *Murphy v. American Home Prods, Corp*., 58 N.Y.2d 293, 300, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983); *Sabetay v. Sterling Drug*, 69 N.Y.2d 329, 333, 506 N.E.2d 919, 514 N.Y.S.2d 209 (1987). [*23] This long-established New York rule maintains force even where an employee alleges that his termination was in breach of internal company policies. *See Sabetay*, 69 N.Y.2d at 336-37. The plaintiff neither disputes that she was an at-will employee nor alleges facts demonstrating that her employer had "limited by express agreement" its right to terminate her at anytime without cause. *Id*. at 334.[4]

---

[4] The Complaint alleges that the hospital's Code of Conduct encourages reporting of illegal or unethical conduct and prohibits retaliation against anyone who reports possible unethical or illegal conduct in violation of that Code of Conduct. Compl. ¶¶ 143,232. New York courts have declined to find that internal corporate compliance manuals create implied contractual rights for at-will employees absent provisions in those manuals limiting the employer's right to terminate and an employee's reliance on an explicit promise not to discharge the employee without cause in accepting the position. *See Albert v. Loksen*, 239 F.3d 256, 264 (2d Cir, 2001) (reliance on assurances in the defendant hospital's compliance manual without "express, written limitations on the Hospital's rights to discharge its employees" [*24] not enough to establish implied contractual rights); *Murphy*, 58 N.Y.2d at 305 (dismissing claim where plaintiff alleged he was discharged for internally reporting accounting misconduct in accordance with company's internal regulations but did not point to any provision in manual affecting employer's right to terminate); *cf. Weiner v. McGraw-Hill, Inc*., 57 N.Y.2d 458, 443 N.E.2d 441, 457 N.Y.S.2d 193 (1982) (finding express agreement where plaintiff induced to take position on assurance that he would not be discharged without cause and instructed by supervisors to follow internal manual

The plaintiff nonetheless argues that she falls under an exception to the above rule, established in *Wieder v. Skala*, 80 N.Y.2d 628, 609 N.E.2d 105, 593 N.Y.S.2d 752 (1992), applicable to attorneys who are terminated for acting in compliance with New York's ethical and disciplinary rules. In *Wieder*, an associate at a law firm reported another associate's misconduct to the firm's partners and asked them to report it to the Appellate Division's Disciplinary Committee, [*25] as required by DR 1-103(A) of New York's Code of Professional Responsibility. *Id*. at 632. After he was fired, the plaintiff brought a claim for retaliatory discharge and breach of implied contract. The court found that the associate and the firm's mutual obligation to comply with the rules of ethics created an implied-in-law obligation that the firm would not impede or discourage the associate's compliance with the rules. *Id*. at 637-38. The *Wieder* court thus made two critical observations: (1) "plaintiffs performance of professional services for the firm's clients as a duly admitted member of the Bar was at the very core and, indeed, the only purpose of his association with defendants" and (2) there was an implied understanding "that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession." *Id*. at 635-36. Thus, the court held, "[i]t is in this distinctive relationship between a law firm and a lawyer hired as an associate that plaintiff finds the implied-in-taw obligation on which he founds his claim." *Id*. at 635. Thus, insisting that the plaintiff disregard the ethics rules would frustrate "the only legitimate [*26] purpose of the employment relationship" he had with the firm. *Id*. at 638. The court also noted that the implied-in-law obligation it was recognizing at that time was limited to the reporting requirements of DR 1-103(A). *Id*. at 637.

The New York Court of Appeals has addressed the reach of the *Wieder* exception once since that decision. *See Horn v. New York Times*, 100 N.Y.2d

---

because employees could only be discharged for just cause). The plaintiff has not alleged that that she relied on any stated or written policy limiting her employer's right to terminate her without cause.

85, 790 N.E.2d 753, 760 N.Y.S.2d 378 (2003). In *Horn*, the court refused to extend the doctrine to a physician who was discharged by her non-medical employer for refusing to release other employees' confidential medical information. The plaintiff there argued that fundamental to her employment was the understanding that she would conduct her medical practice on her employer's behalf in accordance with the ethical standards of the medical profession. 100 N.Y.2d at 90. In rejecting her claim of an implied-in-law contract, the court noted that "at the heart of our holding [in *Wieder*]" was that "Wieder and the law firm were engaged in a 'common professional enterprise,' the practice of law" and that "[b]ecause of their common endeavor, Wieder and his firm were *mutually* bound to follow DR 1-103(a)." *Id.* at 94 (emphasis in original). Thus, since the only  [*27] purpose of the employment relationship in *Wieder* was to provide legal services, it was an implied term that the employer would not "act in any way to impede or discourage [Wieder's] compliance" with the rules of ethics. *Id.* at 94 (quoting *Wieder*, 80 N.Y.2d at 638) (alteration in original). Horn, on the other hand, acted as a medical professional not just for the benefit of an employee-patient, but "in furtherance of her responsibilities as a part of corporate management." *Id.* at 95. The provision of medical services was neither the core nor the only purpose of her employment. *Id.*

In determining whether the plaintiff can rely on the *Wieder* exception, the court is presented with two questions: first, does *Wieder* extend to the relationship between an in-house attorney and its corporate employer? This question has not been squarely answered by any New York court and so this court must "make an estimate of what the state's highest court would rule to be its law." *Bailey Employment Sys., Inc. v. Hahn*, 655 F.2d 473, 477 (2d Cir. 1981).[3] And second, if *Wieder*

does apply here, was the plaintiff actually faced with the dilemma of choosing between her job and compliance with DR 1-103(a)'s reporting  [*28] requirements?

The court concludes that New York case law does not support extending the *Wieder* exception to in-house counsel at a corporation. Unlike *Wieder*, the plaintiff and her employer did not have a mutual obligation to comply with DR 1-103(a). Moreover, like the physician in *Horn*, the plaintiff's duties were not limited to her role as an attorney, but were also "in furtherance of her responsibilities as a part of corporate management." *Horn*, 100 N.Y.2d at 95. In addition to her position as General Counsel, she was also Senior Vice President and Corporate Compliance Officer of Medisys and served on the Boards of Brookdale Hospital and Neighborhood Health Providers. Compl. ¶¶ 93, 146. The Court of Appeals characterized the decision in *Wieder* as "narrow" and warned against creating "a broad new exception to the presumption of at-will employment" in the absence of a common professional enterprise founded on mutual ethical obligations,  [*29] *Horn*, 100 N.Y.2d at 96; *see also Dooley v. Metropolitan Jewish Health System*, No. 02-CV-4640, 2003 U.S. Dist. LEXIS 16520, 2003 WL 22171876, at *8 (E.D.N.Y. July 30, 2003) ("*Horn* reinforces the breadth of the employment-at-will rule and recognizes *Wieder's* 'narrow exception' as the result of a 'unique confluence of specific, related factors'") (citation omitted). As General Counsel and Corporate Compliance Officer, the plaintiff acted as both an attorney and as a member of management. Therefore, the absence of the reciprocal ethical obligations central to *Wieder* and the existence of the corporate management role considered by *Horn* leads this court to conclude that an in-house attorney in plaintiff's position cannot assert a breach of contract claim for retaliatory discharge.

Even if *Wieder* could apply here, it does not appear that the plaintiff has alleged that she was fired for

---

[3] While the court of appeals may certify open questions of state law to the New York Court of Appeals, district courts must decide these issues. *See Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group. PLC*, 150 F.3d 194, 202 n.7 (2d Cir. 1998).

conduct protected by that decision. In *Wieder* and subsequent cases, many of which are cited by the plaintiff, discharged law firm associates have maintained actions for retaliatory discharge where they reported, threatened to report, or advised firm management to report violations of the New York Rules of Professional Conduct to the Disciplinary [*30] Committee. *See Kelly v. Hunton & Williams*, 97-CV-5631, 1999 U.S. Dist. LEXIS 9139, 1999 WL 408416, at *8-*9 (E.D.N.Y. June 17, 1999) (applying *Wieder* where associate was fired in retaliation for reporting misconduct within the firm and was discouraged from reporting the misconduct to the Disciplinary Committee); *Lichtman v. Estrin*, 282 A.D.2d 326, 326-28, 723 N.Y.S.2d 185 (1st Dep't 2001) (allowing *Wieder* claim by associate who internally complained of potential ethics violation but did not yet have an ethical obligation to report to the Disciplinary Committee because violation had not happened yet); *cf. Geary v. Hunton & Williams*, 257 A.D.2d 482, 483, 684 N.Y.S.2d 207 (1st Dep't 1999) (rejecting *Wieder* claim where plaintiff was discharged before he raised ethics concerns to employer and had never intended to report misconduct to the Disciplinary Committee); *Rojas v. Debevoise & Plimpton*, 167 Misc. 2d 451, 455, 634 N.Y.S.2d 358 (N.Y. Sup. 1995) (no *Wieder* claim where plaintiff had no legal or ethical obligation to cooperate with FBI investigation of law firm partner and was not faced with choice between continued employment and reporting misconduct to disciplinary authorities).

[TEXT REDACTED BY THE COURT]

[TEXT [*31] REDACTED BY THE COURT]

*See* Section IV, below. The plaintiffs actions may have been correct, but under New York law as it stands, she cannot maintain a *Wieder* claim where she was not placed "in the position of having to choose between continued employment and [her] own potential suspension and disbarment" for failing to comply with the ethical rules. *Wieder*, 80 N.Y.2d at 636-37.

Accordingly, because the court concludes that there

are no set of facts under which the plaintiff could recover for breach of contract or implied contract against the defendants, her first and second causes of action should be dismissed with prejudice.

## C. CLAIMS 3 AND 4 : TORTIOUS INTERFERENCE AND WRONGFUL DISCHARGE

The plaintiff's third and fourth claims allege "Tortous [sic] interference with contract" and "Wrongful discharge/retaliatory discharge." *See* Compl. ¶¶ 268-82. These claims are based on the same conduct as the plaintiff's contract claims. Like the contract claims, they too fail to state claims sounding in tort on the basis of that conduct.

[TEXT REDACTED BY THE COURT] As noted in the plaintiff's brief, a tortious interference with contract claim requires a legally enforceable contract. See Pl. MTD Opp., [*32] at 37 n.58 (citing *Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 646 N.Y.S.2d 76 (1996) (elements of a tortious interference claim include an "actual breach of the contract")). As discussed above, the plaintiff does not allege any facts demonstrating that she had a contract with any of the defendants.

The plaintiff also cannot circumvent the contract requirement by casting her cause of action as tortious interference with employment rather than tortious interference with contract. Some courts have allowed at-will employees to assert a cause of action for tortious interference with employment where the plaintiff can demonstrate that the defendant "utilized wrongful means to effect his or her termination." *McHenry v. Lawrence*, 66 A.D.3d 650, 651, 886 N.Y.S.2d 492 (2d Dep't 2009). In order to maintain such a claim against her co-employees, the plaintiff is required to allege that they acted outside the scope of their authority in persuading the employer to terminate and that she suffered an injury independent of the termination itself. *Kanhoye v. Altana Inc.*, 686 F. Supp.2d 199, 215 (E.D.N.Y. 2009) (citing *Albert v. Loksen*, 239 F.3d 256, 275 (2d Cir. 2001)); *Barcellos v.*

*Robbins*, 50 A.D.3d 934, 935, 858 N.Y.S.2d 658 (2d Dep't 2008). [*33] Thus, in addition to the termination, the plaintiff must allege that the defendants' actions "involved independent tortious acts such as fraud or misrepresentations" or that they "acted purely for malice or self interest." *Kanhoye*, 686 F. Supp. 2d at 215 (quoting *Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996)).

The plaintiff has failed to allege that she suffered any Injury separate and distinct from the termination of her at-will employment or that the defendants' actions were outside the scope of their employment. The plaintiff makes several allegations in support of her claim that the defendants acted with "malice, hate, and in revenge" (Compl. ¶¶ 103, 256, 267, 275, 282, 302, 310) in pursuing her termination:

> [TEXT REDACTED BY THE COURT]
> [TEXT REDACTED BY THE COURT] the trustees voted to terminate the plaintiff. Compl. ¶¶, 205.

[TEXT REDACTED BY THE COURT] *See McHenry*, 66 A.D.3d 650, at 652, 886 N.Y.S.2d 492 (former co-workers who brought concerns to managing attorney and human resources administrator were acting within the scope of their employment); *Murray v. SYSCO Corp.*, 273 A.D.2d 760, 761-62, 710 N.Y.S.2d 179 (3d Dep't 2000) (finding that former employer's letter to the plaintiff's new employer [*34] seeking help in enforcing non-compete agreement was economically justified to extent he was acting to protect his business); *Barcellos*, 50 A.D.3d at 935 (holding that "plaintiff's conclusory allegations that the defendants made 'false and malicious' statements in their 'libelous' campaign against her, without more, were insufficient to place their actions outside of the scope of their employment"). Although the plaintiff alleges that [TEXT REDACTED BY THE COURT] this does not provide her with a cause of action against them.

The plaintiff's claim for "wrongful discharge/retaliatory discharge" also fails. Since the plaintiff does not cite any cases recognizing such a claim, it would appear that she is attempting to assert the tort of abusive discharge here. The allegations underlying this claim are similar to the plaintiffs contract claims. *See* Compl. ¶ 277. As noted by the New York Court of Appeals, New York does not recognize the tort of abusive discharge for an at-will employee. *Wieder v. Skala*, 80 N.Y.2d at 638-39; *Barcellos*, 50 A.D.3d at 935. The plaintiff's third and fourth causes of action should therefore be dismissed with prejudice.

### D. CLAIMS 5 AND 17: BREACH OF FIDUCIARY DUTY [*35] AND NEGLIGENCE

In her fifth claim for relief, entitled "Breach of Trustees fiduciary duties of trust, care, loyalty and obedience" the plaintiff alleges that the trustees breached their fiduciary duty to her by, *inter alia*,

[TEXT REDACTED BY THE COURT] She alleges that she has standing under the "New York State Not for Profit Law, EPTL law, Common Law and Equity" to bring an action where she "believes that the Directors and Management are committing waste or fraud placing their own interest before the corporation," Compl. ¶ 284. In her seventeenth claim, entitled "Negligence/Gross Negligence" the plaintiff alleges that all of the defendants were negligent in "their failure to comply with their fiduciary duties to the Corporations and failing to treat the Plaintiff with fairness and within the bounds of the law and their own Compliance program, policies, and procedures." Compl. ¶ 433. This claim is again based in the plaintiffs alleged wrongful termination. Compl. ¶ 434.

As to the breach of duty to the corporation, the plaintiff has not provided the court with any authority (nor is the court aware of any) holding that a former general counsel or employee of a company has standing to bring [*36] claims for breach of fiduciary duty on behalf of the corporation. Likewise, the plaintiff has not demonstrated the existence of any fiduciary duty owed to her recognized in law. Rather, she makes

allegations that the board owed her due process in accordance with the internal code of conduct and that they breached these promises in the termination process. At most, this amounts to a claim for negligent discharge, which is not available to an at-will employee in the plaintiffs position. *See, e.g. Colodney v. Continuum Health Partners, Inc.*, No. 03-CV-7276, 2004 U.S. Dist. LEXIS 6606, 2004 WL 829158, at *6 (S.D.N.Y. April 15, 2004) (granting motion to dismiss negligent discharge claim by at-will employee who had alleged that the defendant had an "obligation to conduct a good faith investigation" into the charges that led to his termination); *see also De Petris v. Union Settlement Ass'n.*, 86 N.Y.2d 406, 410, 657 N.E.2d 269, 633 N.Y.S.2d 274 (1995) (New York "neither recognizes a tort of wrongful discharge nor requires good faith in an at-will employment relationship"); *Valvo v. Chautauqua Area Girl Scout Council, Inc.*, 159 A.D.2d 1021, 552 N.Y.S.2d 727 (4th Dep't 1990). The plaintiff's fifth and seventeenth claims should therefore be dismissed [*37] with prejudice.

### E. CLAIM 18: VIOLATION OF THE LABOR LAW

In the eighteenth cause of action, the plaintiff alleges that the defendants failed "to pay the Plaintiff accrued and earned vacation time within a reasonable time as required by the New York State Labor Law." Compl. ¶ 442. The plaintiff does not provide the court with a statutory provision that supports this claim. She does not dispute, however, the defendants' contention that New York Labor Law § 198-c governs the claim. Nor does the plaintiff dispute that the rights created by that statute do not apply to a person "in a bona fide executive, administrative, or professional capacity whose earnings are in excess of nine hundred dollars a week." *See* McKinney's Labor Law § 198-c (3); *Taverna v. Credit Suisse First Boston (USA), Inc.*, No. 02-CV-5240, 2003 U.S. Dist. LEXIS 1607, 2003 WL 255250, at *5 (S.D.N.Y. Feb 04, 2003). By the plaintiffs own allegations, she held an executive position with the defendants and was

earning over $7,000 per week when she was terminated. Compl. ¶¶ 93, 147. Therefore, the plaintiff's eighteenth claim should be dismissed with prejudice.

### F. UNNUMBERED CLAIM FOR PUNITIVE DAMAGES

Between her eighteenth and nineteenth claims, the plaintiff [*38] includes an unnumbered section entitled "Punitive Damages — Bad Faith." *See* Compl. ¶¶ 77-78. To the extent this is an attempt to assert a separate *claim* for punitive damages (as opposed to seeking an award of punitive damages on a substantive claim), this cause of action should be dismissed with prejudice. *See Aronis v. TLC Vision Centers, Inc.*, 49 A.D.3d 576, 577, 853 N.Y.S.2d 621 (2d Dep't 2008) ("New York does not recognize an independent cause of action for punitive damages") (citation omitted).

### G. CLAIM 19: DEFAMATION

In order to state a claim for defamation under New York law, the plaintiff must allege "(1) a false and defamatory statement of fact, (2) concerning the plaintiff, (3) published without privilege or authorization to a third party by the defendant, (4) constituting fault as judged by, at a minimum, a negligence standard, and (5) causing special harm or constituting defamation *per se*. *Gristede's Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06-CV-1260, 2009 U.S. Dist. LEXIS 111675, 2009 WL 4547792, at *8 (E.D.N.Y. Dec. 1, 2009).[5] In federal court, a claim for defamation is not subject to particularized pleading but is governed by Rule 8 of the Federal Rules of Civil Procedure and must be "specific [*39] enough to afford defendant sufficient notice of the communications complained of to enable him to defend himself." 2009 U.S. Dist. LEXIS 111675, [WL] at *9 (quoting *Kelly v,*

---

[5] Defamation consists of the "'twin torts of libel and slander'... Spoken defamatory words are slander; written defamatory words are libel." *Colodney*, 2004 U.S. Dist. LEXIS 6606, 2004 WL 829158, at *7 (quoting *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001)).

*Schmidberger*, 806 F.2d 44, 45 (2d Cir. 1986) (internal quotation marks omitted)). The court will look to whether the complaint identifies who made the alleged defamatory statement, when it was made, in what context it was made, whether it was oral or in writing, and whether it was made to a third party. *Nickerson v. Communication Workers of America, Local* 1171, No. 504-CV-875, 2005 U.S. Dist. LEXIS 35496, 2005 WL 1331122, at *7 (N.D.N.Y. May 31, 2005); *Ford v. Clement*, 834 F. Supp. 72, 77-78 (S.D.N.Y. 1993), aff'd 29 F.3d 621 (2nd Cir. 1994) (dismissing defamation claim where plaintiff alleged that the defendant spread false allegations "verbally and in writing" to specific individual but did not identify what those false statements were or when they took place).

The Complaint alleges that the defendants defamed the plaintiff by "written words, [*40] and, by spoken statement and by their actions" in the following ways: (1) "by posting Plaintiff picture prominently on the Police Wanted Board next to criminal wanted individuals, deviants and gang members";[6] (2) "continuing to prevent Plaintiff from gaining employment by slandering her to potential employers"; (3) "by referring and telling employees, patients, visitors and guest [sic] that she is a criminal, and is responsible for the criminal investigation." Compl. ¶¶ 446-451; *see also* ¶¶ 126, 127, 132. She also alleges that this is defamation per because the allegedly defamatory statements damaged her reputation in her field and resulted in her inability to gain employment. Compl. ¶¶ 450-51.

Citing *Wells v. Goord*, 29 Fed. Appx. 693 (2d Cir. 2002), the defendants contend that the posting of the plaintiff's picture is conduct and does not qualify as a statement subject to a defamation claim. Joint MTD, at 26. *Wells*, however, dismissed the action [*41] because the statement that the

plaintiff complained of was not in fact false. 29 Fed. Appx. at 694. In *Regan v. Sullivan*, the Second Circuit held that the publication of an individual's picture in the police department's "rogues gallery" stated a claim for defamation. 557 F.2d 300, 308-09 (2d Cir. 1977). The court noted that a false statement that one is a criminal or is arrested for a crime is considered libel under New York law, and that the publication of a photograph can constitute libel. *Id*. Thus, the court concluded, "[w]hether exhibition of a photograph in a 'rogues' gallery' carries with it the clear implication that the person portrayed is a criminal is a question for the jury." *Id*. at 309. In connection with the posting of this photograph, the plaintiff also alleges that on January 21, 2010, Ms. Genco, an individual who was mistaken for the plaintiff, "was told by Security Officer Cameron at Brookdale Hospital, that Plaintiff was banned from the Hospital because the Plaintiff caused the federal investigation and was going to jail." Compl. ¶ 132. The Complaint alleges that the officer was acting within the scope of his authority as an employee of the defendants when he made [*42] this statement. Compl. ¶¶ 126-27, 213; *Lutzker v. Novo Nordisk Pharmaceuticals, Inc*., No. 07-CV-3272, 2008 U.S. Dist. LEXIS 26604, 2008 WL 905040, at *5-*6 (E.D.N.Y. Apr. 2, 2008); *Corrigan v. Bobbs-Merrill Co*., 228 N.Y. 58, 68, 126 N.E. 260 (1920) (corporation can be held liable for libel published by employee acting within scope of his authority). Thus, allegations that the defendants authorized, approved, or directed the posting of the plaintiff's picture on a police wanted board and statements to a third party on a specific date that she was the subject of a criminal investigation state a claim for defamation.

The defendants assert that these communications are protected by an employer's qualified privilege to communicate with employees that the plaintiffs access to the premises was restricted after the termination of her employment. Defs. MTD Reply, at 9. ft is true that "even if a statement is defamatory, a qualified privilege exists where the communication is made to persons who share a

---

[6] Although the plaintiff does not explicitly allege where the picture was posted, the court reads the Complaint as alleging that the picture of plaintiff was only posted in the security office of Brookdale Hospital. *See* Compl. ¶¶ 208-210, 212.

common interest in the subject matter." *Silverman v. Clark*, 35 A.D.3d 1, 10, 822 N.Y.S.2d 9 (1st Dep't 2006). Thus, the defendants correctly argue that their communications to their employees that the plaintiff was not permitted on the [*43] premises would likely be privileged. *See Anderson v. Our Lady of Mercy Medical Center*, 31 A.D.3d 270, 270-71, 819 N.Y.S.2d 497 (1st Dep't 2006); *Serratore v. Am. Port Servs.*, 293 A.D.2d 464, 739 N.Y.S.2d 452 (1st Dep't 2002). However, the privilege is qualified and will not apply where the statements are communicated to persons who do not have a common interest in the subject matter or if they are made with malice. *Silverman*, 35 A.D.3d at 10-11. Moreover, a claim of qualified privilege is "an affirmative defense to be raised in defendants' answer" rather than on a motion to dismiss. *See Wilcox v. Newark Valley Central School District*, 74 A.D.3d 1558, 1562, 904 N.Y.S.2d 523 (3d Dep't 2010); *Garcia v. Puccio*, 17 A.D. 3d 199, 201, 793 N.Y.S.2d 382 (1st Dep't 2005); *see also Flaherty v. All Hampton Limousine, Inc.*, No. 02-CV-4801, 2008 U.S. Dist. LEXIS 54321, 2008 WL 2788171, at *8 (E.D.N.Y. July 16, 2008). The plaintiff has alleged that her picture was posted "in the Security Office for all to see." (Compl. ¶ 210). The security officer's statement to Ms. Genco was uttered in public and may have been overheard by outside parties who do not have a common interest with the hospital. Moreover, the plaintiff [*44] has sufficiently alleged that the defendants' conduct was done with malice. Malice may be shown by "'knowledge that [the statement] was false or . . . reckless disregard of whether it was false or not'" *Liberman v. Gelstein*, 80 N.Y.2d 429, 437-38, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 11 L. Ed. 2d 686). There is no indication that the plaintiff was charged with any crimes, so any statement indicating that she had been charged would be made either with knowledge of, or with reckless disregard of, its falsity. Compl. ¶¶ 166, 458. On this record, viewing the allegations in the Complaint in the light most favorable to plaintiff, these

allegations state a claim for defamation and do not on their face give way to the qualified privilege.

The plaintiff's remaining allegations do not support a claim for defamation. She alleges that "Co-Defendants Fogler and Kahn made insulting and demeaning comments to Ms. Feely, former risk manager and other staff in attempt to ruin Plaintiffs good name." Compl. ¶ 134. She also alleges that employees at the hospital who resembled her were stopped by hospital security and mat on an unspecified date, an unidentified security officer yelled at one such [*45] individual, stating "'You do not belong here Ms. Johnson' 'Get out and Stay out.'" Compl. ¶ 130. The first of these statements does not specify the false statement, its context, or its approximate date and certainly does not provide the defendants with notice of what the plaintiffs' claim is. *See Nickerson*, 2005 U.S. Dist. LEXIS 35496, 2005 WL 1331122, at *7; *Ford*, 834 F. Supp. at 77-78. As to the second statement, there is no allegation that this statement was false or defamatory to the plaintiff. The plaintiff does not contest that she was discharged and not permitted on the hospital premises. Therefore, to the extent the plaintiff wishes to assert defamation based on these statements, she should provide more specific allegations in an amended complaint.[7]

## H. GENDER-RELATED CLAIMS

The defendants also move to dismiss the sex-based discrimination claims in the complaint, except the hostile working environment claims in the plaintiff's eighth and eleventh causes of action. *See* [*46] Rosen MTD Supp.; Joint MTD Reply, at 1.[8] These claims are brought under the New York State and New York City Human Rights laws ("NYSHRL" and "NYCHRL" respectively) and can

---

[7] The plaintiff identifies other allegedly defamatory statements in her brief. MTD Opp, at 6. She should also be afforded the opportunity to assert claims based on these statements in an amended pleading.

[8] Neither do the defendants move to dismiss the sixteenth cause of action, which asserts a host of federal claims that appear to rest primarily on her allegations of gender discrimination.

be divided into three categories: claims for retaliation, claims for "quid pro quo" sexual harassment, and claims for gender discrimination. As discussed below, all of these claims should be dismissed for failure to state a claim but the plaintiff should be given the opportunity to renew her claims in an amended complaint.[9]

In evaluating the plaintiff's allegations concerning these claims, the court notes that, analytically, "[t]he same framework applies to discrimination and retaliation claims brought pursuant to the New York State [*47] Human Rights Law and the New York City Human Rights Law . . . and pursuant to 42 U.S.C. § 1981." *Blanc v. Sagem Morpo, Inc.*, 394 Fed. Appx. 808, 809 (2d Cir. 2010) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) and *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010)). Nevertheless, claims under the NYCHRL must be treated somewhat differently from claims under federal laws and the NYSHRL. Although "New York courts have consistently looked to federal case law in expounding the New York Human Rights law," *Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438 n. 1 (S.D.N.Y. 1996), the NYCHRL was amended to require "an independent liberal construction analysis in all circumstances, even where state and federal civil rights have comparable language." *Williams v. New York City Housing Authority*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27 (1st Dep't 2009). Thus, claims brought pursuant to the New York City Human Rights Law "'must be reviewed independently from and more liberally than their federal and state counterparts.'" *Blanc*, 394 Fed. Appx. at 809-10 (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 U.S. 268, 278 (2d Cir. 2009)).

## 1. CLAIMS [*48] 6, 14, AND 15: RETALIATION

---

[9] The defendants note that, at this stage, the plaintiff's omission of the relevant dates of the discriminatory activity makes it impossible for them to challenge any of the claims based on the three-year statute of limitations but they reserve the right to do so at a future time. Rosen Supp. MTD, at 10 n.9.

The plaintiff's sixth, fourteenth, and fifteenth causes of action assert retaliatory discharge claims under § 296(1)(a) of the NYSHRL and § 8-107 of the NYCHRL. *See* McKinney's Executive Law § 296; N.Y.C. Admin. Code § 8-107. To state a claim for retaliation, the plaintiff must plead facts showing that: (1) she engaged in "protected activity;" (2) her employer was aware that she participated in such activity; (3) she suffered an adverse employment action based upon her activity; and (4) there is a causal connection between the protected activity and the adverse action. *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007); *Hanig v. Yorktown Central School District*, 384 F. Supp. 2d 710, 724-25 (S.D.N.Y. 2005) (addressing elements of retaliation claim under ADA and § 296 of the NYSHRL); *Jenkins v. St. Luke's-Roosevelt Hosp. Center*, No. 09-CV-12, 2009 U.S. Dist. LEXIS 105866, 2009 WL 3682458, at *8 (S.D.N.Y. Oct. 29, 2009) (noting the elements of claim for retaliation under Title VII and NYSHRL). The NYCHRL prohibits retaliation "in any manner" and "need not result in an ultimate action with respect to employment . . . or in a materially adverse change in the terms and conditions of employment." [*49] N.Y.C. Admin. Code. § 8-107(7). Although the standard under the NYCHRL has not been fully articulated, the Second Circuit has stated that the "proper inquiry under the CHRL is whether a jury could reasonably conclude from the evidence that" the employer's conduct was "reasonably likely to deter a person from engaging in protected activity, without taking account of whether the employer's conduct was sufficiently deterrent so as to be material." *Fincher*, 604 F.3d at 723 (quoting *Williams*, 61 A.D.3d at 71, 872 N.Y.S.2d at 34) (internal quotation marks and alterations omitted).

"'[P]rotected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz*, 202 F.3d at 566. The plaintiff has alleged that Rosen, who was her supervisor, consistently sent her inappropriate emails, requested that she meet with htm socially, and touched her inappropriately in an attempt to

engage her in a romantic relationship. Compl. ¶¶ 8, 241. She alleges that "Plaintiff did not respond to [Rosen's] inappropriate emails, or sometimes just acknowledge receipt" and "Plaintiff consistently refused to respond or engage in a romantic relationship with Rosen, which angered Rosen [*50] and was one of the reasons he ultimately sought to terminate Plaintiff [sic] employment." Compl. ¶ 243, 245. While a complaint to management would constitute protected activity, the plaintiff does not allege with any specificity that she ever affirmatively complained to Rosen or anyone else about his advances.[10] The plaintiff has sufficiently alleged, however, that she consistently refused or ignored Rosen's advances. *See* Compl. ¶ 245.

The defendants argue that the refusal to submit to sexual advances does not constitute "protected activity" for purposes of a retaliation claim. New York courts are split on this issue. *See Wagner v. Burnhams* 03-CV-1522, 2006 U.S. Dist. LEXIS 6659, 2006 WL 266551, at *17 (N.D.N.Y. Feb. 1, 2006) (noting split of authority and that most courts find that refusal of a supervisor is protected activity); *Little v. National Broadcasting Company, Inc.*, 210 F. Supp. 2d 330, 385-86 (S.D.N.Y. 2002) (noting the split of authority of the district courts in the Second Circuit and holding that mere refusal of sexual advances could constitute protected activity). In *Wilcox*, decided at the motion-to-dismiss stage, the plaintiff alleged that she engaged in protected activity when she refused her supervisor's sexual advances on several occasions

and when confronted about her discomfort around him, told him that they could not reconcile their differences. *Wilcox v. PRC of New York Limited Partnership*, No. 95-CV-1292, 1997 U.S. Dist. LEXIS 3854, 1997 WL 141682, at *11 (N.D.N.Y. 1997). The statement to the harasser was "innocuous at best," but "[w]hen coupled with her [*52] allegations that she made every effort to avoid being alone or in social situations with [the harasser] and refused to discuss non-work-related matters with him, however, this response could be viewed . . . as a complaint to management about the harassment." *Id.* In coming to this conclusion, the court noted that absent filing a formal complaint, there was no one to whom the plaintiff could complain, as the harasser was her direct supervisor, President of the company, and general partner of the partnership that employed her. *Id.* Thus, these allegations were sufficient to establish a protected activity on a motion to dismiss, but not necessarily at summary judgment. *Id.* & n. 13.

There is no reason to disagree with the view of the majority of courts that allegations that an employee consistently refused her supervisor's sexual advances constitutes "protected activity" for purposes of a retaliation claim. *See Little*, 210 F. Supp. 2d at 386 ("Sexual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct"). This conclusion is particularly appropriate as to the claims brought under the New York City law. *See* NYCHRL § 8-107[7] [*53] (protecting a person who has "opposed any practice forbidden under this chapter"). The plaintiff's allegations here, alleging resistance to consistent harassment by her supervisor over the course of eight years, resemble those found to constitute "protected activity" in *Wilcox*. Moreover, the plaintiff has sufficiently alleged that Rosen was aware of this protected activity.

The plaintiff has failed to allege, however, any retaliation by the defendants in response to her refusal to engage Rosen's advances. A plaintiff may demonstrate a causal connection either (1)

---

[10] The plaintiff's allegations that she made "complaints of sexual harassment and discrimination to defendants" are conclusory and provide no specificity concerning what complaints were made, when they were made, and to which defendant they were directed. Compl. ¶ 398. In her brief, she asserts that she reported the harassment to both Rosen and Doss on more than one occasion. MTD Opp. at 39, n. 75. While plaintiff may be able to allege that she made "[a] direct complaint about prohibited conduct to a supervisor" in an amended pleading, even if that supervisor is Rosen, she has not done so. *Cf. Gallo v. Alitalia-Linee Aeree Italiane-Societa per Azioni*, 585 F. Supp.2d 520, 542 (S.D.N.Y. 2008) (finding that a direct complaint to plaintiff's supervisor that [*51] the plaintiff opposed the supervisor's discriminatory conduct constituted protected activity).

indirectly, by showing that "the protected activity was followed closely by discriminatory treatment," or by showing "disparate treatment of fellow employees who engaged in similar conduct," or (2) directly by "using evidence of retaliatory animus directed against plaintiff by the defendant." *Little*, 210 F. Supp. 2d at 384-85 (quoting *Rodriguez v. Beechmont Bus. Svc, Inc*., 173 F. Supp.2d 139, 150 (S.D.N.Y. 2001) (internal quotations omitted). The plaintiff alleges that "one of the reasons [Rosen] ultimately sought" her dismissal is because she refused his advances. Compl. ¶ 245. While she alleges that she consistently refused [*54] Rosen's advances over the course of her employment, she was not terminated until eight years into that employment period. She has not alleged either any temporal connection between the protected activity and the termination or other circumstantial evidence like a verbal or written statement evincing retaliatory intent. *See e.g. Patane*, 508 F.3d at 116-17; *Murdaugh v. City of Mew York*, No. 10-CV-7218, 2011 U.S. Dist. LEXIS 23333, 2011 WL 798844, at *5 (S.D.N.Y. Mar. 8, 2011). In contrast, she alleges that she was terminated

According to the complaint, prior to the [TEXT REDACTED BY THE COURT] the plaintiff was promoted, received regular raises, and received benefits like the use of a luxury car. Compl. ¶¶ 146-47. She alleges that Rosen and Doss promised her that her employment was secure and that she would continue to receive good treatment. Compl. ¶ 147. While she makes a generalized assertion in her *brief* that she was terminated "a few months" after complaining to Mounir Doss about Rosen and Bruce Flanz's "conduct" and that she filed a written complaint with Doss, there are no such allegations in the Complaint. MTD Opp. at 26. Even viewing her NYCHRL claims independently, the failure to link the protected activity [*55] to retaliation requires dismissal of the claims. *See Williams*, 61 A.D.3d at 71 (plaintiff's City and State Human Rights claims dismissed where the conduct complained of was not "linked" to a retaliatory motivation). Thus, claims six, fourteen, and fifteen fail to state a claim for retaliation and should be dismissed with leave to replead the fourteenth and fifteenth in an amended complaint.[11]

## 2. CLAIMS 9 AND 12: QUID PRO QUO SEXUAL HARASSMENT

In her ninth and twelfth causes of action, the plaintiff claims that she was the victim of *quid pro quo* sexual harassment in violation of NYSHRL §296(1)(a) and NYCHRL § 8-107. Compl. ¶¶ 336-50, 377-91. These statutes make it unlawful for an employer to discriminate against a person "in the terms, conditions or privileges of employment" on the basis of their gender. While there is "no 'sexual harassment' provision of the law to interpret," sexual harassment is "one species of sex- or gender-based discrimination." *Williams*, 61 A.D.3d at 75. "Courts have traditionally recognized two types of sexual harassment: *quid pro quo* harassment, which involves a threat which is carried out, and hostile work environment harassment, where there is offensive conduct that is severe or pervasive." *Wagner*, 2006 U.S. Dist. LEXIS 6659, 2006 WL 266551, at *6 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752-53, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)) (internal quotation marks and alterations omitted). The plaintiff alleges that she was subject to both types of harassment, presenting *quid pro quo* claims under New York State and City Human Rights laws in [*57] the ninth and twelfth causes of action and hostile work environment claims in her eighth and eleventh causes of action. The

---

[11] The defendants also argue that the plaintiff's sixth cause of action should be dismissed as duplicative of her eleventh, twelfth, and fifteenth causes of action and that her thirteenth cause of action should be dismissed as duplicative of her seventh and tenth causes of action. As to the sixth cause of action, the court agrees, since all four causes of action assert claims under NYCHRL § 8-107 and the sixth simply asserts in one claim the separate violations asserted in the other three. On the other hand, while the thirteenth cause of action proceeds under the same statutes as the seventh and tenth causes of action, it presents an additional aiding and abetting theory of recovery. Thus, the court recommends that only the sixth cause of action be dismissed with prejudice as duplicative of the [*56] eleventh, twelfth, and fifteenth causes of action.

defendants move to dismiss only the *quid pro quo* sexual harassment claims. *See* Rosen MTD Supp. at 4 n.4.

"To state a quid pro quo claim, [the plaintiff] must show a 'tangible employment action,' i.e., that an 'explicit. . . alteration[] in the terms or conditions of employment' resulted from her refusal to submit to [Rosen's] sexual advances." *Schiano v. Quality Payroll Systems, Inc*., 445 F.3d 597, 604 (2d Cir. 2006). "A tangible employment action, as defined by the Supreme Court, 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'. . . 'A tangible employment action in most cases inflicts direct economic harm.'" *Mormol v. Costco Wholesale Corp*., 364 F.3d 54, 57 (2d Cir. 2004) (quoting *Ellerth*, 524 U.S. at 761-62). While an actual economic loss is usually the hallmark of a "tangible employment action," it is not present in all cases. *See, e.g. Jin v, Metro. Life Ins. Co*., 310 F.3d 84, 97 (2d Cir. 2002) [*58] (plaintiff suffered tangible employment action where she avoided economic harm by submitting to the supervisor's sexual advances). As explained by the Supreme Court, "[c]ases based on threats which are carried out are referred to often as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Ellerth*, 524 U.S. at 751.

As discussed above, the plaintiff has failed to sufficiently allege that her termination was the result of her refusal to submit to Rosen's advances. In the alternative, the plaintiff argues that she was forced to tolerate an environment where she was subject to "discriminatory, humiliating, sexually perverted, filthy, lewd, unwelcome, crude and inappropriate behavior, jokes, innuendo, remarks, gestures, comments, discussions and unwanted physical contact and sexual advances by Defendants" in exchange for her continued employment. Compl. ¶¶ 337, 339, 378, 380. In

support of this allegation, the plaintiff alleges that she was forced to share an office with Rosen at two locations and that he would make crude comments and gestures to her. Compl. ¶ 242. While these allegations [*59] may well establish a hostile work environment claim,[12] she has not alleged a causal link between her refusal to submit to Rosen's advances and being subjected to this unwelcome behavior. She has not alleged that she understood that she would be given her own office and that the unwelcome behavior would stop if she submitted to Rosen's advances. Nor has she alleged, for example, that she was moved into a shared office as a result of her refusal to submit to Rosen's demands. *See Jin*, 310 F.3d at 91. Even analyzing these allegations under the more lenient standards required under the NYCHRL, the failure to allege a causal link between her refusal and the complained of terms of her employment are fatal to the plaintiff's *quid pro quo* claims. *See Kolenovic v. ABM Industries Inc*., 361 Fed. Appx. 246, 248-49 (2d Cir. 2010) (affirming district court's dismissal at summary judgment of federal, state, and city *quid pro quo* claims for failure to demonstrate "requisite link" between the refusal and the failure to receive a raise).[13] The plaintiffs *quid pro quo* sexual harassment claims should therefore be dismissed with leave to replead in an amended complaint.

### 3. CLAIMS 7, 10, AND 13: GENDER

---

[12] Indeed, the defendants appear to [*60] concede that they do because they have not moved to dismiss the plaintiff's hostile work environment claims.

[13] Moreover, even if there was causation, these allegations do not amount to a tangible employment action. While no "other male employee had to share an office with Defendant Rosen," (Compl. ¶ 243) and the plaintiff has alleged her discomfort in having to do so, there is no indication that sharing an office with Rosen affected the plaintiff's employment status at all. *See Mormol*, 364 F.3d at 58 (citing *Savino v. CP. Hall Co*., 199 F.3d 925, 932 n.8 (7th Cir. 1999) (stating that "[a] tangible employment action has to cause a substantial detriment to the plaintiff's employment relationship," and that "reassignment to a comparable office is neither sufficiently adverse nor significant")).

DISCRIMINATION

The plaintiff's seventh and tenth causes of actions assert claims for "gender" or "sex" discrimination under the NYSHRL § 296 and NYCHRL § 8-107. Compl. ¶¶ 311-20, 351-61. The thirteenth cause of action attempts to allege a claim for aiding and abetting gender discrimination under the NYCHRL and NYSHRL. Compl. ¶¶ 392-95. The plaintiff's gender discrimination [*61] claims are largely duplicative of and based on the same allegations as her *quid pro quo* and hostile work environment harassment claims. *See* Compl. ¶¶ 311-14, 351-359, 392-395. She alleges that the "Defendants' discriminatory behavior and then retaliatory termination of Plaintiff's employment were made as a direct result of Plaintiff's gender, female, and show an animus of gender bias" and that "similarly situated male employees were treated differently than Plaintiff in respect to of Plaintiff terms, conditions, and privileges of employment." *See* Compl. ¶¶ 311-12, 352-53.

"The *sine qua non* of a gender-based discriminatory action claim . . . is that the discrimination must be *because* of sex. It is axiomatic that mistreatment at work . . . is actionable . . . only when it occurs because of an employee's sex or other protected characteristic." *Patane v. Clark*, 508 F.3d at 112 (citations and internal quotation marks omitted; emphasis in original). The Second Circuit has explained that "the action that is alleged to be gender-based must rise to the level of an 'adverse employment action' and that this action "must cause a 'materially adverse change in the terms and conditions of employment,' [*62] and not just 'mere inconvenience,' in order to qualify as 'adverse.'" *Id.* (citation omitted). As discussed above, this materiality requirement would be relaxed for the New York City claims, which are to be reviewed independently and more liberally than the federal and state statutes.

The defendants correctly argue that the plaintiff has not alleged an adverse employment action and that in any event, the allegations in support of this claim

are duplicative of her hostile work environment discrimination claims. The plaintiff has alleged that Rosen would not provide her with a private office "like the rest of the male Vice Presidents" and that she would have to share an office with him at Jamaica and Flushing Hospitals where he would make crude comments and gestures to her. Compl. ¶ 242. The court agrees that having to share an office with Rosen does not rise to the level of an adverse change in the terms and conditions of the plaintiff's employment sufficient to state a separate claim under either the New York City or State Human Rights law. Like the requirement of a tangible employment action for a *quid pro quo* claim, discussed above at footnote 13, the plaintiff must allege more here [*63] than the inconvenience of sharing an office with Rosen on some occasions. While these allegations may state a claim for gender discrimination based on a hostile work environment, the plaintiff has failed to allege a separate gender discrimination claim based on the sharing of the office alone. These claims should therefore be dismissed with leave to replead in an amended complaint.

## III. ADDITIONAL ARGUMENTS IN SUPPORT OF DISMISSAL

As discussed above, all of the plaintiffs' claims, except for those asserted in the eighth, eleventh, sixteenth, and nineteenth causes of action, should be dismissed either with or without prejudice. The defendants have also moved to dismiss all of the claims as to certain individuals and entities for lack of notice or on the basis of a privilege for trustees, directors, and officers of non-profit entities. These arguments are addressed below.

## A. IMMUNITY OF DIRECTORS, OFFICERS, OR TRUSTEES OF NON-PROFIT CORPORATIONS

The defendants argue that the individual defendants who are alleged to be trustees and officers of "not-for-profit" entities are immune from liability for actions taken in service of those entities under New

York's Not-for-Profit Corporation Law. [*64] *See* Joint MTD, at 9-10. The defendants do not, however, identify which claims against which individuals they seek to dismiss on § 720-a grounds. Under the relevant statutory provision,

> [N]o person serving without compensation as a director, officer or trustee of a corporation, association, organization or trust described in section 501 (c)(3) of the United States internal revenue code . . . shall be liable to any person other than such corporation, association, organization or trust based solely on his or her conduct in the execution of such office unless the conduct of such director, officer or trustee with respect to the person asserting liability constituted gross negligence or was intended to cause the resulting harm to the person asserting such liability. For purposes of this section, such a director, officer or trustee shall not be considered compensated solely by reason of payment of his or her actual expenses incurred in attending meetings or otherwise in the execution of such office.

McKinney's N-PCL § 720-a ("§ 720-a"). Thus, the statute would bar claims brought by the plaintiff against individuals for their conduct in their unpaid role as directors, officers, or trustees of [*65] the non-profit entities, even if they are paid for their work in other capacities. *See Johnson v. Black Equity Alliance, Inc*.,26 Misc. 3d 1219[A], 907 N.Y.S.2d 100, 2010 NY Slip Op 50178[U], 2010 WL 424040, *3 [Sup. Ct. N.Y. County 2010] (distinguishing between allegations in the complaint for conduct as nonpaid director of non-profit entity with those as a compensated consultant).

The defendants' motion to dismiss relies on a provision in New York's Civil Practice Rules that allows a defendant to raise the § 720-a defense at the motion to dismiss stage. *See* McKinney's CPLR § 3211(a)(11). New York's procedural rule requires a plaintiff to allege that there was a "reasonable probability" that the defendant's conduct was grossly negligent or intended to cause the plaintiff

harm, and permits the parties to present evidence on the issues of gross negligence, intent, and compensation in making a motion to dismiss. These procedural rules have no application here, however, given the well-established principle that when analyzing claims brought pursuant to state law, a federal court will apply the state's substantive law and federal procedural rules. *See Gasperini v. Cir. for Humanities*, 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996); *see also Hanna v. Plumer*, 380 U.S. 460, 473-74, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965); [*66] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *McCarthy v. Olin Corp*., 119 F .3d 148, 153 (2d Cir. 1997). The application of the "reasonable probability" standard and the procedure outlined in CPLR § 3211 (a)(11) for motions to dismiss is clearly found in the state's procedural rules, not in the statute. New York's Not-for-Profit Corporation Law does not impose any pleading requirements on a plaintiff to plead her substantive claims. Therefore, in federal court, the defendants cannot avail themselves of the §720-a defense at the motion to dismiss stage unless it is clearly established on the face of the Complaint. *Cf. Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (defendants could not rely on defense of prosecutorial immunity at motion to dismiss stage unless the nature of their conduct was "clear from the face of the complaint").

Although many of the defendants are alleged to be on the boards of non-profit corporations, it is not clear from the allegations in the Complaint which defendants are being sued solely in their capacities as unpaid officers, directors, or trustees of non-profit corporations. Indeed, except for Dr. Kahn, the defendants do not specify which defendants [*67] should be entitled to immunity under §720-a. The plaintiff has alleged, and the defendants do riot dispute, that Dr. Kahn received compensation in connection with his work for the defendant companies. *See* Compl. ¶ 292; Joint MTD, at 10. Therefore, the defendants' motion to dismiss the Complaint as to certain defendants on §720-a grounds should be denied. To the extent that the

plaintiff's allegations fail to provide these individual defendants with sufficient notice of the claims against them under the federal pleading standards, however, the claims against them should be dismissed on that basis. This issue is further discussed below.

## B. NOTICE TO INDIVIDUAL DEFENDANTS

The defendants also argue that the following individual defendants should be dismissed from the action because the Complaint contains no allegations of wrongdoing with respect to them: Neil Foster Phillips, Geraldine M. Chapey, Ph. D., Mr. Joseph Fetrara, Robert W. Koop, Dr. Anthony DiMaria, Dr. Geoffrey Doughlin, Dr. Hector Estepan, Dr. Antonietta Morisco, Douglas W.Singer, Archie Spigner, John Marus, Edward Birnbaum, Hugh Greenberg, Ascher L. Mestel, MD, R.C. Hugh Nelson, Richard Radutzky, Lowell M. Rubin, Alex Rovt, [*68] David I. Schachne, Edwin L. Schulman, Al Silverman, Allen B. Swerdlick, David R. Wilkes, Laurence C. Zale, Honorable Darrell Towns, Steven Plotnick, Esq., Diane Simon, Richard J. Fogler, MD, Mr. Michael J. Russo, Mr. Robert Reichenbach, Mr. Dino Guiducci, Charles Balducci, MD, Mr. Anthony Federici, Mr. Henry E. Froebel, Victor Guarneri, MD, Mr. Max Kupferberg, Ahamed Moideen, MD, Alvin I. Orlian, DDS, Mr. David P. Pagan, Mr. John E. Roe, Sr., William Lynch, Chris Y. Hwang, Peter Barra, MD, Victor Orioli, MD, L. Mestel and Diane Simon. Dr. A. Lawrence is described in ¶ 35 as if he were a defendant, but is not named in the caption. Paragraphs 90-91 of the Complaint reference "John Does" but they are not named in the caption or otherwise addressed in the Complaint.

The defendants are correct that to the extent that the plaintiff makes no particular allegations against these defendants, either individually, or as part of a group, she does not state a claim against them. Fed. R. Civ. P. 8 requires that the plaintiffs "indicate clearly the defendants against whom relief is sought, and the basis upon which relief is sought against the particular defendants." *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (S.D.N.Y. 1997) [*69] (quoting *Mathews v. Kilroe*, 170 F. Supp. 416, 417 (S.D.N.Y. 1959); *see also Morpurgo v. Incorporated Village of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010) ("It is well settled that where the complaint names a defendant in the caption but contains no allegations indicating how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that Defendant should be granted") (quoting *Dove v. Fordham Univ*., 56 F. Supp. 2d 330, 335 (S.D.N.Y. 1999)). Except for six of these defendants, discussed below, the individuals above are not mentioned at all in the Complaint other than in the section identifying the parties. No allegations of wrongdoing by them are made. The claims against these defendants should therefore be dismissed in their entirety, but with leave to replead.

The plaintiff does include more specific allegations as the conduct of Radutzky, Schulman, Rubin, Swerdlick, Fogler, and Phillips in the Complaint, but these allegations also fail to state a claim against these defendants. As to four of them - Radutzky, Schulman, Rubin, and Swerdlick - the only allegations against them are that they are Brookdale Trustees

[TEXT REDACTED BY [*70] THE COURT] These allegations do not assert any wrongdoing by these defendants. As to two others, Fogler and Phillips, the plaintiff alleges that Fogler made demeaning comments about her and that Phillips was her supervisor and discriminated against and retaliated against her. Compl. ¶¶ 13-15, 134, 164. As discussed above, the plaintiff's defamation claim based on Fogler's alleged statement fails because it provides no specificity as to what the statement was and when it was made. Also, as discussed above, the plaintiff's discrimination and retaliation claims should be dismissed. Therefore, the court should grant the defendants' motion to dismiss these individual defendants but with leave to replead in

an amended complaint.

## C DISMISSAL OF ENTITIES

The defendants also move to dismiss all of the entities named in the caption other than Medisys, Brookdale Hospital Medical Center, and Neighborhood Health Providers LLC on the grounds that the Complaint does not contain any allegations of wrongdoing by them. The court should grant this motion except that in addition to Medisys, Brookdale, and Neighborhood Health Providers, the court should also allow the action to proceed against Jamaica Hospital [*71] Medical Center and Flushing Hospital Medical Center.

To the extent the plaintiff has alleged that a defendant directly participated in the conduct that is the basis for her claims, she has provided sufficient notice to these entities of their alleged wrongdoing to defeat a motion to dismiss. *See, e.g., Moses v. Citicorp Mortgage, Inc.*, 982 F. Supp. 897, 903 (E.D.N.Y. 1997) (denying motion to dismiss where plaintiff accused both defendants of direct participation in violations of statute). In her claims based on her termination, the plaintiff has asserted allegations of wrongful conduct by Medisys, Brookdale, and Neighborhood Health Providers; as the defendants concede, these entities are provided with sufficient notice of the claims against them. *See* Compl. ¶¶ 104, 184-85, 205, 296. She has also asserted, however, that she was sexually harassed by Rosen while working at Jamaica Hospital Medical Center and Flushing Hospital Medical Center. Compl, ¶ 242. These allegations are also sufficient to provide these entities with notice of their alleged wrongdoing in relation to the plaintiff's gender-related claims.

As to the remaining entity defendants, who are not mentioned specifically in [*72] the Complaint, the plaintiff seeks to hold them liable by relying on a corporate veil-piercing theory because of their relationship with Medisys. *See* Pl. MTD Opp., at 13-17. She argues that "System's subsidiaries' parent corporation, Medisys (not for profit) may be

found liable for its subsidiaries corporation's actions or non actions under the direct participant theory, or under a direct, reverse or triangular piercing of the corporate veil." *Id.* at 14. The concept of piercing the corporate veil is an exception to the general rule that corporations exist independently of their owners and cannot be held liable for their actions and vice versa. It applies where "the owners of the corporation exercised complete domination over it in the transaction at issue and, in doing so, abused the privilege of doing business in the corporate form, thereby perpetrating a wrong that resulted in injury to the plaintiff." *East Hampton Union Free School District v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 126, 884 N.Y.S.2d 94 (2d Dep't 2009). Allegations supporting the inference that the defendant "abused the privilege" of the corporate form are a prerequisite to stating a claim based on a corporate [*73] veil piercing theory. *Id.* Factors that are considered in this analysis include "whether there was a 'failure to adhere to corporate formalities, inadequate capitalization, commingling of assets, and use of corporate funds for personal use.'" *Id.* at 127 (citation omitted); *see also AHA Sales, Inc. v. Creative Bath Products, Inc.*, 58 A.D.3d 6,24, 867 N.Y.S.2d 169 (2d Dep't 2008) (listing factors); *Gateway I Group, Inc. v. Park Avenue Physicians, P.C.*, 62 A.D.3d 141, 143, 877 N.Y.S.2d 95 (2d Dep't 2009) (allowing piercing of corporate veil where it was alleged *inter alia*, that corporation was undercapitalized, failed to adhere to corporate formalities, and defendant used corporate funds for personal purposes and exercised complete control over corporation). Conclusory allegations of "bad faith" or "domination and control" alone are insufficient. *AHA Sales*, 58 A.D.3d at 24.

The plaintiff's allegations in support of her theory of piercing the corporate veil (whether "direct, reverse, or triangular") are conclusory and fail to allege how Medisys or Rosen controlled the subject entities, what corporate formalities were ignored, whether the subject entities were inadequately capitalized, or [*74] any of the other factors outlined above. Plaintiff asserts generally that:

. . . MediSys controls all of the named Defendants corporations. MediSys has control over all of its member corporations, by virtue of MediSys' powers to remove the entire Board and transfer funds" (¶ 2);

[TEXT REDACTED BY THE COURT]

[TEXT REDACTED BY THE COURT]

Of these allegations, the plaintiff's only factual assertions are that Medisys has the power to remove the entire Board of its member corporations, that all of the members of the Board are the same, [TEXT REDACTED BY THE COURT] While these allegations might support a corporate veil piercing theory, they are not enough on their own to allege that Medisys or Rosen abused the privilege of the corporate form. Thus, the defendants' motion to dismiss the corporate defendants, except for Medisys, Brookdale Hospital Medical Center, Neighborhood Health Providers LLC, Jamaica Hospital Medical Center and Flushing Hospital Medical Center, should also be granted with leave to replead.

## IV. MOTION TO SEAL AND FOR INJUNCTIVE RELIEF

The corporate defendants move (1) to dismiss claims 1 through 5 and 17 concerning her termination because they assert that those claims cannot [*75] be maintained without revealing information protected by the attorney-client privilege, the work-product doctrine and ethical rules protecting client confidences, (2) to seal all or part of the record to protect this information, and (3) to temporarily restrain and preliminarily enjoin the plaintiff from publishing the Complaint to third parties or otherwise disclosing protected information to third parties. The court has preliminarily granted the defendants' motion to seal certain portions of the record pending the decision on these motions. Dkt No. 20; Dkt Entry at Nov. 19, 2010 (sealing Compl. ¶¶ 96, 153, 159, 163, 168, 172, 176 and Aug. 11, 2010 transcript).

The plaintiff argues that none of the allegations in the Complaint reveal privileged or confidential information, or in the alternative, that the defendants waived the privilege. The plaintiff also argues that even if the communications were protected, she may disclose this information by relying on exceptions to her duty to protect the privilege or confidences of her former employers.[14]

## A. THE INFORMATION AT ISSUE

The defendants contend that the plaintiff's knowledge of and communications about the following subjects are protected:

[TEXT REDACTED BY THE COURT][15] The defendants argue that these allegations, asserted by the company's former general counsel, reveal privileged and/or confidential information gained during her employment that she is precluded from revealing by the New York Rules of Professional Conduct.

## 1. LEGAL STANDARDS AND APPLICATION

---

[14] In support of their motions to seal and for injunctive relief, the defendants submit papers they filed in state court on an Order to Show [*76] Cause to seal the record and for injunctive relief, including a Memorandum of Law in Support of the Motion to Seal and for Injunctive Relief, dated March 19, 2010 (provided to the court but not filed electronically), and a Reply Affirmation of Randi Seltzer May, Esq. See Dkt Nos. 5, 6, 14, 16. The plaintiff's papers in opposition include an April 1, 2010 Affirmation of Patrick Johnson, Esq. with Memorandum of Law and Exhibits filed in opposition in state court and an April 30, 2010 Affirmation of Patrick Johnson, Esq. with Exhibits (Dkt No. 28). The parties have also filed several letters to the court regarding the defendants' motion to seal various portions of the record. See Dkt Nos. 74, 79, 80, 84.

[15] The defendants have moved to seal the entire record, or [*77] in the alternative, the following paragraphs of the Complaint and those court documents that reference them: 96, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 114, 119, 120, 121, 122, 136, 141, 142, 143, 153, 154, 155, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 195, 196, 197, 198, 199, 200, 201, 202, 204, 218, 220, 232, 233, 234, 235, 236, 237, 249, 261, 269, 285, 296. Dkt No. 24.

The attorney-client privilege protects confidential communications between a client and his attorney when made for the purpose of obtaining or providing legal advice. *United States v. Construction Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996). The work-product doctrine protects documents prepared principally or exclusively to assist in anticipated or ongoing litigation. *Id.* The privilege permits attorneys and their clients to communicate fully and frankly and thereby to promote "broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981); *HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 70 (S.D.N.Y. 2009). [*78] The burden of establishing the privilege is on the party asserting it. *Swerdlow*, 259 F.R.D. at 70. Corporations also have a privilege as to communications between in-house counsel and corporate representatives. *Evans v. Artek Systems Corp.*, 715 F.2d 788, 792 (2d Cir. 1983); *see also Keller v. Loews Corp.*, 69 A.D.3d 451, 451-52, 894 N.Y.S.2d 376 (1st Dep't 2010). The privilege only protects against the disclosure of communications; it does not protect disclosure of the underlying facts communicated to the attorney. *Upjohn*, 449 U.S. at 395.[16]

The plaintiff's duty to protect client confidences,

imposed by the rules of ethics, is broader than the scope of the attorney-client privilege. Rule 1.6 states that "[a] lawyer shall not knowingly reveal confidential information, as defined in this Rule, or use such information to the disadvantage of a client or for the advantage of the lawyer or a third person." *See* Rule 1.6(a) of the New York Rules of Professional Conduct, N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.0 (22 NYCRR 1200) (hereinafter "NYRPC"). Confidential information is defined as follows:

> "Confidential information" consists of information gained during or relating to the representation of a client, whatever its source, that is (a) protected by the attorney-client [*80] privilege, (b) likely to be embarrassing or detrimental to the client if disclosed, or (c) information that the client has requested be kept confidential. "Confidential information" does not ordinarily include (i) a lawyer's legal knowledge or legal research or (ii) information that is generally known in the local community or in the trade, field or profession to which the information relates.

*Id.* Formerly found in Canon 4 and DR 4-101 of the Code of Professional Responsibility, this "broader category of 'secret' embraces all other information 'gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client" *Morin v. Trupin*, 728 F. Supp. 952, 955 (S.D.N.Y. 1989); *see also Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir. 1973) (duty of confidentiality must be applied as a "strict prophylactic rule to prevent any possibility, however slight, that confidential information acquired from a client during a previous relationship may subsequently be used to the client's disadvantage"); *Ackerman v. National Property Analysts, Inc.*, 887 F. Supp. 510, 515 (S.D.N.Y. 1993) [*81] (confidential information protected by DR 4-101 "encompasses a broader spectrum of information than the attorney-client

---

[16] Although the parties do not address the issue, the court notes that the application of the attorney-client privilege in this case is governed by federal common law. *See* Fed. R. Evid. 501; *von Von Bulow by Auersperg v. von Bulow*, 811 F.2d 136 (2d Cir. 1987) ("The Senate Report which accompanied Rule 501 stated that '[i]t is also intended that the Federal Law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case") (quoting S.Rep. No. 1277, 93rd Cong., 2d Sess., *reprinted* in 1974 U.S. Code Cong. & Ad. News 7051,7059 n.16); *but see* Advisory Committee's Note to 1974 Enactment ("State privilege [*79] law applies even in nondiversity, Federal question civil cases, where an issue governed by State substantive law is the object of the evidence"). Since the plaintiff was a member of the bar of New York State at all times relevant to this action, the New York State Rules of Professional Conduct apply to her actions. *See United States ex rel. Fair Laboratory Practices Assocs. v. Quest Diagnostics Inc.*, No. 05-CV-5393, 2011 U.S. Dist. LEXIS 37014, 2011 WL 1330542, at *5 (S.D.N.Y. Apr. 5, 2011).

privilege") (citation omitted). The rationale behind this broad protection of client confidences is that in order to ensure effective representation, a client must be encouraged to speak openly with his lawyer. *See Emle Industries*, 478 F.2d at 570-71; *Doe v. A Corp*,, 330 F. Supp. 1352, 1354 (S.D.N.Y. 1971), *aff'd sub nom, Hall v. A. Corp*., 453 F.2d 1375 (2d Cir. 1972). Unlike the attorney-client privilege, which is an evidentiary privilege that applies where one seeks to compel an attorney to produce evidence, the "rule of client-lawyer confidentiality" is an affirmative restraint on the attorney. This duty "'applies in situations other than those where evidence is sought From the lawyer through compulsion of law.'" *Morin*, 728 F. Supp. at 955 (citation omitted).

A suit by an attorney against a former client clearly implicates this rule. It is long-established that "if an attorney believes that executives of a corporate client are engaging in wrongful conduct, he may disclose this to the corporation's board of directors; but he infringes [the rules of ethics] if he [*82] himself institutes suit" *Doe v. A Corp*., 330 F. Supp. at 1355. Moreover, "[w]here 'any substantial relationship' can be shown between a lawyer's former representation and subsequent litigation in which the lawyer is involved, his participation in the latter will be prohibited by [the rules of ethics]." *Id*.

In *Doe*, the defendants' former in-house attorney sought to represent a class of holders of A Corp.'s common stock in a derivative suit charging the defendants with fraud, breach of fiduciary duty, and violations of the federal securities laws. The court found that there was "little doubt" that in maintaining the action, the attorney would be called upon to use his former clients' confidential information to their disadvantage. 330 F. Supp. at 1355. Likewise, in *Wise v. Consolidated Edison Co. of New York, Inc*., a former in-house counsel brought suit, *inter alia*, for wrongful discharge, abuse of process, and related torts after he was dismissed by the defendants. 282 A.D.2d 335, 723 N.Y.S.2d 462 (1st Dep't 2001). The court

determined that allowing the action to go forward would entail improper disclosure of client confidences, "including specific corporate tax strategies." *Id*. at 335. [*83] The court noted that the "ethical obligation to maintain the 'confidences' and 'secrets' of clients and former clients is broader than the attorney-client privilege and exists 'without regard to the nature or source of information or the fact that others share the knowledge.'" *Id*. (citation omitted). Finally, in *Eckhaus v. Alfa-Laval, Inc*., 764 F. Supp. 34, 37-38 (S.D.N.Y. 1991), a former general counsel sought to introduce information about work he performed at the company to assert defamation claims against his former employer. The court dismissed the complaint because the plaintiff could not maintain the action without revealing client confidences in violation of the rules of ethics.

The plaintiff's suit closely resembles those brought by the plaintiffs in *Doe, Wise*, and *Eckhaus*. She seeks to litigate whether the defendants' conduct

[TEXT REDACTED BY THE COURT] Some of these allegations are indeed protected by the attorney-client privilege. For instance, her advice to the corporate executives regarding the investigation would be privileged regardless of whether they had separate counsel because her advice was for the benefit of the corporation. *See Evans*, 715 F.2d at 792 (when an [*84] attorney represents the corporation, she serves the corporation not any individual). All of this information, moreover, constitutes "confidential information" protected under Rule 1.6 of the NYRPC. That this information would be detrimental to the defendants is obvious, since the plaintiff seeks to recover based on them.

[TEXT REDACTED BY THE COURT]

The plaintiff argues that information she received in her capacity as a member of corporate management is not protected. It is true that where an in-house attorney also acts as a company officer, this "mixed business-legal responsibility" gives rise to a need to apply the privilege cautiously to those

attorney's communications. *Compare Rossi v. Blue Cross and Blue Shield of Greater New York*, 73 N.Y.2d 588, 592-94, 540 N.E.2d 703, 542 N.Y.S.2d 508 (1989) (internal memorandum drafted by in-house counsel regarding substance of a pending litigation was privileged and could not be compelled to be produced in that litigation) *with Georgia-Pacific Corp. v. GAP Roofing Manufacturing Corp.*, No. 93-CV-5125, 1996 U.S. Dist. LEXIS 671, 1996 WL 29392, at*4-*5 (S.D.N.Y. Jan. 25, 1996) (lawyer who acted as both in-house counsel and negotiated the terms of an agreement on behalf of corporate management was compelled [*85] to testify regarding his view of the terms of that agreement). In this case, the fact that the plaintiff was employed in both a legal and business capacity does not change the analysis. The allegations in the Complaint reflect the Plaintiff's views as general counsel of the company regarding [TEXT REDACTED BY THE COURT]

[TEXT REDACTED BY THE COURT] While in some instances, she may have technically received the underlying information in her business capacity, the duty to protect confidences is not applied in such a technical matter. The critical issue is that she received and is now seeking to use information that she knows would be detrimental to her former clients. *See Ackerman*, 887 F. Supp. at 517 (even if former in-house attorney acted in both a legal and business capacity for the defendants, he violated his ethical obligations when he revealed information to plaintiff's counsel that he knew would be detrimental to his former clients).

With a few exceptions, discussed below, the portions of the record the defendants seek to seal reveal confidential information. These allegations relate to the

[TEXT REDACTED BY THE COURT]

Paragraphs 141, 142, 143, and 184, however, do not contain confidential [*86] or privileged information. Paragraphs 141 through 143 describe Medisys's corporate compliance program. The descriptions of the corporate compliance program and what it says is not confidential information whose disclosure would be embarrassing or detrimental to the corporation. While allegations that the defendants did not comply with their own compliance program or that it was a sham would be confidential, the program's existence and its provisions are not. Paragraph 184, which alleges that the plaintiff was terminated at the request of defendants Rosen, Flanz, Doss, Dufficy and Kahn, simply reflects an employment decision. It is not a confidence nor is its disclosure embarrassing or detrimental to the defendants.

## 2. WAIVER

The plaintiff argues that the attorney-client privilege was waived by disclosure to third parties, particularly the regulatory agencies investigating Medisys and those who became aware of the contents of the meeting that led to her termination.

[TEXT REDACTED BY THE COURT] She also provides the court with the minutes of that meeting, which state that the confidentiality of the meeting was breached by disclosure of its contents to her. Aff. of Patrick Johnson, Esq., [*87] Apr. 30, 2010, Ex. 4, Dkt. 28. The defendants respond in an affirmation by their counsel which states that there was a limited waiver of privilege with respect to advice the company received from a former outside law firm as to certain transactions that are under investigation. They contend that Medisys specifically preserved privilege as to all other matters, including advice regarding the investigation itself. Aff. of Randi Seltzer May, Esq., Apr. 15, 2010, at ¶ 21, Dkt. No. 14.

The plaintiff correctly argues that the party asserting the attorney-client privilege has the burden of showing that the privilege was not waived through voluntary disclosure to a third party, *Detmey v. Jenkens & Gilchrist*, 362 F. Supp. 2d 407, 412 (S.D.N.Y. 2004). The person who has disclosed the information to a third party must have the authority to make the waiver. *Id.* at 413. Courts have held that even an officer or director of a

corporation may be without authority to waive the privilege when acting in his individual capacity, especially in the face of board or management decision to the contrary. *Id.* at 414.

The court finds it unlikely that any of the actions cited by the plaintiff constituted a knowing [*88] waiver of the attorney-client privilege by a person with the authority to do so. It is not necessary to reach this issue, however, because unlike the attorney-client privilege, which is destroyed by the disclosure to a third party, the duty to preserve confidential information exists regardless of the knowledge of third parties. As stated by the Second Circuit, "the client's privilege in confidential information disclosed to his attorney 'is not nullified by the fact that the circumstances to be disclosed are part of a public record, or that there are other available sources for such information, or by the fact that the lawyer received the same information from other sources.'" *Emle Industries*, 478 F.2d at 572-73 (quoting H. Drinker, Legal Ethics 135 (1953)); *see also Doe*, 330 F. Supp. at 1356 (duty of confidentiality "looks beyond technical considerations of secrecy in the evidentiary sense and shields all information given by a client to his attorney whether or not strictly confidential in nature"). The availability of the information to third parties does not waive the duty of confidentiality. Instead, "[t]he determinative factor is that the attorney's action will result in disclosure [*89] of communications made in confidence by the client to his lawyer." *Doe*, 330 F. Supp at 1355 (citing Drinker, Legal Ethics 135 (1953)). Moreover, as discussed above, while the attorney-client privilege is often a defense to an effort to compel an attorney's disclosure of privileged information, the duty to protect client confidences is an affirmative obligation on the attorney. Since many of the plaintiff's allegations reveal her former employer's confidences whose disclosure would be detrimental to them in this and potentially subsequent matters, the rules of ethics prohibit her from revealing them publicly through this litigation.

## B. EXCEPTIONS TO THE RULES PROHIBITING DISCLOSURE

### 1. DEFENSE AGAINST ACCUSATION OF WRONGFUL CONDUCT

The plaintiff contends that she can rely on an exception to the ethical rules that allows a lawyer to "reveal or use confidential information to the extent that the lawyer reasonably believes necessary . . . to defend the lawyer or the lawyer's employees and associates against an accusation of wrongful conduct." NYRPC Rule 1.6(b)(5)(i). This argument may have been persuasive if it was not the plaintiff who had commenced the present suit. Indeed, comment 10 to [*90] NYRPC Rule 1.6 states in part:

> Where a claim or charge alleges misconduct of the lawyer related to the representation of a current or former client, the lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense. Such a claim can arise in a civil, criminal, disciplinary or other proceeding... A lawyer may make the disclosures authorized by paragraph (b)(5) through counsel.

Cases applying the exception to defend against an accusation of wrongful conduct are those where the "client initiated the lawsuit and where the 'accusation of wrongful conduct' is asserted as a formal claim against the attorney." *Eckhaus*, 764 F. Supp. at 37-38 (citing examples). This exception has only been applied outside of court where the accusations arose in administrative proceedings or during criminal grand jury investigations. *Id* at 38 n.6. Moreover, the scope of the information that can be disclosed to defend oneself is narrow and must "directly bear on the propriety or legality of [the attorney's] activities." *Morin*, 728 F. Supp. at 956.

In *Eckhaus*, an in-house attorney was accused of wrongful conduct during in an internal performance review. 764 F. Supp. at 38. He brought [*91] a

defamation suit against his former employer and sought to introduce a portion of a confidential memorandum where the company's president stated that the plaintiff pursued a "convoluted" strategy in notifying insurance carriers of the existence of a hazardous waste site and evidence that corporate officers intended to destroy documents they were required to produce in litigation. *Id.* at 37. The court granted summary judgment for the defendants, finding that it was clear that the plaintiff's purpose was to "achieve, by a defamation action, an adjudication of the disputes underlying his resignation." *Id.* at 38. Similarly, in *Wise v. Consolidated Edison of New York, Inc.*, a New York state court rejected the plaintiff's claim that he affirmatively brought suit against the defendant in order to defend against an accusation of wrongful conduct. *See* 282 A.D.2 at 336.

Here, like in *Eckhaus* and *Wise*, no formal claim has been made against the plaintiff in any proceeding contemplated by the rule. Therefore her attempt to rely on an exception to her duty of confidentiality to defend against an accusation of wrongful conduct fails.

## 2. CRIME-FRAUD EXCEPTION

The rules allow an attorney to "reveal or [*92] use confidential information to the extent the lawyer reasonably believes necessary [] to prevent the client from committing a crime." NYRPC Rule 1.6(b)(2). "The crime-fraud exception removes the privilege from those attorney-client communications that are 'relate[d] to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct.'" *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). "This rule 'is aimed at serious misconduct,' and can be invoked only if [the parties] demonstrate that there is 'probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *Swerdlow*, 259 F.R.D. at 73 (quoting *Jacobs*, 117 F.3d at 87).

[TEXT REDACTED BY THE COURT] She provides no authority, however, for the proposition that [TEXT REDACTED BY THE COURT]

[TEXT REDACTED BY THE COURT] Indeed, it appears that it would be inevitable that [TEXT REDACTED BY THE COURT] Cf. Upjohn Co., 449 U.S. at 390-92.

[TEXT REDACTED BY THE COURT] While employed as general counsel during an ongoing investigation, she was obligated to maintain the confidentiality of past violations of the law. *See* Comment [*93] 7 to NYRPC Rule 1.13.

[TEXT REDACTED BY THE COURT] *See Doe*, 330 F. Supp at 1355. Assuming that such allegations were true, the plaintiff's obligations were to "persuade [her] clients to rectify their wrongs [and if] the clients refused to do so" she should have severed her relations with them, not attempted to independently enforce the corporation's rights in court. *Id.* at 1356. After her termination, her reporting obligation concerning what she perceived to be a retaliatory discharge extended solely to reporting to the organization's internal authorities. *See* Comment 8 to NYRPC Rule 1.13.[17] The plaintiff's initiation of this public suit is not contemplated by the rules as the proper method of disclosure.

## C. REMEDY

Having found that many of the plaintiff's allegations involve disclosure of confidential information of the defendants, the court grants the defendants' motion to seal the relevant portions of

---

[17] The text of that comment states:

> Under some circumstances, the duty of communication under Rule 1.4 [lawyer's obligation to get informed consent in certain circumstances] and the duty under Rule 1.16(e) to protect a client's interest upon termination of the representation, in conjunction with this Rule, may require the lawyer to inform the organization's highest authority of the lawyer's discharge or withdrawal, and of what the lawyer reasonably believes to be the basis for the discharge [*94] or withdrawal.

the record and recommends that the plaintiff be enjoined from future disclosure of her former client's confidences. The standards and application of these issues are discussed below.[18]

There is a presumption that judicial records are open to the public. *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("*Amodeo II*"). The weight of the presumption depends on the value of such information in the exercise of Article III judicial power, which must then be weighed against demonstrated countervailing factors, such as law enforcement concerns, judicial efficiency and the privacy interests of the parties. *Id.* at 1049-1052. Thus, in determining whether to grant such a request, the court will balance the demonstrated interests of the movant in the secrecy of the information in question against the importance of the material to the adjudication and the public's interest in access to such materials. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597-603, 98 S. Ct. 1306, 55 L. Ed. 2d 570 (1978); *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 826 (2d Cir. 1997); *Amodeo II*, 71 F.3d at 1051-53; *Joy v. North*, 692 F.2d 880, 893-94 (2d Cir. 1982).

The defendants have also moved to enjoin the plaintiff from further disclosure of confidential information of her former employer. The decision whether to [*96] grant or deny a preliminary injunction rests within the court's sound discretion. *Weight Watchers Int'l, Inc. v. Luigino's. Inc.*, 423

---

[18] As discussed above, the claims upon which the majority of the confidential allegations are based fail to state a claim on other grounds - thus, this court need not decide whether or not the plaintiff is precluded from bringing suit at all if she had a legitimate claim. *Compare Doe v. A Corp.*, 709 F.2d 1043, 1049-50 (5th Cir. 1983) (rules of confidentiality are not a *per se* baron former in-house attorney from bringing suit against former employer); *Ackerman*, 887 F. Supp. at 518-19 (dismissing complaint without prejudice where former in-house counsel had significant involvement in drafting of complaints), *with Eckhaus*, 764 F. Supp. at 37-38 (even though complaint stated a cause of action for defamation, court dismissed complaint because suit would have required revelation of confidences); *Wise*, 282 A.D.2d at 335-36 [*95] (court granted a motion to dismiss the complaint in its entirety and a motion to seal the record).

F.3d 137, 141 (2d Cir. 2005); *Sierra Club v. United States Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir. 1984). To obtain a preliminary injunction, the movant is traditionally required to show (1) a likelihood of irreparable harm and (2) either (a) that it is likely to succeed on the merits or (b) sufficiently serious questions regarding the merits of the claim to make them fairly litigable, with the balance of hardships tipping decidedly in the movant's favor. *See Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *1-800 1-800 Contacts, Inc. v. WhenU.com, Inc.*., 414 F.3d 400, 406 (2d Cir. 2005); *No Spray Coalition, Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001). A preliminary injunction is a drastic and extraordinary remedy that should not be granted routinely. *See JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990); *CollaGenex Pharmaceuticals, Inc. v. IVAX Corp.*, 375 F.Supp. 2d 120, 123 (E.D.N.Y. 2005). A party seeking preliminary injunctive relief has a "heavy burden" to sustain. *See Robert W. Stark, Jr., Inc. v. New York Stock Exchange, Inc.*, 466 F.2d 743, 744 (2d Cir. 1972); [*97] *City of Newburgh v. Sarna*, 690 F.Supp.2d 136, 163-64, (S.D.N.Y. 2010).

The propriety of the sealing and preliminary injunction remedies sought by the defendants is supported in the case law. In *Doe v. A Corp.*, the court dismissed the action brought by the defendant's former counsel, enjoined him from initiating a suit based on the facts alleged in that case, enjoined him from disclosure of secret or confidential information obtained during his employment at the company, and directed the clerk of the court to seal the file of the case. *Doe*, 330 F. Supp. at 1356. Similarly in *Housler v. First Nat. Bank of East Islip*, 484 F. Supp. 1321 (E.D.N.Y. 1980), the court affirmed a ruling in a derivative suit enjoining a corporation's former general counsel from disclosing secret or confidential information bearing on events related to the pending litigation and sealing portions of record that contained such information. Finally, in *Morin*, the court enjoined an attorney from disclosing information obtained as a result of his professional

relationship with a former client and ordered those portions of the record containing such information to be sealed. *Morin*, 728 F. Supp. at 958.

The defendants [*98] have established the elements necessary to obtain a preliminary injunction and to seal those portions of the record that reveal the defendants' confidential information. By the plaintiff's own allegations, the information at issue in her complaint was obtained by her during her tenure as in-house counsel at Medisys. As discussed above, these allegations include confidential information that is likely to be detrimental to her former clients and that she is prohibited by the rules of ethics from using to their disadvantage. There is little public interest in the defendants' confidential information and, as discussed above, the court is satisfied that the claims that rely on these allegations are without merit and should be dismissed. In an affirmation and reply affirmation submitted by the defendants' former counsel, the defendants contend that the plaintiff retained materials of the defendants that contain confidential information. *See* Reply Aff. of Randi Seltzer May Apr. 15, 2010 and Ex. C, Dkt No. 14. The court should therefore grant the motion for a preliminary injunction. The court should also order the plaintiff to refrain from including confidential information of the defendants [*99] in future filings or disclosing this information to third parties. To the extent she needs to include such information in filings with the court, she should file the documents under seal or file a redacted version and provide the court with an unredacted hard copy.

The defendants assert that they would not be adequately protected by an order that isolates certain paragraphs of the Complaint because the plaintiff and her former counsel have repeatedly ignored previous court orders to that effect. They also argue that the defendants cannot defend against the plaintiff's claims without themselves disclosing information that they are entitled to keep confidential. As an initial matter, the interest in public access to court records militates against sealing the entire record, especially where plaintiff has asserted serious claims of defamation and sexual harassment that do not rest on confidential information. Moreover, the danger of future disclosures is likely a moot issue because the court has recommended that the plaintiff's claims that depend on the confidential information be dismissed with prejudice. Should Judge Korman disagree with this recommendation, however, the defendants should [*100] be able to raise the issue again at that time.

## CONCLUSION

In conclusion, as discussed above, the court respectfully recommends,

> (1) that the plaintiff's motion to remand be denied;
> (2) that the defendants' motion to dismiss be granted in part and denied in part; and
> (3) that the plaintiff be preliminarily enjoined from publishing the defendants' confidential information to third parties except as otherwise instructed in this opinion.

In addition, for the reasons outlined in this opinion, the court orders that the following portions of the record and any subsequent filings related to them be sealed: The clerk of the court is directed to redact from the public record those portions of the August 11, 2010 transcript as requested by defendants in Docket No. 84 and the following paragraphs of the Complaint: 96, 99, 100, 101, 102, 104, 105, 106, 107, 108, 109, 110, 114, 119, 120, 121, 122, 136, 153, 154, 155, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 185, 186, 187, 188, 189, 190, 191, 192, 193, 195, 196, 197, 198, 199, 200, 201, 202, 204, 218, 220, 232, 233, 234, 235, 236, 237, 249, 261, 269, 285, 296. [*101] Copies of this sealed opinion will be provided only to the plaintiff and the defendants in this action. The defendants shall provide the court with a redacted copy of this opinion for public filing within ten days of this

opinion, and with three days notice to the plaintiff.

* * * * *

Any objections to the portions of this opinion that are on Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir. 1992); *Small v. Sec. of Health and Human Serv*., 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

Dated: Brooklyn, New York

April 28, 2011

Respectfully Submitted,

/s/ Viktor V. Pohorelsky

VIKTOR V. POHORELSKY

United        States        Magistrate        Judge

2011 U.S. Dist. LEXIS 156828, *101

**Table1** (Return to related document text)

BACKGROUND

I. Facts

II. Procedural History

DISCUSSION

I. Motion to Remand

A. Motion For Total Remand

B. Motion for Partial Remand

II. Motion to Dismiss

A. Legal Standards on a Motion to Dismiss

B. Claims 1 and 2: Breach of Contract and Implied Contract

C. Claims 3 and 4: Tortious Interference and Wrongful Discharge

D. Claims 5 and 17: Breach of Fiduciary Duty and Negligence

E. Claim 18: Violation of the Labor Law

F. Unnumbered Claim for Punitive damages

G. Claim 19: Defamation

H. Gender-Related Claims

1. Claims 6, 14, and 15: Retaliation

2. Claims 9 and 12; Quid Pro Quo Sexual Harassment

3. Claims 7, 10, and 13: Gender Discrimination

III. Additional Arguments In Support of Dismissal

A. Immunity of Directors, Officers, or Trustees of Non-Profit Corporations

B. Notice to Individual Defendants

C. Dismissal of Entities

IV. Motion to Seal and for Injunctive Relief

A. The Information At Issue

1. Legal Standards and Application

2. Waiver

B. Exceptions to the Rules Prohibiting Disclosure

1. Defense Against Accusation of Wrongful Conduct

2. Crime-Fraud Exception

C. Remedy

CONCLUSION

**Table1** (Return to related document text)



Cited
As of: April 4, 2022 8:09 PM Z

# Maynard v. Montefiore Med. Ctr.

United States District Court for the Southern District of New York

February 4, 2021, Decided; February 4, 2021, Filed

No. 18-CV-8877 (LAP)

**Reporter**

2021 U.S. Dist. LEXIS 21570 *; 2021 WL 396700

SUSAN MAYNARD, Plaintiff, -against- MONTEFIORE MEDICAL CENTER, MARCIA LUTZ, VAYOLA NELSON, BEVERLEY WINTER, PEARLINE DOUGLAS, DAVIDA HARRIS, Defendants.

**Counsel:** [*1] For Susan Maynard, Plaintiff: Christopher J. Berlingieri, LEAD ATTORNEY, Berlingieri Law, PLLC, New York, NY; Abraham Zev Wolf Melamed, Derek Smith Law Group, PLLC, New York, NY.

For Montefiore Medical Center, Marcia Lutz, individually, Vayola Nelson, individually, Beverley Winter, individually, Pearline Douglas, individually, Davida Harris, Defendants: Sean A Malley, Jean L. Schmidt, LEAD ATTORNEY, Littler Mendelson, P.C. (NYC), New York, NY.

**Judges:** LORETTA A. PRESKA, Senior United States District Judge.

**Opinion by:** LORETTA A. PRESKA

# Opinion

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court is the motion for summary judgment filed by Defendants Montefiore Medical Center ("Montefiore"), Marcia Lutz, Vayola Nelson, Beverly Wynter, Pearline Douglas, and

Davida Harris (collectively, "Defendants").[1] Plaintiff Susan Maynard opposes the motion.[2] For the reasons below, the motion for summary judgment is <u>GRANTED</u>.

## I. Background

"Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York . . . requires a party moving for summary judgment to submit a statement of the allegedly undisputed facts on which the moving party relies, together with citation [*2] to the admissible evidence of record supporting each such fact." <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003). Defendant submitted such a statement, along with accompanying declarations and exhibits.[3]

---

[1] (<u>See</u> Defendants' Notice of Motion for Summary Judgment, dated Mar. 23, 2020 [dkt. no. 52]; <u>see also</u> Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Defs. Br."), dated Mar. 23, 2020 [dkt. no. 54]; Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated May 14, 2020 [dkt. no. 68].)

[2] (<u>See</u> Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl. Br."), dated Apr. 29, 2020 [dkt. no. 63].)

[3] (<u>See</u> Local Rule 56.1 Statement of Montefiore Medical Center ("Defs. 56.1"), dated Mar. 23, 2020 [dkt. no. 53]; <u>see also</u> Declaration of David Brodksy, dated Mar. 19, 2020 [dkt. no. 55]; Declaration of Marcia Lutz, dated Mar. 17, 2020 [dkt. no. 56]; Declaration of Maureen Scanlan, dated Mar. 12, 2020 [dkt. no. 57]; Declaration of Janice Reyes-Tutiven, dated Mar. 12, 2020 [dkt. no. 58]; Declaration of Sean A. Malley, dated Mar. 23, 2020 [dkt. no. 59].)

In the non-moving party's responsive statement, he or she must then "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts." LOCAL CIV. R. 56.1(b). Each statement in the response "must be followed by citation to evidence which would be admissible." Id. 56.1(d). If the non-moving party "fails to submit a responsive statement, then the facts set forth in the moving party's 56.1 statement are deemed admitted." Truitt v. Salisbury Bank & Tr. Co., No. 18-CV-8386 (NSR), 2020 U.S. Dist. LEXIS 129874, 2020 WL 4208452, at *1 (S.D.N.Y. July 21, 2020).

Plaintiff's Rule 56.1 Statement is not up to snuff. It repeatedly offers conclusory denials--including thirty-five responses offering only a solitary "deny"--without any citations to admissible evidence. (See Plaintiff's Response to Defendants' Local Rule 56.1 Statement, dated Apr. 29, 2020 [dkt. no. 62].) Instead, Plaintiff chooses to rely on competing declarations and exhibits to challenge Defendants' Rule 56.1 Statement. (See Declaration of Susan Maynard ("Maynard Decl."), dated Apr. [*3] 27, 2020 [dkt. no. 64]; Declaration of Christopher J. Berlingieri, dated Apr. 29, 2020 [dkt. no. 66].) Accordingly, "[b]ecause Plaintiff failed to comply with Local Rule 56.1, the Court will deem as admitted those facts set forth in Defendants' 56.1 Statement, to the extent they are supported by the record." Truitt, 2020 U.S. Dist. LEXIS 129874, 2020 WL 4208452, at *1.

### a. Plaintiff's Employment

Montefiore hired Plaintiff in 2008 as a per diem nurse on the Eighth Floor of its Children's Hospital ("CHAM 8"). (Defs. 56.1 ¶ 1.) Montefiore hired Plaintiff as a full-time CHAM 8 nurse in January 2014. (Id. ¶ 2.) CHAM 8 treats patients between the ages of three weeks and twenty-one years for a wide variety of health issues, (id. ¶ 3), and

Plaintiff's responsibilities included, inter alia, "admitting patients, discharge planning, starting IVs, drawing blood, and reporting to doctors," (id. ¶ 5). During Plaintiff's tenure, she was supervised by Marcia Lutz, the Administrative Nurse charged with "overseeing all [n]urses on CHAM 8." (Id. ¶ 6.)

### b. Plaintiff's Medical Leave and Temporary Shift Change

In January 2016, Plaintiff requested medical leave to recover from surgery, which Montefiore granted. (Id. ¶ 57.) Of that leave, Plaintiff asserts "that she asked for three specific [*4] days . . . to be paid through accumulated sick time, but that these days were instead designated as 'voluntary time off.'" (Id. ¶ 58.) Ms. Lutz recalls things differently: She remembers "that Plaintiff specifically requested that these three days be deemed unpaid voluntary sick time." (Id. ¶ 59.) Although Plaintiff was not paid for those days, she chose not to file a grievance with her union. (Id. ¶ 60.)

In April 2016, shortly after Plaintiff returned, CHAM 8 nurses were required to attend State-mandated training. (Id. ¶ 61.) Because Montefiore could only offer the training during daytime hours, Ms. Lutz determined that she needed to rotate shifts temporarily so that all the CHAM 8 nurses could attend the required sessions. (Id. ¶ 62.) Four nurses were rotated onto the night shift for a period of four weeks. (Id.) Plaintiff, who primarily worked daytime shifts, was among those rotated. (Id. ¶¶ 4, 62.) The other three nurses rotated "did not possess a disability," and none had taken "medical leave prior to rotating." (Id. ¶¶ 63-64.) Once the trainings concluded, all four nurses resumed their normal daytime shifts. (Id. ¶ 65.)

### c. Complaints About Plaintiff

Soon after returning to the dayshift, [*5] Plaintiff's employment took a turn for the worse. Between May and October 2017, Montefiore received four

complaints regarding Plaintiff from four different individuals, three of whom were mothers of CHAM 8 patients. (See id. ¶¶ 7-37.)

On May 12, 2017, Montefiore received a complaint from the mother of a CHAM 8 patient. (Id. ¶ 7.) That complaint alleged that Plaintiff had "called security on an African American man" who was the "grandfather of a patient." (Id.) The complaint also stated that, after calling security, Plaintiff yelled "this only happens to black people; this don't happen to white people," and "[t]his isn't Nazi Germany." (Id. ¶ 8.) Two employees reported that Plaintiff also referred to the grandfather as a "500-pound black man." (Id. ¶ 12.) As a result, Montefiore investigated Plaintiff for violations of its Non-Discrimination and Harassment Policy ("the Policy").[4] Ms. Lutz led the investigation, interviewing the complainant and another family member of the grandfather as well as taking statements from four employees. (Id. ¶¶ 9, 11.) All the witnesses confirmed the allegations. (Id. ¶ 10.)

One week later, Ms. Lutz met with Plaintiff to discuss the complaint. (Id. ¶ 13.) [*6] Joan Curry, Administrative Nurses Manager, Candice Sering, Union Representative, and Collette Dobbins, Union Delegate, also attended the meeting. (Id.) Plaintiff denied the allegations, although Ms. Lutz's notes indicate that Plaintiff did not provide any witnesses or substance to refute the charges. (Id. ¶ 14.) The same parties reconvened for a disciplinary meeting on August 16, 2017, at which Plaintiff received a written warning. (Id. ¶ 15.) That warning detailed the specific rules and policies Plaintiff had violated and cautioned that additional violations would result in further discipline or possible termination. (Id. ¶¶ 16-17.)

The very next day, Montefiore received a second complaint from another mother of a CHAM 8 patient, which stated that Plaintiff had argued with a physician's assistant in front of the patient's

family regarding who was more qualified to insert an IV. (Id. ¶ 18.) The complaint then asserted that Plaintiff used excessive force to insert the IV, causing the patient to cry out in pain. (Id. ¶ 19.) After the mother requested another nurse, Plaintiff left without calling for one. (Id. ¶ 20.) Like the first complaint, Ms. Lutz investigated by speaking to the complainant [*7] and to CHAM 8 employees. (Id. ¶¶ 21-22.) The investigation corroborated the latest allegations. (Id. ¶ 23.)

Just two weeks later, Montefiore received a third complaint from a different CHAM 8 mother, this time asserting that Plaintiff had used inappropriate language. (Id. ¶ 24.) Specifically, the complaint alleged that Plaintiff had said (1) "I can't stand it here these black and Spanish people come here and they take everything"; (2) "[t]hey gave me the African Lion King back there and she stinks"; and (3) "Spanish patients eat up the diapers, they think it's the welfare office." (Id. ¶ 25.) Given the frequency of the complaints against Plaintiff, Ms. Lutz alerted Janice Reyes, Senior Labor and Employee Relations Manager, of the allegations in early September 2017. (Id. ¶ 26.)

In response, Ms. Reyes and Ms. Lutz investigated the third complaint. (Id. ¶ 27.) Both interviewed the complainant, who confirmed that she overheard Plaintiff make the statements at the nursing station near her child's hospital room. (Id. ¶¶ 28- 29.) Moreover, Ms. Lutz also spoke with CHAM 8 employees, who corroborated the complainant's account. (Id. ¶ 30.) Shortly thereafter, Ms. Lutz informed David Brodksy, [*8] Senior Vice President of Labor and Employee Relations, about the complaints, (id. ¶ 31), and he suggested placing Plaintiff on paid administrative leave pending further investigation, (id. ¶ 32).

On October 16, 2017, Montefiore received a final complaint, which was filed anonymously with Montefiore's Department of Labor and Employee Relations. (Id. ¶ 33.) That complaint alleged that Plaintiff had stated "can you believe that black guy is talking to me that way?" to an African American

---

[4] (Defs. 56.1 ¶¶ 11, 66, 71.) The Policy encourages employees to report incidents promptly and provides several avenues through which to do so. (Id. ¶¶ 69-70.)

employee. (Id. ¶ 33.) The complaint also stated that Plaintiff, when discussing a patient, had attributed the patient's "behavior to the patient's ethnic last name and because she was inbreeded." (Id. ¶ 34.) Ms. Reyes asked Ms. Lutz for help investigating the most recent complaint, and Ms. Lutz took statements from the employee and another CHAM 8 worker. (Id. ¶¶ 35-36.) Both corroborated the complaint's account of events. (Id. ¶ 36.)

### d. Plaintiff's Termination

On November 17, 2017, Plaintiff met with Ms. Reyes, Ms. Lutz, and Marlena Fontes, a union representative, regarding the latter three complaints. (Id. ¶ 38.) Plaintiff denied the conduct underlying the complaints but could not explain why so many similar [*9] complaints had been made. (Id. ¶¶ 39-40.) Instead, for the first time, Plaintiff asserted that her co- workers had made several discriminatory remarks to her. (Id. ¶¶ 41-43.) In response, Montefiore placed Plaintiff on paid administrative leave pending further investigation. (Id. ¶ 44.)

In early December 2017, Ms. Reyes provided copies of the complaints and investigative files to Maureen Scanlan, Vice President of Nursing, Freddy Cabrera, Chief Human Resources Officer, Susan Green-Lorenzen, System Senior Vice-President, and Mr. Brodsky (collectively, "the Committee"). (Id. ¶¶ 45-46.) Given the seriousness of Plaintiff's conduct, Ms. Reyes recommended terminating Plaintiff. (Id. ¶¶ 47-48.) The Committee had the sole power to terminate a nurse. (Id. ¶ 45.) After meeting and reviewing the relevant files, the Committee decided to terminate Plaintiff's employment and informed Ms. Reyes of its decision. (Id. ¶¶ 49-52, 54.) On December 29, 2017, Ms. Reyes, Ms. Lutz, and Ms. Fontes informed Plaintiff that she was being fired based on the complaints against her. (Id. ¶¶ 55-56.)

### e. This Action

On February 23, 2018, Plaintiff filed charges of discrimination with the Equal Employment Opportunity [*10] Commission ("EEOC"). (First Amended Complaint ("FAC"), dated Jan. 8, 2019 [dkt. no. 30] ¶ 3.) On July 7, 2018, Plaintiff received right- to-sue letters from the EEOC. (Id. ¶ 4.) On September 27, 2018, Plaintiff filed the instant action, asserting, inter alia, claims under (1) Title VII of the Civil Rights Act of 1964, (2) 42 U.S.C. § 1981, (3) the Americans with Disabilities Act ("ADA"), (4) the Family Medical Leave Act ("FMLA"), (5) the New York State Human Rights Law ("NYSHRL"), and (6) the New York City Human Rights Law ("NYCHRL"). (Id. ¶¶ 37-90.)

## II. Legal Standards

### a. Summary Judgment

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the burden to show the absence of a dispute as to a material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof at trial, the moving party may discharge its summary judgment burden in "two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's [*11] claim." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017).

In assessing the record, the Court "must view the evidence in the light most favorable to the [non-moving] party," Tolan v. Cotton, 572 U.S. 650, 657, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014) (quotation marks omitted), and "resolve all ambiguities and draw all reasonable inferences against the movant," Caronia v. Philip Morris USA, Inc., 715 F.3d 417, 427 (2d Cir. 2013). At the same

time, "the mere existence of <u>some</u> alleged factual dispute" is not enough to prevent summary judgment--the dispute must be material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" only if it "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248. Finally, "conclusory statements or mere allegations are not sufficient to defeat a summary judgment motion." <u>Johnson v. Killian</u>, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam) (alterations omitted).

### b. <u>Discrimination</u>

Plaintiff asserts claims for discrimination under (1) Title VII, (2) 42 U.S.C. § 1981, (3) the NYSHRL, (4) the NYCHRL, (5) the ADA, and (6) the FMLA. (<u>See</u> FAC ¶¶ 37-41, 45-47, 51-61, 65- 68, 72-78, 82-90.) In cases like this one where there is not direct evidence of discrimination, those claims are governed by the canonical burden-shifting framework announced in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).[5] That inquiry proceeds in three steps. First, the plaintiff bears the initial burden of establishing a <u>prima facie</u> case of discrimination.[6] Next, if the plaintiff meets her burden, the burden shifts to the defendant [*12] to offer a legitimate, nondiscriminatory reason for its actions. <u>See Comcast</u>, 140 S. Ct. at 1019. Finally, if the defendant offers such a reason, the burden shifts back to the plaintiff who must show that the

---

[5] <u>See Kirkland v. Cablevision Sys.</u>, 760 F.3d 223, 225 (2d Cir. 2014) (Title VII); <u>Ruiz v. Cnty. of Rockland</u>, 609 F.3d 486, 491 (2d Cir. 2010) (§ 1981); <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL and NYCHRL); <u>McMillan v. City of New York</u>, 711 F.3d 120, 125 (2d Cir. 2013) (ADA). Plaintiff's FMLA interference claim is not governed by <u>McDonnell Douglas</u>, which makes sense because discriminatory intent is not an element of such a claim. <u>See Graziadio v. Culinary Inst. of Am.</u>, 817 F.3d 415, 424 (2d Cir. 2016).

[6] <u>See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media</u>, 140 S. Ct. 1009, 1019, 206 L. Ed. 2d 356 (2020). "Th[at] burden is not a heavy one." <u>Gorzynski v. JetBlue Airways Corp.</u>, 596 F.3d 93, 107 (2d Cir. 2010).

proffered explanation is pretextual. <u>See id.</u>

### 1. <u>Title VII & NYSHRL</u>

Claims under Title VII and the NYSHRL are treated as "analytically identical."[7] To establish a <u>prima facie</u> claim of discrimination under those statutes, Plaintiff must show that "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination." <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 83 (2d Cir. 2015); <u>accord Spiegel</u>, 604 F.3d at 80.

### 2. <u>Section 1981</u>

To make out a <u>prima facie</u> discrimination claim under § 1981, Plaintiff must establish the following: "(1) [she] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute." <u>Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 7 F.3d 1085, 1087 (2d Cir. 1993) (per curiam). As for the first prong, the Supreme Court has held that § 1981 also applies "to racial discrimination against white persons." <u>McDonald v. Santa Fe Trail Transp. Co.</u>, 427 U.S. 273, 287, 96 S. Ct. 2574, 49 L. Ed. 2d 493 (1976).

### 3. <u>NYCHRL</u>

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and [*13] state law claims, construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." <u>Mihalik v. Credit Agricole Cheuvreux N.</u>

---

[7] <u>Lenzi v. Systemax, Inc.</u>, 944 F.3d 97, 107 n.7 (2d Cir. 2019). "In August 2019, the NYSHRL was amended in several ways, but the events underlying this case preceded those amendments. <u>Farmer v. Shake Shack Enters., LLC</u>, 473 F. Supp. 3d 309, 334 n.9, 2020 U.S. Dist. LEXIS 128272 (S.D.N.Y. 2020)."

Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (cleaned up). "Thus, even if the challenged conduct is not actionable under federal and state law, federal courts must consider separately whether it is actionable under the broader New York City standards." Id. Although the first two elements of a NYCHRL discrimination claim mirror those under Title VII, important differences exist as to the third and fourth elements. See, e.g., Gorman v. Covidien, LLC, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015).

For "the third prong of a prima facie case of discrimination under the NYCHRL, a plaintiff must simply show that she was treated differently from others in a way that was more than trivial, insubstantial, or petty." Kellman v. Metro. Transp. Auth., 8 F. Supp. 3d 351, 379 (S.D.N.Y. 2014) (underlining added). Unlike Title VII or the NYSHRL, "the NYCHRL does not require that an employment action taken against a plaintiff be 'materially adverse' . . . to establish a prima facie case of discrimination." Gorman, 146 F. Supp. 3d at 530. Moreover, the fourth prong of a prima facie case is established so long as "a member of a protected class was treated differently than a worker who was not a member of that protected class." Leon v. Columbia Univ. Med. Ctr., No. 11 Civ. 8559 (NSR), 2013 U.S. Dist. LEXIS 177728, 2013 WL 6669415, at *11 (S.D.N.Y. Dec. 17, 2013). In short, to defeat summary [*14] judgment, Plaintiff "need only show differential treatment-- that she [wa]s treated 'less well'-- because of a discriminatory intent." Mihalik, 715 F.3d at 110.

### 4. ADA

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show . . . that: (1) h[er] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4) [s]he suffered adverse employment action because of h[er] disability." Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020).

### 5. FMLA

"[T]o prevail on a" FMLA interference claim, "a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." Graziadio, 817 F.3d at 424.

### c. Retaliation

In addition to her discrimination claims, Plaintiff also asserts retaliation claims under the same statutes. (See FAC PP 42-44, 48-58, 62-64, 69-74, 79-90.) The retaliation claims are also governed by McDonnell Douglas's tripart framework.[8]

### 1. Title VII, § 1981, NYSHRL, & ADA

"To make out a prima facie case of retaliation" under Title VII, § 1981, the NYSHRL, and the ADA, "a plaintiff must make four showings: that (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity."[9] Title VII, § 1981, and ADA claims "must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence

---

[8] See [*15] Littlejohn v. City of New York, 795 F.3d 297, 315 (2d Cir. 2015) (Title VII and § 1981); Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013) (NYSHRL); Schaper v. Bronx Lebanon Hosp. Ctr., 408 F. Supp. 3d 379, 394 (S.D.N.Y. 2019) (NYCHRL); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (ADA); Graziadio, 817 F.3d at 429 (FMLA).

[9] Summa, 708 F.3d at 125 (quotation marks omitted and underlining added) (Title VII and NYSHRL); accord Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (§ 1981); Treglia, 313 F.3d at 719 (ADA).

of the alleged wrongful action or actions of the employer."[10] Although the Court of Appeals has not held explicitly that but-for causation governs NYSHRL claims, it has implicitly applied that standard on several occasions. See Smith v. N.Y. & Presbyterian Hosp., 440 F. Supp. 3d 303, 340 n.22 (S.D.N.Y. 2020) (collecting cases).

## 2. NYCHRL

The NYCHRL imposes an identical standard to the one above, save for two important exceptions. First, "the plaintiff need not prove any adverse employment action; instead, she must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." Benzinger v. Lukoil Pan Americas, LLC, 447 F. Supp. 3d 99, 129 (S.D.N.Y. 2020) (cleaned up). And [*16] "[s]econd, the NYCHRL does not require a plaintiff to show but-for causation. Instead, summary judgment is appropriate only if the plaintiff cannot show that retaliation played any part in the employer's decision." Dodd v. City Univ. of N.Y., No. 17 Civ. 9932 (PAE), 489 F. Supp. 3d 219, 2020 U.S. Dist. LEXIS 176849, 2020 WL 5750715, at *37 (S.D.N.Y. Sept. 25, 2020) (quotation marks omitted).

## 3. FMLA

"[T]o make out a prima facie case" of FMLA retaliation, a plaintiff "must establish that: 1) he exercised rights protected under the FMLA; 2) he was qualified for his position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) (underlining added).

## d. Hostile Work Environment

Finally, Plaintiff asserts hostile work environment claims under Title VII, § 1981, the NYSHRL, and the NYCHRL. (See FAC PP 51-61, 65-68, 72-78, 82-90.) Unlike claims for retaliation and discrimination, hostile work environment claims "are not analyzed using the McDonnell Douglas three-part burden-shifting test." Spence v. Bukofzer, No. 15-CV-6167 (ER), 2017 U.S. Dist. LEXIS 47979, 2017 WL 1194478, at *6 (S.D.N.Y. Mar. 30, 2017).

## 1. Title VII, § 1981, & NYSHRL

The same standards apply to hostile work environment claims brought under Title VII, § 1981, and the NYSHRL.[11] To establish a hostile work environment claim under those statutes, Plaintiff must show that her "workplace is permeated with [*17] discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113 (2d Cir. 2015). "[T]he conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003) (quotation marks omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including, among others, (1) "the

---

[10] Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013); accord Comcast, 140 S. Ct. at 1019 (§ 1981 claims); Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019), cert. denied, 140 S. Ct. 2668, 206 L. Ed. 2d 822 (2020) (ADA claims).

[11] See Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 & n.4 (2d Cir. 2014). "However, Section 1981 deals only with race-based forms of discrimination." Parra v. City of White Plains, 48 F. Supp. 3d 542, 551 n.2 (S.D.N.Y. 2014).

frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). Even so, a claim will only lie if the plaintiff "can also demonstrate that the hostile work environment was caused by animus towards her as a result of her membership in a protected class." Bermudez v. City of New York, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011). "Hostile work environment claims are meant to protect individuals [*18] from abuse and trauma that is severe," but "[t]hey are not intended to promote or enforce civility, gentility or even decency." Isbell v. City of New York, 316 F. Supp. 3d 571, 591 (S.D.N.Y. 2018).

Because "Title VII claims are not cognizable against individuals," Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004), a plaintiff must establish "a specific basis . . . for imputing the conduct that created the hostile environment to the employer," Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997). Liability turns, in part, on the status of the harasser. "If the harassing employee is the victim's co-worker"--as all of the alleged harassers are in this case[12] --"the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State Univ., 570 U.S. 421, 424, 133 S. Ct. 2434, 186 L. Ed. 2d 565 (2013). Under the standard, liability will run to the employer only "if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 107 (2d Cir. 2011) (quotation marks removed). Employer liability can be established in the same manner under § 1981

and the NYSHRL. See Lamarr-Arruz v. CVS Pharmacy, Inc., 271 F. Supp. 3d 646, 658-59 (S.D.N.Y. 2017).

Unlike Title VII, liability may run to individuals under § 1981 and the NYSHRL. "A claim seeking personal liability under [§] 1981 must be predicated on the actor's personal involvement." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000). Conversely, the NYSHRL authorizes individual liability (1) for "individuals with ownership interest or supervisors, [*19] who themselves, have the authority to hire and fire employees," Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 365-66 (S.D.N.Y. 2012); and (2) "where the defendant aided and abetted the unlawful discriminatory acts of others," Xiang v. Eagle Enters., LLC, No. 19 Civ. 1752 (PAE), 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *5 (S.D.N.Y. Jan. 16, 2020). "[S]o long as the employer's conduct has also been found to be discriminatory under the NYSHRL" liability can flow to an individual who "actually participates in the conduct giving rise to a discrimination claim." Farmer, 473 F. Supp. 3d at 337, 2020 U.S. Dist. LEXIS 128272.

## 2. NYCHRL

"Section 8-107(1)(a) of [the] NYCHRL makes it unlawful 'for an employer or an employee or agent thereof' to create a hostile work environment." Dillon v. Ned Mgmt., Inc., 85 F. Supp. 3d 639, 658 (E.D.N.Y. 2015) (quoting N.Y.C. ADMIN. CODE § 8-107(1)(a)). The NYCHRL is "intended to be more protective than the state and federal counterparts," Schaper, 408 F. Supp. 3d at 398, and the NYCHRL's "liberal construction lowers the standard for a hostile work environment claim brought under its auspices," Baez v. Anne Fontaine USA, Inc., No. 14-CV-6621 (KBF), 2017 U.S. Dist. LEXIS 1630, 2017 WL 57858, at *4 (S.D.N.Y. Jan. 5, 2017).

"[U]nder the NYCHRL, there are not separate standards for 'discrimination' and 'harassment'

---

[12] The relevant statements were allegedly uttered by Ms. Harris, a secretary, Ms. Douglas, a nursing assistant, Ms. Nelson, a fellow nurse, and Ms. Wynter, another fellow nurse. (See Defs. 56.1 ¶¶ 41-43, 74-87.) None had any supervisory authority over Plaintiff. (See id. ¶¶ 6, 84-87.)

claims." Johnson v. Strive E. Harlem Emp. Grp., 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014). To make out a hostile work environment claim under the NYCHRL, the alleged conduct need not be "severe or pervasive." Mihalik, 715 F.3d at 113. "With that said, the NYCHRL, like Title VII and the NYSHRL, is still not a general civility code, and petty slights and trivial inconveniences are not actionable." Davis- Bell v. Columbia Univ., 851 F. Supp. 2d 650, 671 (S.D.N.Y. 2012) (quotation marks omitted). "The relevant consideration [*20] is whether there is a triable issue of fact as to whether the plaintiff 'has been treated less well than other employees' because of her [protected status]." Sotomayor v. City of New York, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) (quoting Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 872 N.Y.S.2d 27, 39 (1st Dep't 2009)).

Liability under the NYCHRL may be imposed against both employers and individuals. See N.Y.C. ADMIN. CODE § 8-107(1)(a). Employers are vicariously liable for their employees' conduct in the following circumstances:

> (1) where the offending employee "exercised managerial or supervisory responsibility" . . .; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take "immediate and appropriate corrective action"; and (3) where the employer "should have known" of the offending employee's unlawful discriminatory conduct yet "failed to exercise reasonable diligence to prevent [it]."

Zakrzewska v. New Sch., 14 N.Y.3d 469, 928 N.E.2d 1035, 1039, 902 N.Y.S.2d 838 (N.Y. 2010) (quoting N.Y.C. ADMIN. CODE § 8-107(13)(b)(1)-(3)). An individual, on the other hand, may be directly liable, "regardless of ownership or decisionmaking power," if he "actually participated in the conduct giving rise to plaintiff's . . . claim." Schaper, 408 F. Supp. 3d at 395 (alterations omitted). Likewise, the NYCHRL provides for aiding-and-abetting liability with the same standard as the NYSHRL. See N.Y.C. ADMIN. CODE § 8-107(6); Schaper, 408 F. Supp. 3d at 396.

**e. Statutes of Limitations [*21]**

**1. Title VII**

A Title VII plaintiff must file a charge of discrimination with the EEOC either 180 or 300 days after an "alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice"--such as New York--the 300-day limit applies. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). Once the EEOC issues a right-to-sue letter, the plaintiff has ninety days to file suit. See 42 U.S.C. § 2000e-5(f)(1). "A claim is time barred if it is not filed within these limits." Nat'l R.R., 536 U.S. at 109.

**2. Section 1981**

The limitations period for § 1981 claims is four years. See Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382-83, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004). That "limitations period is" not "tolled during the pendency of EEOC administrative proceedings." Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 209 (E.D.N.Y. 2014).

**3. NYSHRL & NYCHRL**

NYSHRL and NYCHRL claims "are time-barred unless filed within three years of the alleged discriminatory acts." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 238 (2d Cir. 2007). Although the Court of Appeals has not held as much, numerous courts have tolled the statute of limitations "during the period in which a complaint is filed . . . with the EEOC." Taylor v. City of New

York, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016).

#### 4. ADA

A plaintiff raising an ADA claim must file a charge with the EEOC within 300 days of the alleged unlawful activity. See Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999).

#### 5. FMLA

A two-year limitations period applies to FMLA actions unless the employer's conduct was [*22] "willful," i.e., the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the" FMLA. Porter v. N.Y. Univ. Sch. L., 392 F.3d 530, 531 (2d Cir. 2004) (per curiam).

### III. Discussion

Plaintiff asserts claims for discrimination, retaliation, and hostile work environment under (1) Title VII, (2) § 1981, (3) the ADA, (4) the FMLA, (5) the NYSHRL, and (6) the NYCHRL. (See FAC ¶¶ 37-90.) The Court will address each in turn.

#### a. Discrimination Claims

#### 1. Title VII, § 1981, NYSHRL, & NYCHRL

Consistent with McDonnell Douglas, the Court begins with whether Plaintiff has established a prima facie case of discrimination. See Comcast, 140 S. Ct. at 1019. Plaintiff alleges discrimination primarily on the basis of race but also suggests discrimination on the basis of sex, religion, and disability status. (See FAC ¶¶ 51-61, 65-68, 75-78.) The parties do not dispute that those categories are protected classes under the applicable statutes, nor do they contest that Plaintiff was qualified for her nursing position. Moreover, the termination of Plaintiff's employment undoubtedly both (1)

constitutes an "adverse employment action"[13] and (2) concerns the "mak[ing] and enforce[ment] of contracts."[14] The discrimination element is the whole ballgame.

Defendants assert [*23] that Plaintiff has not discharged her burden because she "has made no allegation, and has presented no evidence, that the four decision makers who terminated [her] . . . possessed any discriminatory animus." (Defs. Br. at 10.) Plaintiff counters that discriminatory intent can be inferred because Montefiore treated Plaintiff differently from other similarly situated employees. (See Pl. Br. at 11-12.) Specifically, Plaintiff posits that (1) all the complaints against her "were allegedly from ethnic minorities," (2) she "was treated far more worse [sic] than her black co-workers and was subjected to racial commentary of a period of years," and (3) she would not have been terminated but for her race given that no discipline was imposed on any of her co-workers for making discriminatory comments to her. (Id. at 12.)

Ultimately, the Court need not decide whether Plaintiff has made out a prima facie case. Caselaw from the Court of Appeals "makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis, as long as the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment [*24] action." Howard v. MTA Metro-N. Commuter R.R., 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011) (underlining added). Defendants have plainly offered such an explanation for terminating Plaintiff's employment: Plaintiff repeatedly violated the Policy, as evidenced by four complaints involving racially derogatory remarks and other unprofessional

---

[13] See, e.g., Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (including "termination of employment" among a list of "materially adverse employment actions").

[14] See 42 U.S.C. § 1981(b) ("[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts . . . .").

behavior.[15] Consequently, the burden reverts to Plaintiff to show that Defendants' justification is pretextual. See Comcast, 140 S. Ct. at 1019. And on that front, she comes up wholly short.

Plaintiff can show pretext either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Ibrahim v. N.Y. State Dep't of Health, 904 F.2d 161, 166 (2d Cir. 1990). She fails on both fronts because she offers absolutely nothing to show that Montefiore's explanation is pretextual. To the contrary, the record is replete with evidence indicating that four separate complaints were received, each of which was investigated and corroborated, and the complaints and investigation files were reviewed by the Committee, which determined that Plaintiff's employment should be terminated. (See Defs. 56.1 ¶¶ 7-56.)

Beyond conclusory denials in her Rule 56.1 Statement--which the Court has already found not to be entitled to credence, [*25] see Truitt, 2020 U.S. Dist. LEXIS 129874, 2020 WL 4208452, at *1--Plaintiff offers only (1) her own testimony that she did not do any of the things alleged in the complaints and (2) her unsupported speculation that Ms. Lutz somehow "orchestrated [her] termination." (E.g., Maynard Decl. ¶¶ 5, 22-27.) Both contentions miss the point for two reason. First, only the Committee had the authority to terminate Plaintiff, and it exercised that prerogative without Ms. Lutz's participation. (See Defs. 56.1 ¶¶ 45, 52.) And second, when evaluating Defendants' justification, the Court looks "to what motivated the employer rather than to the truth of the allegations against the plaintiff." Vasquez v. Empress

Ambulance Serv., Inc., 835 F.3d 267, 275 (2d Cir. 2016) (cleaned up). Yet, Plaintiff points to nothing that even suggests that the Committee's decision was motivated by racial animus.

In short, the record shows that Montefiore made a good faith determination to terminate Plaintiff's employment. Thus, even assuming that Plaintiff established her prima facie case of discrimination, she plainly has failed to show that Defendants' proffered justification for terminating her is pretextual. Accordingly, summary judgment is required on her Title VII, § 1981, NYSHRL, and NYCHRL discrimination claims.

## 2. ADA and FMLA

Defendants maintain that [*26] it is unnecessary to consider the merits of Plaintiff's ADA and FMLA claims because those claims are untimely. (See Defs. Br. at 24.) Specifically, Defendants posit that Plaintiff's ADA and FMLA claims are time barred because Plaintiff did not file (1) an EEOC charge within 300 days of the alleged discrimination or (2) this action within two years of the purported unlawful conduct. (See id.) Plaintiff counters that her claims are timely because a three-year limitations period applies given that Ms. Lutz's decision to rotate "Plaintiff on the night-shift as retaliation show[ed] some intent." (Pl. Br. at 15.)

Plaintiff's question-begging argument misses the mark: She offers no evidence of a willful violation of her FMLA rights and cites no authority establishing a three-year limitations period for ADA claims. Consequently, the two-year limitations period applies to her FMLA claims and the 300-day limitations period governs her ADA claims. Applying those standards, it is patent that neither the FMLA claim nor the ADA claim is timely.

Those claims relate to (1) Defendants' not paying Plaintiff for certain leave and (2) Defendants' temporarily moving Plaintiff to the night shift after she [*27] returned from leave. (See Defs. 56.1 ¶¶

---

[15] See, e.g., Ruiz, 609 F.3d at 493 ("[E]vidence of employee misconduct . . . may . . . be used by an employer to show that it had a legitimate, non-discriminatory reason for plaintiff's termination."); Risco v. McHugh, 868 F. Supp. 2d 75, 109 (S.D.N.Y. 2012) ("On-the-job misconduct . . . always constitute[s] [a] legitimate and nondiscriminatory reason[ ] for terminating employment . . . ." (brackets omitted)).

57-65.) Those acts occurred, at the latest, in April 2016. (See id.) Yet, Plaintiff did not file her EEOC charges until February 2018, well outside the 300-day window for her ADA claim. (FAC ¶ 3.) Likewise, Plaintiff did not file the present action asserting her FMLA claim until September 27, 2018, more than two and a half years after the alleged unlawful conduct. (See Complaint, dated Sept. 27, 2018 [dkt. no. 15].) Based on those undisputed facts, Plaintiff's ADA and FMLA claims are plainly time barred. Thus, summary judgment is proper.

**b. Retaliation Claims**

**1. Title VII, § 1981, NYSHRL, & NYCHRL**

Next, the Court turns to Plaintiff's retaliation claims. Like her discrimination claims, the Court begins by examining whether Plaintiff has established a prima facie case. See Comcast, 140 S. Ct. at 1019. Plaintiff alleges retaliation arising out of her complaints regarding derogatory comments made by her co-workers. (See Pl. Br. at 13; see also FAC ¶¶ 51-58, 62-64, 69-71.) The parties' dispute centers on whether a causal connection exists between Plaintiff's reporting on her co- workers and her termination.

Defendants assert that Plaintiff cannot demonstrate causation because the events [*28] that led to her firing were already under way when she complained about her co-workers' remarks. (See Defs. Br. at 14-15.) For support, Defendants point out that they "began investigating Plaintiff for making racist remarks in the workplace in May 2017"--"nearly seven months before her termination"--and that Plaintiff only raised her concerns at the culmination of that investigative process. (Id. at 15.) Plaintiff counters that she has established causation because Montefiore terminated her employment in "close proximity" to her lodging the complaints. (Pl. Br. at 14.)

Whether Plaintiff has made her prima facie case is

a close question. She is undoubtedly correct that, for the purposes of her prima facie case, "proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." Duplan v. City of New York, 888 F.3d 612, 626 (2d Cir. 2018). However, "[i]t is [also] well established that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity." Wilkinson v. Nord Anglia Educ. Ltd., No. 17 Civ. 7421 (PAE), 2019 U.S. Dist. LEXIS 126863, 2019 WL 3430662, at *10 (S.D.N.Y. July 30, 2019). Given that, the Court assumes Plaintiff has made out a prima facie case and jumps to pretext. See Howard, 866 F. Supp. 2d at 205.

The pretext issue is anything but close. As [*29] discussed above, Defendants have justified their decision to terminate Plaintiff based on the four corroborated complaints made about her on-the-job performance. (See Defs. 56.1 ¶¶ 7-37.) Defendants investigated the first complaint and issued a written warning on August 16, 2017, more than three months before Plaintiff raised her grievances. (Id. ¶¶ 7-17.) Defendants then scrutinized three more complaints between August and October 2017, each of which was corroborated. (Id. ¶¶ 18-37.) Only on November 17, 2017, at the culmination of nearly six months of disciplinary proceedings, did Plaintiff first allege discrimination against her by her co-workers. (Id. ¶¶ 38-43.) Put bluntly, although Plaintiff's disciplinary problems came to a boil when she was terminated in December 2017, by that point the stove had already been on for more than seven months.

To establish causation, Plaintiff relies only on temporal proximity. (See Pl. Br. at 14-15.) But "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."[16] And Plaintiff offers no evidence--

---

[16] Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir.

beyond [*30] conclusory denials and vague conspiracy allegations--to suggest that the Committee's decision had anything to do with any protected activity. In fact, despite Plaintiff's groundless suggestion to the contrary, (see Pl. Br. at 13), the record evinces that the Committee was unaware of Plaintiff's complaints when it elected to terminate her, (see Defs. 56.1 ¶ 53.)

In sum, Plaintiff has failed to offer any evidence that Defendants' legitimate explanation for terminating her is pretextual. Consequently, summary judgment is appropriate on her Title VII, § 1981, NYSHRL, and NYCHRL retaliation claims.

## 2. ADA and FMLA

Plaintiff's retaliation claims under the ADA and FMLA are time barred for the same reasons as her discrimination claims. Accordingly, summary judgment is required for those claims too.

## c. Hostile Work Environment Claims

The Court turns its attention to Plaintiff's hostile work environment claims under Title VII, § 1981, the NYSHRL, and the NYCHRL. Those claims are premised on remarks made by Ms. Harris, Ms. Douglas, Ms. Nelson, and Ms. Wynter. (See Defs.

---

2001); see also Tomizawa v. ADT LLC, No. 13-CV-6366 (MKB) (LB), 2015 U.S. Dist. LEXIS 133649, 2015 WL 5772106, at *7-*8 (E.D.N.Y. Sept. 29, 2015) (granting motion for summary judgment on NYSHRL and NYCHRL claims where "a progressive series of disciplinary actions" began "months before" plaintiff engaged in protected activity and plaintiff relied only on temporal proximity and "his own subjective belief that Defendants' actions were retaliatory" to show causation); Dabney v. Christmas Tree Shops, 958 F.Supp.2d 439, 456 (S.D.N.Y. 2013) (granting summary judgment on Title VII and NYSHRL retaliation claims, despite temporal proximity between termination and protected activity, because "the termination was ultimately the product of an extensive period of progressive discipline" (quotation marks omitted)); Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 614-15 (S.D.N.Y. 2008) (granting summary judgment on Title VII claim where "the road that led to plaintiff's termination began before plaintiff" engaged in protected activity and plaintiff relied "entirely on the temporal proximity between" the protected activity and her termination to show pretext).

56.1 ¶¶ 74-83.) Specifically, Plaintiff recounts the following:

• Between 2013 and 2015, Ms. Harris repeatedly [*31] called Plaintiff a "snowflake." (Id. ¶¶ 43, 74.)

• Sometime in 2013, Ms. Douglas asked Plaintiff "[c]an I touch your hair?" and "does your husband pull your hair when you're having sex?" (Id. ¶¶ 42, 75.)

• In January 2014, Ms. Nelson called Plaintiff "blondie." (Id. ¶ 76.)

• Sometime before April 2015, Ms. Nelson told Plaintiff that "blonde people have no problems." (Id. ¶ 77.)

• In May 2015, Ms. Wynter called Plaintiff the "KKK." (Id. ¶¶ 41, 78.)

• In August 2015, Ms. Harris told Plaintiff she could be "the middle of an oreo cookie," that "white people are weird," and that "white people eat weird food," and she asked Plaintiff "why don't you do something with your hair?" (Id. ¶¶ 43, 79.)

• In December 2015, Ms. Douglas said that "white women are pigs and their houses are dirty." (Id. ¶¶ 42, 80.)

• In spring 2017, Ms. Nelson told Plaintiff that she was "not a religious person" and that Ms. Nelson had considered giving her a bible. (Id. ¶ 81.)

Only Ms. Harris admits to making any of the remarks alleged. (Id. ¶ 82.)

## 1. Timeliness of Claims

Defendants question the timeliness of Plaintiff's hostile work environment claims. (See Defs. Br. at 16-18.) Plaintiff does not address that argument, even [*32] in passing. It is well settled that "[w]here a defendant moves for summary

judgment, and the opposing party fails to oppose the argument, courts will deem the claim abandoned and grant dismissal."[17] Even so, the Court still must examine Defendants' "submission to determine if [they] ha[ve] met [their] burden of demonstrating that no material issue of fact remains for trial." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

Recall that the relevant statutes of limitations are as follows: (1) 300 days for Title VII claims, see Nat'l R.R., 536 U.S. at 109; (2) four years for § 1981 claims with no tolling, see Jones, 541 U.S. at 382-83; Bowen-Hooks, 13 F. Supp. 3d at 209; and (3) three years for NYSHRL and NYCHRL claims, with tolling during the pendency of EEOC proceedings, see Kassner, 496 F.3d at 238; Taylor, 207 F. Supp. 3d at 302. That leaves the following last accrual dates for each claim:

• Title VII: The accrual date is April 29, 2017, i.e., 300 days before the EEOC charges were filed on February 23, 2018. (See FAC ¶ 3.)

• Section 1981: The accrual date is September 27, 2014, i.e., four years before this action was commenced on September 27, 2018. (See Complaint at 16.)

• NYSHRL & NYCHRL: The accrual date is May 16, 2015, i.e., three years and 134 days before this case was filed. That figure includes the original limitations period as well as applicable [*33] tolling. (See id.; FAC ¶¶ 3-4.) Based on those accrual periods, Plaintiff's Title VII hostile work environment claim is time barred because all the relevant statements were made before April 29, 2017. On that basis alone, summary judgment is proper as to that claim.

For the § 1981, NYSHRL, and NYCHRL claims, the issue is a bit more complicated because some of the statements were made during the limitations period and some were made before. Defendants assert that Ms. Douglas's 2013 statements and Ms. Nelson's 2014 statement calling Plaintiff "blondie"--which were uttered before September 2014--are untimely under all the relied-upon statutes. (See Defs. Br. at 17.) Likewise, Defendants posit that Ms. Nelson's April 2015 statement that "blonde people have no problems" and Ms. Wynter's May 2015 statement calling Plaintiff the "KKK" are untimely under the NYSHRL and the NYCHRL, but not § 1981. (See id.)

Pre-limitations conduct may be actionable under a hostile work environment theory if it is "sufficiently related" to events occurring during the limitations period. McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 77 (2d Cir. 2010). "Courts should make an individualized assessment of relatedness, considering whether as a matter of law that the acts before and after the [*34] limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment." Batista v. Waldorf Astoria, No. 13 Civ. 3226 (LGS), 2015 U.S. Dist. LEXIS 94023, 2015 WL 4402590, at *6 (S.D.N.Y. July 20, 2015) (quotation marks omitted). But "sporadic, discriminatory actions, taken by different co- workers," fail to clear that "sufficiently related" hurdle.[18]

With those standards in mind, the Court agrees with Defendants: The pre-limitations activity is not sufficiently related to the during-limitations incidents "to be part of the same alleged hostile work environment practice." McGullam, 609 F.3d at 77. For her part, Plaintiff offers no explanation relating the untimely utterances to the timely ones. In fact, from a review of the record, the opposite

---

[17] Alexander v. Westbury Union Free Sch. Dist., 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011); see also Jackson v. Fed. Express, 766 F.3d 189, 197-98 (2d Cir. 2014) (granting summary judgment on claims where plaintiff failed to oppose defendant's motion).

[18] Maxton v. Underwriter Labs., Inc., 4 F. Supp. 3d 534, 544 (E.D.N.Y. 2014); see also Grimes-Jenkins v. Consol. Edison Co. of N.Y., Inc., No. 16-CIV-4897 (AT) (JCF), 2017 U.S. Dist. LEXIS 77710, 2017 WL 2258374, at *12 (S.D.N.Y. May 22, 2017) ("[U]ntimely acts and timely acts of harassment are not sufficiently related when they are committed by different coworkers in a different section of the workplace." (cleaned up)).

seems to be true: The alleged conduct was undertaken by different co-workers with the timely and untimely events being separated by months or even years. For example, Ms. Wynter is not alleged to have made any other comments to Plaintiff, either before or during the relevant limitations periods. Likewise, although Ms. Douglas made a remark to Plaintiff during the limitations period, that statement was more than two years removed from her other alleged comment [*35] and concerned an entirely different subject. Ms. Nelson is in a similar position: Her timely comment was made years after her untimely ones. Those facts severely undermine any contention that the pre-limitations statements relate to those made during the limitations period.

What then remains? For Plaintiff's NYSHRL and NYCHRL claims, the following: (1) Ms. Harris's calling Plaintiff a "snowflake"; (2) Ms. Harris's August 2015 statements; (3) Ms. Douglas's December 2015 comment; and (4) Ms. Nelson's 2017 remark. As for Plaintiff's § 1981 claim, Ms. Nelson's and Ms. Wynter's 2015 statements are also fair game. Whether these remaining statements are sufficient to avoid summary judgement is considered below.

## 2. Employer and Individual Liability

Next, Defendants assert that Plaintiff cannot impute liability to Montefiore based on the individual defendants' actions. (See Defs. Br. at 19-21.) Plaintiff counters that holding Montefiore liable is proper because its response to her harassment was inadequate. (See Pl. Br. at 8-10.) Plaintiff makes the following (at times conflicting) accusations: (1) Montefiore did not stop the harassment of Plaintiff to the point that she had to involve law enforcement; [*36] (2) Montefiore did not investigate all of the alleged harassment, in contravention of its policy; (3) it is unclear whether Montefiore disclosed all investigative materials to her; (4) interview notes and records were either not maintained or were destroyed; and (5) Montefiore

did not notify Plaintiff that an investigation could take longer than thirty days. (See id. at 8-9.)

But Plaintiff cites absolutely nothing in the record to support those accusations. The Court's independent review of the record revealed no such evidence either. To the contrary, the record shows that none of the alleged harassers had any supervisory authority over the Plaintiff, (Defs. 56.1 ¶¶ 6, 84- 87), which forecloses one avenue for establishing vicarious liability from the start.[19] Given that the harassment was perpetrated by her co-workers, Plaintiff must show that Montefiore (1) either knew or should have known of it and (2) did not take corrective action to stop it. See Rojas, 660 F.3d at 107; N.Y.C. ADMIN. CODE § 8-107(13)(b)(1)-(3). She cannot.

Although Plaintiff alleges instances of harassment over several years, she did not report anything to Montefiore until November 2017, even though Montefiore provided numerous channels through which she could do [*37] so. (See Defs. 56.1 ¶¶ 41-43, 68- 70.) Montefiore obviously could not have taken immediate corrective action regarding the conduct underlying the complaints because it was only made aware of the conduct months or years later. And after Plaintiff reported the alleged harassment, it does not appear that the conduct continued: Plaintiff identifies no more statements after November 2017. Her accusations that Montefiore failed to investigate and took no corrective action do not alter that calculus. Accordingly, Plaintiff cannot impute the individual defendants' conduct to Montefiore under § 1981, the NYSHRL, or the NYCHRL.[20]

---

[19] See Vance, 570 U.S. at 424 ("If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable."); Zakrzewska, 928 N.E.2d at 1039 (providing for employer liability under the NYCHRL "where the offending employee exercised managerial or supervisory responsibility" (quotation marks omitted)).

[20] The Court again observes that the standards for imputing an employee's conduct to the employer are identical under Title VII, § 1981, and the NYSHRL. See Vance, 570 U.S. at 424; Lamarr-Arruz, 271 F. Supp. 3d at 658-59. Because "Title VII claims are not

Defendants also aver that, "because the individual defendants were not managers or supervisors, Plaintiff does not have a direct cause of action against [her] coworker defendants." (Defs. Br. at 20.) That contention proves a bit too much. Individual liability can lie under § 1981, the NYSHRL, and the NYCHRL without the individual occupying a supervisory role. Both § 1981 and the NYCHRL, for example, allow for individual liability where the individual was personally involved, which the individual defendants obviously were because they allegedly made the statements. See Whidbee, 223 F.3d at 75; Schaper, 408 F. Supp. 3d at 395.

But individual [*38] liability under the NYSHRL is another story. Unlike § 1981 and the NYCHRL, mere personal involvement in the alleged harassment is not enough. Instead, for employees who are not owners or supervisors, personal liability will flow only if the individual "aided and abetted the unlawful discriminatory acts of others." Xiang, 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *5. Yet, such liability is solely "derivative," i.e., the employer must be liable as a principal for a hostile work environment. See, e.g., Osborne v. Moody's Invs. Serv., Inc., No. 1:17-CV-01859 (ALC), 2018 U.S. Dist. LEXIS 47558, 2018 WL 1441392, at *7 (S.D.N.Y. Mar. 22, 2018). As discussed above, however, Plaintiff cannot impute liability to Montefiore. It follows, then, that the individual defendants cannot be liable under an aiding-and-abetting theory. (See id.) Summary judgment is appropriate on Plaintiff's NYSHRL hostile work environment claim.

### 3. The Remaining Claims

The funnel has further narrowed: Only Plaintiff's § 1981 and NYCHRL claims against Ms. Harris, Ms. Douglas, Ms. Wynter, and Ms. Nelson remain.[21] As

for those claims, Defendants aver that they too fail "because the alleged comments do [sic] not amount to a hostile work environment." (Defs. Br. at 21.) Plaintiff barely addresses this argument, offering only one assertion that "[t]he comments at Plaintiff's [*39] place of employment for several months are clearly not a petty slight and trivial inconvenience." (Pl. Br. at 10.)

Plaintiff's claims under § 1981 fail. As an initial matter, § 1981 deals only with race-based discrimination, Parra, 48 F. Supp. 3d at 551 n.2, so Ms. Nelson's comment regarding Plaintiff's religion is outside its ambit. As for the remaining statements, even taken together they are not so "severe or pervasive" that a reasonable person would find the workplace "hostile or abusive." Raspardo, 770 F.3d at 114. "For racist comments, slurs, and jokes to constitute a hostile work environment, . . . there must be more than a few isolated incidents of racial enmity." Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 83 (2d Cir. 2009) (quotation marks omitted). In other words, "instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (brackets omitted). The Court finds that the remarks at issue here--which were made by four different co-workers over the course of three years--simply "are not continuous enough to be considered 'pervasive' by a rational juror." Davis-Bell, 851 F. Supp. 2d at 673. Summary judgment is warranted on Plaintiff's § 1981 claim.

Even though the NYCHRL imposes a lower liability standard than § 1981, Title VII, or the NYSHRL, see Baez, 2017 U.S. Dist. LEXIS 1630, 2017 WL 57858, at *4, Plaintiff's NYCHRL claims suffer the same fate. The NYCHRL still [*40] does not impose "a general civility code," and "[i]solated incidents of unwelcome verbal conduct have been found to constitute the type of petty slights and trivial inconveniences that are not actionable."

---

cognizable against individuals," Patterson, 375 F.3d at 226, this conclusion constitutes an alternative ground supporting summary judgment on Plaintiff's Title VII hostile work environment claims.

[21] As discussed above, the Court has already found that Ms. Wynter's

statement may only be considered under § 1981.

Alexander v. Possible Prods., Inc., 336 F. Supp. 3d 187, 195 (S.D.N.Y. 2018). That aptly describes the facts here. As mentioned above, the relevant statements--though certainly unwelcome and upsetting-- were made by a handful of different co-workers spread out over more than three years. Moreover, those remarks do "not reflect obvious discrimination or speak to [Plaintiff's] standing in the workplace, even if they were unkind." Duverny v. Hercules Med. P.C., No. 18-CV-07652 (DLC), 2020 U.S. Dist. LEXIS 37547, 2020 WL 1033048, at *11 (S.D.N.Y. Mar. 3, 2020). With that in mind, the Court finds that the alleged comments are insufficient to support a hostile work environment claim, "even under the liberal NYCHRL standard."[22] Summary judgment is in order.

## IV. Conclusions

For the foregoing reasons, Defendants' motion for summary judgment [dkt. no. 52] is GRANTED. The Clerk of the Court shall mark the action closed and all pending motions denied as moot.

**SO ORDERED**.

Dated: February 4, 2021

New York, New York

/s/ Loretta A. Preska

LORETTA A. PRESKA

Senior United States District Judge

---

End of Document

---

[22] Alexander, 336 F. Supp. 3d at 195; see also Mullins v. Consol. Edison Co. of N.Y., Inc., No. 13 Civ. 6800 (LGS), 2015 U.S. Dist. LEXIS 96276, 2015 WL 4503648, at *13 (S.D.N.Y. July 22, 2015) (finding that "occasional jokes" and other comments by the defendant were non- actionable under the NYCHRL). Additionally, because summary judgment is proper on the NYCHRL claims, it follows a fortiori that summary judgment would also be appropriate on her Title VII and NYSHRL claims.

 Positive
As of: April 4, 2022 8:10 PM Z

# Monastra v. NYNEX Corp.

United States District Court for the Southern District of New York

September 8, 2000, Decided ; September 12, 2000, Filed

99 Civ. 8917 (RCC)

**Reporter**
2000 U.S. Dist. LEXIS 13142 *; 165 L.R.R.M. 2500; 141 Lab. Cas. (CCH) P10,818

MARIE MONASTRA, Plaintiff, -v- NYNEX CORPORATION, THOMAS SERGI, ERNEST HOFFMAN, RODDY HARRINGTON, MICHAEL ANTONACCI, and DENNIS LE DUC, Defendants.

**Disposition:** [*1] Plaintiff's motion to remand denied and defendant Le Duc's motion for judgment on the pleadings, dismissing the case as against him, granted.

**Counsel:** For MARIE MONASTRA, plaintiff: Nancy Zecca, Marshall B. Bellovin, Ballon, Stoll, Bader & Nadler, P.C., New York, NY.

For NYNEX CORPORATION, THOMAS SERGI, ERNEST HOFFMAN, RODDY HARRINGTON, MICHEAL ANTONACCIO, defendants: Joy D. Oberman, New York, NY.

For DENNIS LE DUC, defendant: Amy S. Young, New York, NY.

**Judges:** Richard Conway Casey, U.S.D.J.

**Opinion by:** Richard Conway Casey

# Opinion

Opinion and Order

Richard Conway Casey, U.S.D.J.

Plaintiff, Marie Monastra, initiated this action in New York State Supreme Court, against her former employer, NYNEX Corporation ("NYNEX"), and five individual defendants, alleging employment discrimination, wrongful termination in breach of a collective bargaining agreement and outrageous and malicious treatment. Plaintiff asserts that she was involved in an incident where another NYNEX employee threatened her, and that as a result of this incident she became physically and mentally ill. She further contends that despite her requests for assistance, NYNEX and the individual defendants failed to address the situation, [*2] further contributing to her emotional distress. Plaintiff brought this action against the defendants for: i) failure to provide her with a medically justified leave of absence; ii) failure to accommodate her with a transfer to a different and safer location; iii) failure to take corrective action against the employee who threatened her; and iv) wrongfully terminating her in violation of the collective bargaining agreement between NYNEX and her union.

NYNEX removed the action to the United States District Court for the Southern District of New York and plaintiff has now moved to remand the action to state court. One of the individual defendants, Dennis Le Duc, has moved for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), dismissing the action against him. For the reasons set forth below, plaintiff's motion to remand is denied and defendant Le Duc's motion to dismiss the action as against him is granted.

# I. BACKGROUND

Plaintiff commenced her employment with NYNEX on May 20, 1980 as a directory assistance operator. During her employment, plaintiff was a member of District One of the AFL-CIO Communications Workers of America Union, also known as CWA [*3] Local 1101 ("Local 1101"). NYNEX and Local 1101 maintain a collective bargaining agreement (the "Agreement") which governs the terms and conditions of employment for Local 1101 members. Section 10.01(1) of the Agreement specifically provides that:

> if an employee is to be discharged, he shall first be suspended for ten (10) calendar days. The Local Union shall be notified in writing immediately that the employee has been suspended prior to discharge. During the ten (10) day period, the Local Union may discuss the reasons for NYNEX's action with the appropriate district level supervisor (or his alternate) and may protest the action.

(Affidavit of Joy D. Oberman, Exh. B.)

In or about May of 1996, plaintiff was employed as a Construction Coordinator at the NYNEX Garage, located at 2300 Randall Avenue, Bronx, New York (the "Randall Avenue facility"). As a Construction Coordinator, plaintiff's duties were primarily office related, involving the maintenance of employee time sheets and inventory records and other administrative tasks. On or about July 28, 1996, plaintiff alleges that she was threatened by a male co-worker, Gerard Job. While the two were alone in the kitchen [*4] area, Job allegedly prevented plaintiff from leaving the kitchen and threatened her over rumors that she had informed someone that Job and another employee, Ruben Garcia, were stealing from the Randall Avenue facility. (Complaint at p. 4, PP 25-29.) Despite plaintiff's denial of the rumors, Job repeatedly told plaintiff that he "better not hear anything else or else!" (*Id.* at p. 4, PP 26, 29.) Plaintiff, upset and concerned for her safety, left work for the day immediately thereafter.

Plaintiff maintains that she was in fear for her life and therefore, relayed the incident to Roy Sokolov,

a retired NYNEX foreman, and to Pamela Jones, the director of the NYNEX Employee Assistance Program. The next day, on or about July 29, 1996, plaintiff further reported the incident to defendant Thomas Sergi, a former management-level NYNEX employee. Plaintiff alleges that Sergi informed her that he would "personally take care of the Job incident" and later directed her not to take further action. (Complaint at p. 6, P 39.) Plaintiff also made follow-up requests to NYNEX management, requesting that the incident with Job be written up. Subsequently, plaintiff received indirect threats from Garcia [*5] as well.

Discouraged that NYNEX had not addressed the matter to her satisfaction, on or about November 13, 1996, plaintiff reported the incident to defendant Ernest Hoffman, Sergi's superior at the time. Then on November 14, 1996, plaintiff met with Sergi, defendant Roddy Harrington, a NYNEX control foreman, a third NYNEX employee and defendant Dennis Le Duc, a Local 1101 business agent, to discuss the incident. Plaintiff contends that the meeting was merely a pretense and that the atmosphere and tenor of the meeting only made her more fearful for her situation. She asserts that she was told not to discuss the incident with anyone else and informed by Le Duc "that they [didn't] like the idea of her telling anyone what goes on in the office area." (Complaint at pp. 8-9, PP 62-66.) Plaintiff subsequently contacted a confidential NYNEX hotline to report her situation. On or about November 22, 1996, she spoke with Kevin Houston of NYNEX Security regarding the Job incident. Plaintiff avers that she later applied for different positions within NYNEX, in order to transfer out from the Randall Avenue facility. Job has denied ever threatening plaintiff and NYNEX has not taken any disciplinary [*6] action against him.

After initially informing Sergi of the incident with Job, plaintiff became physically and emotionally ill. Thereafter, she sought medical treatment from both a psychiatrist, Dr. Grant Mitchell, and a psychotherapist and social worker, Laurie Orfe, on a continuing basis. (Complaint at p. 6, P 46.)

Plaintiff asserts that her condition worsened and was exacerbated by the failure of NYNEX and the individual defendants to resolve this matter concerning the Job incident. Eventually, due to her medical and emotional condition, plaintiff contends that she was unable to immediately return to work. Plaintiff further asserts that Dr. Mitchell and Ms. Orfe notified NYNEX that she had ben diagnosed with severe depression, anxiety and panic, and that she would require time off from work. (*Id.* at p. 10, P 90.) By letter dated December 7, 1996, NYNEX notified plaintiff that she would have to provide medical justification for her absence from work. (*Id.* at p. 10, P 92.)

In or about late December of 1996, at Le Duc's direction, plaintiff reported for work at the NYNEX facility located at 500 Zerega Avenue, Bronx, New York (the "Zerega Avenue facility"). Plaintiff alleges [*7] that the foreman of the Zerega Avenue facility, defendant Michael Antonacci, informed plaintiff that she was to return to the Randall Avenue facility. (Complaint at p. 10, P 95.) Upon informing Le Duc of this development, he advised her to return home and that he would find her another location to work.

By letter dated January 2, 1997, Harrington informed plaintiff that if she did not return to work by January 9, 1997, she would be separated from the payroll. Plaintiff contends that Dr. Mitchell forwarded to NYNEX the requisite medical information for her to obtain sick leave. Plaintiff then spoke with Barbara Biggs-Glover, a chief steward for Local 1101, who advised her that Harrington had refused to accept plaintiff's sick leave status and further advised plaintiff to return work. Plaintiff avers that she returned to work at the Randall Avenue facility on or about January 15, 1997, and that Harrington advised her to go home because she did not have the requisite medical approval to return to work. (Complaint at p. 12, PP 107-08.) Prior to that date, plaintiff had never been informed that she was required to submit medical approval to Harrington in order to return to work.

Plaintiff [*8] asserts that she was placed on absence without leave status on January 15, 1997. (Complaint at p. 12, P 111.) On or about January of 1997, plaintiff received a letter from COBRASERV, notifying her that she had been terminated from NYNEX and that she needed to elect whether or not to continue her health benefits.

Plaintiff initiated this action on June 22, 1999, asserting twelve causes of action against NYNEX, for violations of the New York Human Rights Law (the "Human Rights Law") and the New York City Administrative Code (the "Administrative Code"). She alleges disability discrimination, gender discrimination, breach of the Agreement and outrageous and malicious treatment by NYNEX. Plaintiff's first eight causes of action allege disability discrimination and are summarized as follows: i) plaintiff suffered from a disability as defined by N.Y. Exec. Law § 292(21) and New York City Administrative Code § 8-102(16)(a), and NYNEX refused to grant her request for a leave of absence in violation of N.Y. Exec. Law § 296(1)(a) and New York City Administrative Code § 8-107(1)(a); ii) NYNEX failed to reasonably accommodate her by transferring plaintiff to a safer location in violation of [*9] N.Y. Exec. Law § 296(3)(a) and New York City Administrative Code § 8-107(1)(a); iii) NYNEX refused to accept medical documentation supporting her leave of absence and eventually terminated her in violation of N.Y. Exec. Law § 296(1)(a) and New York City Administrative Code § 8-107(1)(a); and iv) NYNEX wrongfully terminated plaintiff in retaliation for opposing unlawful discriminatory practices and in violation of N.Y. Exec. Law § 296 (3)(c) and New York City Administrative Code § 8-107(7). The ninth and tenth causes of action allege gender discrimination, because NYNEX failed to take corrective action against Job, Garcia and Brignoni [1] in violation of N.Y. Exec. Law § 296(1)(a) and New York City Administrative Code § 8-107(1)(a). The eleventh cause of action alleges

---

[1] This is the only mention of an individual named Brignoni in plaintiff's complaint.

that NYNEX breached the Agreement because NYNEX failed to suspend her ten days prior to termination, failed to notify Local 1101 that she had been suspended or would be discharged and failed to notify her that she had, in fact, been terminated. Plaintiff's final cause of action alleges that NYNEX's treatment of plaintiff was outrageous, malicious and done with reckless indifference toward plaintiff, in violation [*10] of the New York City Administrative Code.

On July 15, 1999, NYNEX removed the action to the United States District Court for the Southern District of New York, on the basis of the Court's original jurisdiction under Section 301 of the Labor Management Relations Act of 1947 (the "Labor Relations Act") and 28 U.S.C. §§ 1331, 1337. Plaintiff has moved to remand this action to the New York State Supreme Court, arguing that this Court lacks subject matter jurisdiction. In addition, defendant Le Duc has moved for judgment on the pleadings, dismissing the action as against him for failure to allege a legally sufficient claim of discrimination.

## II. DISCUSSION

### A. MOTION TO REMAND

#### 1. Preemption by Section 301 of the Labor Relations Act

Plaintiff contends that all of the causes of action here are either state or local in nature and therefore, the Court lacks subject matter jurisdiction and should [*11] remand this action to state court. With regard to the eleventh cause of action, asserting breach of the Agreement, plaintiff argues that the Labor Relations Act is inapplicable here because the controversy is between an employer and a single employee and not between an employer and an entire labor organization. Plaintiff also argues that because she has not pled a violation of the Labor Relations Act in the complaint, it should not be controlling here.

A defendant may remove any civil action commenced in state court to the United States District Court where the federal court maintains original jurisdiction. 28 U.S.C. § 1441(1994). Under Section 301 of the Labor Relations Act ("Section 301"), the Court maintains jurisdiction over causes of action based on violations of collective bargaining agreements. *McKee v. Transco Prods., Inc.*, 874 F.2d 83, 85 (2d Cir. 1989). Specifically, Section 301 provides that:

> suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district [*12] court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C.A. § 185(a) (1998). Therefore, Section 301 governs claims based upon rights created by a collective bargaining agreement and any claims "'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (quoting *Int'l Brotherhood of Elec. Workers v. Hechler*, 481 U.S. 851, 859, n. 3, 107 S. Ct. 2161, 95 L. Ed. 2d 791 (1987)); *see McKee*, 874 F.2d at 85. Although plaintiff has not pled this as a federal cause of action in the complaint, the "complete preemption" doctrine dictates that where "the preemptive force of a statute is so extraordinary [] it converts an ordinary state common-law complaint into one stating a federal claim." *Caterpillar*, 482 U.S. at 393 (citations and quotation marks omitted); *see also Wilk v. Intercontinental Hotel*, 1994 U.S. Dist. LEXIS 658, 1994 WL 25807 at *2 (S.D.N.Y. Jan. 28, 1994) (holding that section [*13] 301 converts common law breach of contract claim into federal cause of action where contract is collective bargaining agreement). This "complete preemption" doctrine primarily applies to claims under Section 301. *See Caterpillar*, 482 U.S. at

393; *Hernandez v. Conriv Realty Assocs.*, 116 F.3d 35, 38 (2d Cir. 1997). Plaintiff, therefore, cannot elude federal jurisdiction over this claim by fashioning it as a state law claim. Here, plaintiff has not alleged any violation of a specific state law. Instead, she merely eschews any reference to federal jurisdiction and frames the cause of action as common law breach of contract. Plaintiff has failed to even cite any case law in support of her position. Nevertheless, because the violation alleged requires the Court to review and interpret the Agreement in order to determine whether it has been breached, Section 301 governs. *See Lingle v. Norge Division of Magic Chef*, 486 U.S. 399, 413, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988); *Foy v. Pratt & Whitney Group*, 127 F.3d 229, 233 (2d Cir. 1997).

In addition, plaintiff's argument that this action is beyond the scope of Section 301 [*14] because it is a controversy between an individual employee and an employer, and not a controversy between an employer and an entire labor organization, is unavailing. In fact, Section 301 has been held to be controlling in this exact situation. *See Smith v. Evening News Assoc.,* 371 U.S. 195, 200-01, 83 S. Ct. 267, 9 L. Ed. 2d 246 (1962); *Dougherty v. American Tel. and Tel. Co.*, 902 F.2d 201, 203 (2d Cir. 1990); *McKee*, 874 F.2d at 85. Accordingly, because the Court maintains jurisdiction over this cause of action, removal was proper in this instance and plaintiff's motion to remand is denied.

### 2. ERISA Preemption

Although plaintiff makes no further arguments in support of the motion to remand, NYNEX further contends that the Court maintains jurisdiction over plaintiff's causes of action for denial of medical leave and benefits based on ERISA preemption. NYNEX removed this action on the basis of preemption by Section 301 and only now advances its ERISA preemption argument in opposing the motion to remand. (Notice of Removal, PP 3-7.) Furthermore, plaintiff has not even addressed this particular issue. Therefore, having

determined [*15] that removal was proper on the basis of preemption by Section 301, the Court declines to address whether ERISA preemption exists here, for purposes of determining the motion to remand.

### B. DEFENDANT LE DUC'S MOTION FOR JUDGMENT ON THE PLEADINGS

### 1. Le Duc as an "Employer"

Defendant Le Duc, a business agent of Local 1101, contends that this action should be dismissed as against him because he does not hold a management position with NYNEX. He argues, therefore, that he is not an employer as defined by either the Labor Relations Act or the Human Rights Law. Le Duc asserts that because plaintiff's causes of action allege discrimination by her employer, NYNEX, and individual NYNEX employees, he is not a proper defendant in this action.

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(c), the Court applies the same standard as it would under a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816, 130 L. Ed. 2d 28, 115 S. Ct. 73 (1994); *Heartland Sec. Corp. v. Gerstenblatt*, 2000 U.S. Dist. LEXIS 3496, 2000 WL 303274 at *4 (S.D.N.Y. Mar. 22, 2000). [*16] Accordingly, the Court "accept[s] the allegations contained in the complaint as true, and draw[s] all reasonable inferences in favor of the non-movant; [and will] not dismiss the complaint 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Sheppard*, 18 F.3d at 150 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)) (internal quotations omitted); *see Fitzgerald v. Field*, 1998 U.S. Dist. LEXIS 4205, 1998 WL 152575 at *2 (S.D.N.Y. Apr. 1, 1998).

The Court notes that plaintiff undercuts her argument in support of the motion to remand, by now relying upon the Labor Relations Act to

support her claims against Le Duc. Plaintiff cannot selectively apply the Labor Relations Act to suit her purposes; opting to renounce its application in hopes of remanding this action and then relying upon it to oppose the motion to dismiss. Plaintiff's causes of action all allege violations of the Human Rights Law or the Administrative Code, with the exception of the eleventh cause of action, which the Court has determined is governed by the Labor Relations [*17] Act. The Court now will address plaintiff's claim that the Labor Relations Act controls whether Le Duc is an employer, only with respect to that particular cause of action. The remaining claims are governed by the Human Relations Law.

The Labor Relations Act defines an "employer" as "any person acting as an agent of an employer, directly or indirectly." 29 U.S.C.A. § 152(2) (1998). However, the Labor Relations Act further provides that "anyone acting in the capacity of officer or agent of [a] labor organization" is not included in the definition of "employer." *Id.* Notwithstanding the clear language of the statute, plaintiff argues that Le Duc "so aligned himself with management as to become a part thereof." (Plaintiff's Memo in Opposition at p. 3.) Hence, she argues that Le Duc is an employer as defined by the Labor Relations Act and not exempt from liability.

It is undisputed that Le Duc is a business agent of plaintiff's union, Local 1101, and not an employee of NYNEX. Plaintiff only contends that Le Duc is a de facto employee of NYNEX by virtue of his conduct. She never claims that he was actually an employee of NYNEX and there is nothing in the record [*18] to indicate that an employee-employer relationship existed between Le Duc and NYNEX. This fact alone, takes Le Duc outside of the definition of an employer under the Labor Relations Act. However, because plaintiff is entitled to all reasonable inferences in her favor, the Court will extend its analysis beyond the precise language of the statute. In actions arising under the Labor Relations Act, an employer-employee relationship exists where the "'purported employer

controls or has the right to control both the result to be accomplished, and the manner and means by which the purported employee brings about the result.'" *Chaiken v. VW Pub. Corp.*, 119 F.3d 1018, 1034 (2d Cir. 1997), *cert. denied*, 522 U.S. 1149, 140 L. Ed. 2d 179, 118 S. Ct. 1169 (1998) (quoting *Hilton Int'l Co. v. NLRB*, 690 F.2d 318, 320 (2d Cir. 1982)); *see Momen v. United States of America*, 946 F. Supp. 196, 202 (N.D.N.Y. 1996); *see also NLRB v. E.C. Atkins & Co.*, 331 U.S. 398, 413-14, 67 S. Ct. 1265, 91 L. Ed. 1563 (1947) (holding that employer-employee relationship is determined by power to set wages and hours, coupled with the financial [*19] burden of the wages and receipt of the benefits of the work, as well as the absolute power to hire and fire or the power to control all the activities of the worker); *District 2 Marine Eng'rs Beneficial Ass'n v. Grand Bassa Tankers, Inc.,* 1980 U.S. Dist. LEXIS 9698, 1980 WL 2187 at *5 (E.D.N.Y. Nov. 4, 1980) (quoting *E.C. Atkins*, 331 U.S. at 413-14). Here, plaintiff has failed to allege that Le Duc possessed any indicia of control over the objective, manner and means of her employment. Plaintiff also fails to assert any facts to support her claim that Le Duc acted as a de facto member of NYNEX management. The only fact that could possibly lead to an inference that Le Duc maintained any control over plaintiff, is Le Duc's directing her to report to the Zerega Avenue facility. (Complaint at p. 10, PP 93-94.) However, this can only be construed as Le Duc assisting plaintiff, as he found her an alternative work location to the Randall Avenue facility, the situs of the threats underlying this action. On its face, this conduct alone fails to demonstrate that Le Duc possessed any control over the incidents of plaintiff's employment. Moreover, Le Duc's actions here rebut plaintiff's [*20] allegation that Le Duc acted in concert with management to discriminate against her. On the contrary, it serves to bolster Le Duc's position that he is a business agent of Local 1101 and not an employer. The remaining assertions concerning Le Duc's conduct do not implicate the issue of control over plaintiff's incidents of

employment. Therefore, plaintiff's bald assertions that Le Duc is an employer under the Labor Relations Act are insufficient to survive a motion to dismiss. *Tarshis v. The Riese Org.*, 211 F.3d 30, 35 (2d Cir. 2000); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Le Duc also does not qualify as an employer under the Human Rights Law. The determination of whether a party is an employer under the Human Rights Law, turns on whether the purported employer: i) has the power of selecting and engaging the employee; ii) makes payment of salary or wages to the employee; iii) has the power of dismissal over the employee; and iv) has the power to control the employee's conduct. *See Pampillonia v. RJR Nabisco, Inc.*, 138 F.3d 459, 461 (2d Cir. 1998) (citing *Goyette v. DCA Adver., Inc.*, 830 F. Supp. 737, 746 (S.D.N.Y. 1993)); [*21] *Robins v. Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 470 (S.D.N.Y. 1996); *State Div. Of Human Rights v. GTE Corp.*, 109 A.D.2d 1082, 487 N.Y.S.2d 234, 235 (4th Dep't 1985). Of these factors, whether the purported employer "exercised control over the employee's conduct and the incidents of [her] employment," is the crucial inquiry. *Pampillonia*, 138 F.3d at 461; *see Robins*, 923 F. Supp. at 470 (quoting *Alie v. NYNEX Corp.*, 158 F.R.D. 239, 246 (E.D.N.Y.1994)); *see also In re Villa Maria Inst. of Music v. Ross*, 54 N.Y.2d 691, 442 N.Y.S.2d 972, 973, 426 N.E.2d 466 (1981) (holding that court looks to degree of control and direction reserved to employer, in determining existence of employment relationship). Again, plaintiff here has failed to even allege that Le Duc exerted any such control over her employment. Further, there is nothing in the complaint to suggest that Le Duc possessed control over the conditions of plaintiff's employment, much less exerted such control. As previously discussed, the only conduct demonstrating that Le Duc exercised any influence over plaintiff, [2] only

bolsters [*22] Le Duc's position as a union representative. Despite drawing all reasonable inferences in plaintiff's favor, Le Duc is not an employer as defined by the Labor Relations Act or the Human Rights Law. Therefore, Le Duc cannot be held individually liable as an employer and those claims against him are dismissed.

## 2. Le Duc as an Aider and/or Abetter

Plaintiff also alleges that Le Duc is individually liable for NYNEX's discriminatory conduct under the Human Rights Law. The Human Rights Law provides for individual liability where a person "aid[s], abet[s], incite[s], compel[s] or coerce[s] the doing of any of the acts forbidden" by the Human Rights Law. N.Y. Exec. Law § 292(6). Thus, in order to hold Le Duc personally liable as an aider or abetter, plaintiff must establish that he "actually participated in the conduct giving rise to a discrimination claim. [*23] " *Tomka v. Seiler*, 66 F.3d 1295, 1317 (2d Cir. 1995); *see Shepard v. Frontier Communications Servs., Inc.*, 92 F. Supp. 2d 279, 287 (S.D.N.Y. 2000); *Oliver v. General Nutrition Ctr.*, 1999 U.S. Dist. LEXIS 9571, 1999 WL 435208 at *3 (S.D.N.Y. Jun. 25, 1999). Plaintiff, however, has failed to assert any facts indicating that Le Duc did participate in the alleged discriminatory conduct of NYNEX and the other individual defendants. For instance, she contends that Le Duc: i) "stood idly by while job-related threats were improperly handled;" ii) failed to "assist her in attaining support for her medical leave of absence;" and iii) "remained silent in the face of these contractual breaches;" (Plaintiff's Memo in Opposition at p. 4.) Yet these allegations are wholly unsubstantiated by any facts in the complaint. The Court cannot extrapolate a set of reasonable inferences in favor of plaintiff without sufficient factual allegations from which to draw these inferences. *See Tarshis*, 211 F.3d at 35; *Leeds*, 85 F.3d at 53.

The only examples of Le Duc's purported participation that plaintiff does cite are: i) his presence, "without comment [*24] or

---

[2] Le Duc directed plaintiff to report to the Zerega Avenue facility, instead of the Randall Avenue facility. (Complaint at p. 10, PP 93-94.)

intervention," at the November 14, 1999 meeting (Plaintiff's Memo in Opposition at p. 3); ii) "ordering" [3] plaintiff to return to work at the Zerega Avenue facility; and iii) informing plaintiff that he would find her another work location (*id.* at p. 4). Without more, this conduct simply does not demonstrate that Le Duc participated in the alleged discriminatory conduct in any manner. *See Nodelman v. Gruner & Jahr USA Publ'g*, 2000 U.S. Dist. LEXIS 5398, 2000 WL 502858 at *12 (S.D.N.Y. Apr. 26, 2000) (holding that employee may be individually liable under Human Rights Law if he "directly and purposefully participated in the charged discrimination"); *Cerrato v. Durham*, 941 F. Supp. 388, 396 (S.D.N.Y. 1996) (holding that informing plaintiff that she had been terminated was not akin to "direct [and] purposeful participation" for which courts have held individuals liable as aiders and abettors). The Court finds it particularly telling that plaintiff claims that Le Duc "actively interfered with plaintiff's medical leave . . . and refrained from relocating her to a location free of threats" (Plaintiff's Memo in Opposition at p. 4), when in fact, he did relocate her to an alternative [*25] work location as requested. This cannot be interpreted as the act of one who aided and abetted the alleged discriminatory conduct against plaintiff. Because the pleadings are devoid of sufficient evidence to support the claims against Le Duc as an aider or abetter, those claims are dismissed.

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion to remand is denied and defendant Le Duc's motion for judgment on the pleadings, dismissing the case as against him, is granted.

**Dated: September 8, 2000**

**New York, New York**

**SO ORDERED:**

**Richard Conway Casey, U.S.D.J.**

End of Document

---

[3] Although plaintiff avers that Le Duc had "directed" her to report to the Zerega Avenue facility in the complaint, she rephrases it as Le Duc having "ordered" her to report there in the Memo in Opposition to the motion to dismiss.


Positive
As of: April 4, 2022 8:11 PM Z

# Robles v. Goddard Riverside Cmty. Ctr.

United States District Court for the Southern District of New York

June 17, 2009, Decided; June 17, 2009, Filed

No. 08 Civ. 4856 (LTS)(JCF)

**Reporter**

2009 U . S .  Dist.  LEXIS  51500 *; 2009 WL 1704627

JOSE ROBLES, Plaintiff, -v- GODDARD RIVERSIDE COMMUNITY CENTER, et al., Defendants.

**Counsel:** [*1] For Jose Robles, Plaintiff: John C. Klotz, LEAD ATTORNEY, John C. Klotz, New York, NY.

For Goddard Riverside Community Center, Inc., Stephan Russo, Stephen Adler, Richard Burgheim, Stanley Heckman, Evelyn Grant, Kayalyn A. Marafioti, Betsy Newell, Laura Page, Susan Richman, Eric Rosenfeld, Daniel Siff, Howard Stein, Peter Workman, Defendants: Anthony Joseph Rao, Michael Tiliakos, Rosemary Patricia Joyce, LEAD ATTORNEYS, Rao Ongaro Burtt & Tiliakos LLP, New York, NY.

**Judges:** LAURA TAYLOR SWAIN, United States District Judge.

**Opinion by:** LAURA TAYLOR SWAIN

## Opinion

### *OPINION AND ORDER*

In his Amended Complaint in this action, Plaintiff Jose Robles ("Plaintiff"), who was 62 years old when he was terminated from his employment with Defendant Goddard Riverside Community Center, Inc. ("Goddard"), and who describes himself as a person of color of Dominican origin, alleges that Goddard engaged in discriminatory employment practices based on Plaintiff's race and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*., the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 *et seq*., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and breached [*2] Plaintiff's employment contract. In Counts Four and Five of the Amended Complaint, Plaintiff alleges that the Executive Director of Goddard, Stephan Russo ("Russo"), along with 12 individuals who were members of the Goddard Board of Directors at all relevant times -- Stephen Adler, Richard Burgheim, Evelyn Grant, Stanley Heckman, Kayalyn A. Marafioti, Betsy Newell, Laura Page, Susan Richman, Eric Rosenfeld, Daniel Siff, Howard Stein and Peter Workman (collectively, the "Board Defendants") -- aided and abetted Goddard's alleged age and race discrimination, in violation of N.Y. Exec. Law § 296(6). [1] The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367.

Goddard, Russo and the Board Defendants

---

[1] In his papers in opposition 1 to the motion, Plaintiff disclaims any intention to assert his federal age and race discrimination (Counts One and Two), and breach of contract (Count Six), claims against any of the individual defendants, and withdraws his 42 U.S.C. § 1983 claim (Count Three) as against all defendants. He also acknowledges that Defendant Kayalyn A. Marfioti was not timely served. Accordingly, Counts One, Two and Six are dismissed without prejudice pursuant to Fed. R. Civ. P. 41(a)(2) insofar as [*3] they can be construed to assert claims against the individual defendants. Count Three is dismissed with prejudice pursuant to Rule 41(a)(2). The Amended Complaint is dismissed without prejudice as against Defendant Marfioti pursuant to Fed. R. Civ. P. 4(m).

(collectively, "Defendants") move, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings in favor of the Board Defendants with respect to Plaintiff's claims asserted in Counts Four and Five. The Court has considered thoroughly the parties' arguments. For the following reasons, Defendants' motion is granted, and Plaintiff is given leave to replead these claims.

## BACKGROUND

The following facts are alleged in the Amended Complaint and are construed as true for purposes of this motion practice. Plaintiff is a person of color who was born on April 23, 1945. On or about 1987, Plaintiff was hired by Goddard as a resident superintendent of Phelps House, a federally assisted senior citizen residence center. His compensation included a pension contribution from Goddard equal to 12% of his pay. In 1994, Goddard adopted a new policy under which employees hired thereafter [*4] would only receive a pension contribution of 6% of their pay. (Am. Compl. PP 1-28.)

In 1998, Russo was appointed the Executive Director of Goddard. Russo thereafter "embarked upon a policy of forcing out . . . senior employees" from Goddard, in order to reduce costs by replacing them with newly hired employees who would be entitled to only a 6% pension contribution, to create a more junior staff dependent on Russo, and to erase the institutional memory associated with Russo's precedessor. (Am. Compl. PP 35-36, 43.) During Russo's tenure, the employment of at least three individuals over the age of 40 was terminated at the conclusion of funded programs and these employees were not offered other Goddard opportunities which were filled with younger workers. (*Id*. P 46.)

In October 2007, a substantial quantity of alcohol was found missing or stolen from a book storage room. Plaintiff did not take the alcohol, and believes it likely that members of the Development Office, who are predominantly white, were responsible because they conducted many "book sorting" events in the book storage room and consumed alcohol during such events. (Am. Compl. PP 49-50.) Plaintiff adds that the donors solicited [*5] by the Development Office are also predominantly white. (*Id*. P 51.) Russo accused Plaintiff of taking the alcohol; Plaintiff denied the accusation, pointed out that the Development Office had responsibility for the room, and suggested that Russo call the police. Russo then called for his resignation and, after Plaintiff refused to resign, fired him on or about October 11, 2007, without any written explanation. (*Id*. PP 37-42, 59.) The decision to terminate Plaintiff was made individually by Russo. (*Id*. P 48.)

According to Goddard's Statement of Personnel Practices (the "SPP"), a copy of which is attached to the Amended Complaint, "Reasons for dismissal should be made clear to the employee as part of the regular supervisory process." (Am. Compl. Ex. A at A-8.) Goddard employees who have grievances with the Executive Director may seek to have them reviewed by the Personnel Committee of the Board. If the employee is not satisfied, he can submit a request to the President or Vice President and the Chairman of the Personnel Committee, and if no solution is reached the matter "shall be submitted to the Board of Directors with the recommendation" of the President/Vice President and the Chairman [*6] of the Personnel Committee, and the "Board of Directors' decision shall be final." (*Id*. at A-8 - A-9.)

Plaintiff submitted a grievance in connection with his termination, and his grievance was "denied" by the Board. (Am. Compl. PP 59-60.) The Board Defendants were each members of the Board during that time. (*Id*. P 64.) The Board did not give any reasons for its decision, did not give Plaintiff an opportunity to present evidence to the Board, and did not provide Plaintiff a rebuttal to his grievance. (*Id*. PP 59, 66.) Plaintiff alleges, "In deciding to discharge plaintiff, each of the Board defendants exercised independent discretion and

were under no compulsion to so act." (*Id.* P 67.)

Plaintiff filed a charge with the United States Equal Employment Opportunity Commission alleging race and age discrimination by Goddard and Russo, and the EEOC issued a right to sue letter on March 5, 2008.

## DISCUSSION

The standard governing a Rule 12(c) motion is equivalent to that governing motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). In deciding a motion to dismiss a complaint for failure to state a [*7] claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "accept as true all factual statements alleged in the complaint and draw reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (internal citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009), *quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S.Ct. 1937, 173 L. Ed. 2d 868, 2009 WL 1361536, at *12 (internal quotations and citations omitted). This *Twombly* standard applies to all civil actions. 129 S.Ct. 1937, 173 L. Ed. 2d 868, *Id.* at *16.

Plaintiff alleges, in the claims at issue in this motion practice, that the Board Defendants "aided and abetted" Goddard's alleged violations of the NYSHRL. (Am. Compl. PP 94, 99.) Section 296(1)(a) of the New York Executive Law provides that it "shall be an unlawful discriminatory practice [*8] [f]or an employer . . . , because of the age [or] race . . . of any individual, . . . to discharge from

employment such individual." N.Y. Exec. Law § 296(1)(a) (West Supp. 2009). Section 296(6) provides, "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or to attempt to do so." N.Y. Exec. Law § 296(6) (West Supp. 2009). "Courts have interpreted this language to require a showing that the defendant *actually participated* in the conduct giving rise to the claim of discrimination." *Brice v. Security Operations Sys., Inc.*, No. 00 Civ. 2438 (GEL), 2001 U.S. Dist. LEXIS 1856, 2001 WL 185136, *4 (S.D.N.Y. Feb. 26, 2001) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), among other cases). "Aiding and abetting liability requires that the aider and abettor 'share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose.'" *Id.* (citing cases). "Consequently, to find that a defendant actually participated in the discriminatory conduct requires a showing of 'direct, purposeful, participation.'" *Id.* (citation omitted).

As noted above, [*9] the Amended Complaint attributes to Russo the alleged scheme to fire older employees to save compensation expenses. It also alleges that Russo, "personally[] and individually, made the decision to discharge Plaintiff," and that the protection of white Development Office employees was also a motivation for the firing. In contrast, Plaintiff's allegations regarding the Defendant Board Members proffer neither facts demonstrating any participation by any such defendant in Russo's discharge decision nor any facts indicative of any discriminatory motivation in connection with the Board's decision to deny Plaintiff's grievance. The Amended Complaint thus fails to allege facts indicating plausibly the shared intent or community of purpose that is essential to aiding and abetting liability under the New York statute, and Counts Four and Five of the Amended Complaint will therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(c) as to the Board Defendants.

2009 U . S .   Dist.   LEXIS   51500, *9

In his opposition papers, Plaintiff argues that the Board Defendants are also liable under the NYSHRL as "employers." (Opp'n at 10-11.) The Amended Complaint, however, makes no such assertion, and instead explicitly premises [*10] its claims against the Board Defendants on the allegation that they aided and abetted Goddard's discrimination; accordingly, Plaintiff has failed to state a NYSHRL claim against the Board Defendants that is premised on this theory.

Plaintiff requests leave to amend his Amended Complaint should the Court grant Defendants' motion. That request is granted.

*CONCLUSION*

For the foregoing reasons, Defendant's motion is granted and Plaintiff's NYSHRL claims against the Board Defendants are dismissed without prejudice. The Clerk of Court is respectfully requested to terminate Docket Entry No. 40, and to terminate Defendants Stephen Adler, Richard Burgheim, Evelyn Grant, Stanley Heckman, Kayalyn A. Marafioti, Betsy Newell, Laura Page, Susan Richman, Eric Rosenfeld, Daniel Siff, Howard Stein and Peter Workman in connection with the caption of this case.

Plaintiff is given 21 days from the date of this Opinion and Order to file and serve a Second Amended Complaint repleading his claims against the above-named defendants. If no such timely amended pleading is served with respect to a claim or cause of action, such claim or cause of action will be dismissed with prejudice and without further advance [*11] notice.

SO ORDERED.

Dated: New York, New York

June 17, 2009

/s/ Laura Taylor Swain

LAURA TAYLOR SWAIN

United States District Judge

**End of Document**

 Neutral
As of: April 4, 2022 8:11 PM Z

# Sommerville v. New York City Police Dep't

United States District Court for the Eastern District of New York

February 29, 2012, Decided; February 29, 2012, Filed

12-CV-00165 (KAM) (JMA)

**Reporter**
2012 U.S. Dist. LEXIS 26436 *; 2012 WL 668926

WESLEY SOMMERVILLE, Plaintiff, -against-NYPD et al., Detective LINDSEY FAYE # 2459, Detective JOHN WRIGHT #6196, Sgt. KELLY, Tax No. 897780, C.I. #06-001752, MICHAEL GUEVARA, Defendants.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Magistrate's recommendation at Sommerville v. Wright, 2014 U.S. Dist. LEXIS 24760 (E.D.N.Y., Feb. 7, 2014)

**Counsel:** [*1] Wesley Sommerville, Plaintiff, Pro se, Ossining, NY.

**Judges:** KIYO A. MATSUMOTO, United States District Judge.

**Opinion by:** KIYO A. MATSUMOTO

## Opinion

### MEMORANDUM AND ORDER

### MATSUMOTO, United States District Judge:

On December 2, 2011, plaintiff Wesley Sommerville, who is currently incarcerated at Sing Sing Correctional Facility, filed this *pro se* action pursuant to 42 U.S.C. § 1983 against "NYPD et al.,"[1] Detective Lindsey Faye, Detective John

Wright, Sergeant Kelly,[2] "CI #06-001752,"[3] and Michael Guevara (collectively, "defendants"), in the United States District Court for the Southern District of New York and requested to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. By order dated January 12, 2012, pursuant to 28 U.S.C. §§ 1391(b) and 1404(a) the action was transferred to the Eastern District of New York because a substantial part of plaintiff's claims arose in Brooklyn, New York.

The court grants plaintiff's motion to proceed *in forma pauperis*. In addition, for the reasons [*2] set forth below, plaintiff's claims against Detective Wright and Sergeant Kelly may proceed, but his claims against the NYPD is dismissed because the NYPD is not a suable entity and his claims against Confidential Informant #06-001752, Detective Faye, and Mr. Guevara are dismissed for failure to state a claim.

### BACKGROUND

The following facts are drawn from plaintiff's complaint and taken as true for purposes of this order. On December 12, 2006, Sergeant Kelly confiscated plaintiff's car. (ECF No. 2, Complaint ("Compl.") at 3.) At that time, Detective Wright informed plaintiff that he could call a given phone number to determine whether the car was stolen or contained stolen parts. (*Id.*) Plaintiff "called [the

---

[1] The court construes this name as referring to the New York City Police Department ("NYPD").

[2] Plaintiff did not include a given name for this defendant.

[3] Plaintiff's complaint indicates that "CI" is an abbreviation for "Confidential Informant."

number] for approximately one year." (*Id*.)

On November 16, 2007, plaintiff "went to meet up with the detectives" and was arrested, although the case "was ultimately dismissed [on] November 23, 2009." (*Id*.) On December 2, 2009, he received a "District Attorney release" for his car. (*Id*.) When plaintiff attempted to retrieve the car, however, it could not be found. (*Id*.) After conducting an investigation, personnel at the "vehicle seizure unit" informed plaintiff that the car had [*3] been "given to the owner" in 2010. (*Id*.)

Plaintiff alleges that the defendants violated his Fourth and Fourteenth Amendment rights by stopping, searching, and seizing his vehicle without probable cause or a warrant. (*Id*.) Plaintiff claims that his injuries include "stress and mental anguish" and pain in his hip and back "from walking and carrying all of [his] stuff from the precinct." (*Id*.) Plaintiff seeks compensation for the loss of his car and the "business that [he] lost because of this case," and punitive damages and criminal prosecution against certain defendants for entrapment and falsifying a report, for a total of "$500,000.00 for all of these damages." (*Id*. at 5.)

## DISCUSSION

## I. Standard of Review

### A. Dismissal of Prisoner Action

Under 28 U.S.C. § 1915A, a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or employee of a governmental entity." 28 U.S.C. § 1915A(a). Upon review, a district court shall dismiss a prisoner complaint *sua sponte* if the complaint is "frivolous, malicious, or fails to state a claim upon which relief [*4] may be granted; or seeks monetary relief from a defendant who is immune

from such relief." *Id*. § 1915A(b).

### B. Dismissal of an *In Forma Pauperis* Action

Similarly, a district court shall dismiss an *in forma pauperis* action where it is satisfied that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e) (2) (B). An action is "frivolous" when either: (1) "the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy"; or (2) "the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co*., 141 F.3d 434, 437 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990)).

At the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co*., 621 F.3d 111, 124 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 , 129 S.Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009)). To survive dismissal, however, a complaint must plead [*5] sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

### C. *Pro Se Submissions*

It is axiomatic that *pro se* complaints are held to less stringent standards than pleadings drafted by attorneys and that the court is required to read the plaintiff's *pro se* complaint liberally and interpret it as raising the strongest arguments it suggests. *United States v. Akinrosotu*, 637 F.3d 165, 167 (2d Cir. 2011). Although the court applies these less stringent standards in analyzing plaintiff's claims, the court also notes that a "*pro se* plaintiff is not relieved of pleading requirements, and failure to plead the basic elements of a cause of action may result in dismissal." *Andino v. Fischer*, 698 F.

Supp. 2d 362, 376 (S.D.N.Y. 2010); *Pandozy v. Segan*, 518 F. Supp. 2d 550, 554 (S.D.N.Y. 2007) ("[*P*]*ro se* status does not relieve a plaintiff of the pleading standards otherwise prescribed by the Federal Rules of Civil Procedure.")

## II. The New York Police Department is Not a Suable Entity

The court dismisses the complaint against the New York City Police Department ("NYPD") because the NYPD is not a suable entity. Section 396 of the New York City Charter [*6] provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter § 396 (2009).[4] "Section 396 of the Charter has been construed to mean that New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008); *see, e.g., Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (NYPD not a suable entity). Therefore, because the NYPD cannot be sued, the complaint is dismissed as to the NYPD pursuant to 28 U.S.C. § 1915A(b).

## III. Sufficiency of the Pleadings as to Section 1983 Claim

### A. Pleading Standard

In relevant part, 42 U.S.C. § 1983 ("Section 1983") provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State subjects, or causes to be subjected, any citizen of the United States or other person

within the jurisdiction [*7] thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 itself does not create any substantive rights; rather, it provides a procedural mechanism for redressing the deprivation of rights created by the Constitution or laws of the United States. *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985)).

To state a cognizable claim under Section 1983, plaintiffs must allege that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 568 (E.D.N.Y. 2011) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)).

### B. Application

Liberally construing the complaint and accepting plaintiff's well-pleaded allegations as fact, the court finds that the complaint fails to state a Section 1983 claim against Confidential Informant #06-001752, Detective [*8] Faye, or Michael Guevara. It appears that plaintiff is suing all defendants for the unreasonable search and seizure of his vehicle, but plaintiff nowhere alleges that Detective Faye, Confidential Informant #06-001752, or Mr. Guevara played any role in causing the search or seizure. Plaintiff's speculation whether Michael Guevara is Confidential Informant #06-001752 is insufficient to state a claim. In fact, the complaint does not assert any wrongs allegedly committed by any of these three defendants. Therefore, the claims against Confidential Informant #06-001752, Detective Faye, and Mr. Guevara must be dismissed for failure to state a claim. *See Johnson v. Barney*, 360 F. App'x 199, 201 (2d Cir. 2010)

---

[4] This provision is accessible at http://www.nyc.gov/html/charter/downloads/pdf/citycharter2009.pdf (last visited February 29, 2012).

(affirming dismissal of Section 1983 claims because plaintiff "failed to allege sufficient personal involvement on [defendant's] part to make him liable under [Section] 1983"); *Aguiar v. Terrell*, No. 11-CV-3944, 2011 U.S. Dist. LEXIS 92879, 2011 WL 3665170, at *1 (E.D.N.Y. Aug. 19, 2011) (dismissing Section 1983 claim against defendant because plaintiff failed to "allege facts to support a claim that [defendant] had any personal involvement in the alleged deprivation of plaintiff's civil rights").

## CONCLUSION

For the [*9] foregoing reasons, plaintiff's claims against the NYPD are dismissed because the NYPD is not a suable entity. In addition, plaintiff's claims against Detective Faye, Confidential Informant #06-001752, and Mr. Guevara are dismissed for failure to state a claim. Accordingly, it is hereby:

**ORDERED** that plaintiff's claims against defendant NYPD are dismissed with prejudice. *See* 28 U.S.C. § 1915 (e) (2) (B). No summons shall issue as to this defendant; and it is further

**ORDERED** that plaintiff's claims against Confidential Informant #06-001752, Detective Faye, and Mr. Guevara are dismissed for failure to state a claim. *See id*. No summons shall issue as to these defendants; and it is further

**ORDERED** that the United States Marshals Service is directed to serve the summons and complaint upon Detective John Wright and Sergeant Kelly, without prepayment of fees; and it is further

**ORDERED** that the Clerk of Court shall mail a courtesy copy of the same papers to the Corporation Counsel of the City of New York, Special Federal Litigation Division, and note service on the docket; and it is further

**ORDERED** that the Clerk of the Court shall mail a courtesy copy of this Memorandum and Order to the plaintiff [*10] and note service on the docket;

and it is further

**ORDERED** that this case be referred to the Honorable Joan M. Azrack, United States Magistrate Judge, for pretrial supervision.

The court certifies pursuant to 28 U.S.C. § 1915(a) (3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

SO ORDERED.

/s/ Kiyo A. Matsumoto

KIYO A. MATSUMOTO

United States District Judge

Dated: February 29, 2012

Brooklyn, New York

---

**End of Document**

 Positive
As of: April 4, 2022 8:11 PM Z

# Torres v. New York Methodist Hosp.

United States District Court for the Eastern District of New York

January 7, 2016, Decided; January 7, 2016, Filed

15 CV 1264 (PKC) (PK)

**Reporter**

2016 U.S. Dist. LEXIS 2365 *

NELLIE TORRES, Plaintiff, - against - NEW YORK METHODIST HOSPITAL, STANLEY SANTORELLI, and YVELISSE TORRES, Defendants.

**Counsel:** [*1] For Nellie Torres, Plaintiff: Steven Seltzer, LEAD ATTORNEY, The Seltzer Law Group PC, New York, NY.

For New York Methodist Hospital, Stanley Santorelli, Yvelise Torres, Defendants: Brian Daniel Murphy, Jonathan Howard Stoler, Sheppard Mullin Richter & Hampton LLP, New York, NY.

**Judges:** PAMELA K. CHEN, United States District Judge.

**Opinion by:** PAMELA K. CHEN

# Opinion

## MEMORANDUM & ORDER

PAMELA K. CHEN, United States District Judge:

Plaintiff Nellie Torres commenced this action on March 11, 2015, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 296 (1),(6), and (7) *et seq.* ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(1)(a), (6) and (7) *et seq.*, alleging sexual harassment, gender discrimination, hostile work environment, retaliation, and constructive discharge

claims against Defendants New York Methodist Hospital ("NYMH"), Stanley Santorelli ("Dr. Santorelli"), and Yvelisse Torres ("Defendant Torres") (collectively, "Defendants"). (Dkt. 1 ("Complaint" or Compl.") ¶¶ 1, 269-72, 295-98, 327.) On July 6, 2015, Defendants moved, pursuant to Federal Rule of Civil Procedure ("FRCP") 12(b)(6), to dismiss as untimely and unexhausted any claim premised on (i) allegations concerning [*2] incidents prior to April 2011, and (ii) conduct by individuals other than Dr. Santorelli or Defendant Torres, and further to strike related allegations pursuant to FRCP 12(f). (Dkts. 17; 20.) Defendants' motion also seeks to dismiss claims against Dr. Santorelli in his individual capacity under the NYSHRL and NYCHRL §§ 8-107(6), (7). (Dkt. 20 at 21-25.)[1]

For the reasons discussed below, the Court finds the matter fully briefed and oral argument unnecessary (*see* Dkt. 22), and concludes based on the parties' submissions that Defendants' motion be granted in part and denied in part.

## BACKGROUND

Plaintiff was employed by NYMH in the Department of Nursing as a Nursing Assistant from 1992 until 2000, and as a Nurse Technician from 1994 until 2000. (Compl. ¶ 17.)[2] From 2000 until

---

[1] Citations to the documents filed on this Court's electronic docket refer to the pagination assigned by the ECF system.

[2] For purposes [*3] of deciding the pending motion, the Court accepts as true all well-pleaded allegations in the Complaint and

her resignation on February 17, 2015, Plaintiff worked as a Medical Assistant in the Department of Endoscopy. (*Id.* ¶¶ 17-18.) Defendant Torres was Plaintiff's supervisor in the Department of Endoscopy. (*Id.* ¶¶ 14, 25-26.) Dr. Santorelli is an anesthesiologist who works at, and is alleged to be an agent of, NYMH. (*Id.* ¶¶ 13, 25, 98.)

In 1993 and again in 1996, while working in the Department of Nursing, Plaintiff was subjected to unwelcome sexual advances by two doctors. (*Id.* ¶¶ 19-24.) She reported the 1996 incident to her supervisor at the Department of Nursing, who responded that Plaintiff's appearance and demeanor invited such behavior. (*Id.* ¶¶ 22-24.)[3]

After Plaintiff transferred to the Department of Endoscopy in 2000, "Dr. Santorelli subjected [her] to harassment on a continual basis." (*Id.* ¶ 25.) Plaintiff's Complaint chronicles a litany of sexual comments or misconduct on the part of Dr. Santorelli and other Department of Endoscopy personnel between 2002 and 2015. Plaintiff repeatedly reported Dr. Santorelli's conduct to Defendant Torres, who ignored Plaintiff's complaints or threatened Plaintiff with termination if she continued to complain. (*See, e.g., id.* ¶¶ 26-28.) Plaintiff's allegations regarding the sexual harassment she experienced and [*4] NYMH's failure to respond to her complaints include, but are not limited to, the following:

   • In 2002, Dr. Santorelli told Plaintiff in the presence of another doctor that he wanted her to perform oral sex. Plaintiff reported this to Defendant Torres, who replied that Defendant Torres "did not want to hear" about it. Defendant Torres noted in Plaintiff's 2002 performance review that Plaintiff needed to be "less critical" of her co-workers. (*Id.* ¶¶ 29-32.)

   • "On multiple occasions in 2003," Dr. Santorelli told Plaintiff that he "'would love' to have Plaintiff's lips on him, giving him a 'blow job.'" When Plaintiff attempted to report these incidents, Defendant Torres waved her hands in Plaintiff's face and walked away. (*Id.* ¶¶ 35-37.)

   • "Throughout" 2003 to 2006, Dr. Santorelli continued to request oral sex from Plaintiff. (*Id.* ¶ 38.) Dr. Santorelli "often" simulated the performance of oral sex toward another doctor. (*Id.* ¶ 48.) Dr. Santorelli also told Plaintiff, at times in the presence of another doctor, that Plaintiff needed to be "screwed all night" and that she must be "great in bed[.]" (*Id.* ¶¶ 39, 43, 45.) Dr. Santorelli "often" leered at Plaintiff's breasts, and stated "Yum Yum. [*5] Look at those babies. I would love to squeeze them." (*Id.* ¶ 49.) Plaintiff continued to make complaints to Defendant Torres, who told Plaintiff that she would lose her job if she continued to "make trouble." (*Id.* ¶¶ 40-41.) Defendant Torres also covered her ears with her hands and stated "See? I can't hear anything." (*Id.* ¶ 47.)

   • In 2007, while another doctor was present, Dr. Santorelli requested oral sex from Plaintiff and demonstrated the motions. (*Id.* ¶¶ 50-51.) Also in 2007, an operating room technician told Plaintiff that he should "give it to her," while she was opening the unit in the morning. (*Id.* ¶ 55.) Defendant Torres continued to ignore Plaintiff's complaints. (*Id.* ¶¶ 53-54, 56.)

   • In 2008, while working on an anesthesized patient with another doctor, Dr. Santorelli simulated masturbation with a filled syringe, shot the liquid onto Plaintiff's chest, right shoulder, and face, and stated "Ahh, I just came all over you[.]" (*Id.* ¶¶ 61-66.) When Plaintiff called for Defendant Torres' assistance, Defendant Torres covered her ears, stated "I can't hear anything," and walked away. (*Id.* ¶¶ 68-70.) This incident became the subject of

---

draws all reasonable inferences Plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *see Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014); *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).

[3] The Complaint does not indicate whether Plaintiff reported the 1993 incident. (*See* Compl. ¶¶ 19-20.)

jokes among Department of Endoscopy employees. [*6]  (*Id.* ¶¶ 73-75.)

• "Throughout" 2009 and 2010, Dr. Santorelli moaned and called Plaintiff "Mama." (*Id.* ¶¶ 76-78.) He again requested oral sex from Plaintiff "[t]hroughout 2010[.]" (*Id.* ¶ 79.)

• In 2011, Dr. Santorelli commented that Plaintiff must be "great in bed" and that she was a "hot mama." (*Id.* ¶ 81.) He remarked that the person she had been dating could not handle her sexuality. Dr. Santorelli also "frequently" stood on his toes to look down Plaintiff's shirt and said "Ooh." (*Id.* ¶¶ 82-83.)

• In 2012, Dr. Santorelli lowered his pants in front of Plaintiff, told her he was getting a rectal exam, and that he expected it to feel good. He then exposed his buttocks and asked Plaintiff if she "wanted some of this." (*Id.* ¶¶ 84-86.) Another doctor told Plaintiff, in front of an x-ray technician that Plaintiff had sexually transmitted diseases in her throat. (*Id.* ¶¶ 89-90.) Defendant Torres continued to ignore or dismiss Plaintiff's complaints. (*Id.* ¶¶ 87-88, 91-92.)

• In 2013, an employee who delivered linen to the Department of Endoscopy told Plaintiff that he wanted to "give it to her." (*Id.* ¶¶ 93-94.)

• In January 2013, Dr. Santorelli told Plaintiff that he wanted to "try [her] out" and that they [*7] would "go at it all night[.]" (*Id.* ¶¶ 119-20.) When Plaintiff complained about Dr. Santorelli's behavior in 2013, Defendant Torres told Plaintiff to "keep her mouth quiet," that she was "looking to get fired," and that she was a "pain in the ass." (*Id.* ¶¶ 99-102.)

• In November 2013, Dr. Santorelli entered a procedure room and made sexual remarks to Plaintiff. He told her to "lighten up" and brushed his crotch against her. Dr. Santorelli continued to brush his crotch against Plaintiff almost every time he passed her. (*Id.* ¶¶ 103-

05, 122.) Defendant Torres responded to Plaintiff's complaints by telling her to "stop being a pain in the ass" and telling her that she would be terminated if she filed a report outside the unit that would make the unit look bad. (*Id.* ¶¶ 109-16, 125, 130-32.)

Plaintiff further alleges that in January 2014, Plaintiff "made clear" to Defendant Torres that she intended to lodge a complaint with Human Resources Defendant if Torres did not address Dr. Santorelli's conduct. (*Id.* ¶¶ 134-35.) On January 23, 2014, Defendant Torres insisted that Plaintiff train a new registered nurse ("RN"), even though Plaintiff and Plaintiff's union representative informed Defendant [*8] Torres that as a nursing assistant, Plaintiff was prohibited from training RNs. (*Id.* ¶¶ 136-50, 155-157.) Defendant Torres then issued a written warning that Plaintiff would be suspended or terminated if she refused to train the RN. (*Id.* ¶¶ 160-60.)

On February 16, 2014, Plaintiff submitted a letter to Human Resources and her union, detailing her complaints of sexual harassment and retaliation. (*Id.* 1 162.) Following Plaintiff's letter, Defendant Torres called Plaintiff a "viper," and instructed Department of Endoscopy personnel to isolate Plaintiff socially, and to be wary of Plaintiff because she was trying to "make trouble." (*Id.* 11 163-64, 176-78.) Defendant Torres also demanded that Plaintiff work overtime. (*Id.* 11 180, 182.)

On March 3, 2014, Dr. Santorelli entered a procedure room where Plaintiff was working and walked toward Plaintiff, stating "Look at her there sitting with her legs crossed. Wouldn't she like to see me gone from here?" (*Id.* ¶¶ 167-68.) On March 7, 2014, when Plaintiff asked to be transferred to a different assignment to avoid working with Dr. Santorelli, other Department of Endoscopy employees berated and mocked her. (*Id.* 11 170-74.)

In late March 2014, Plaintiff participated in meetings with NYMH management about her [*9] complaints. At the meetings, NYMH officials

accused Plaintiff of fabricating the reported incidents, and verbally attacked her. (*Id.* ¶¶ 183-86, 193, 196.) Plaintiff began to experience chest pains during one such meeting on March 28, 2014. She was admitted later that day to Maimonides Hospital's intensive care and cardiac unit for three days, where she was diagnosed with "hypertension urgency." (*Id.* ¶¶ 200-03.) Plaintiff took a medical leave of absence from that day until May 1, 2014. (*Id.* ¶¶ 204, 208.) When Plaintiff returned to work on May 1, 2014, Dr. Santorelli stated that he was "untouchable no matter how many complaints" were filed against him. (*Id.* ¶ 208.)

On August 4, 2014, Defendant Torres issued Plaintiff three warnings based on false complaints that Plaintiff had left patients unattended, and had left work early. (*Id.* ¶¶ 219-21.) In September 2014, Defendant Torres denied Plaintiff's vacation requests, removed Plaintiff's vacation days from the calendar, and granted vacation requests for the same dates to employees with less seniority. (*Id.* ¶¶ 231-34.) Defendant Torres also denied Plaintiff previously-approved vacation dates during the December 2014 to January 2015 holiday season. (*Id.* ¶ 239.) In January 2015, Defendant Torres issued Plaintiff [*10] an "Anecdotal Note" for not wearing proper attire. (*Id.* ¶¶ 240-43.)

Plaintiff's Complaint also describes harassing or retaliatory conduct in 2014 and 2015 that involved Department of Endoscopy personnel other than Dr. Santorelli or Defendant Torres. For instance, on July 10, 2014, the Chief of the Department of Endoscopy yelled at Plaintiff and told her that he would make false accusations about Plaintiff until she is terminated. (*Id.* ¶¶ 210-11.) On July 25, 2014, another doctor massaged Plaintiff's hand while she was working with a patient and asked her to position herself so he can look at her "lovely face." (*Id.* ¶¶ 214-16.) In August 2014, two doctors made inappropriate sexual remarks. (*Id.* ¶¶ 222, 224-25.) Plaintiff was mocked when she complained about these incidents. (*Id.* ¶¶ 223, 225, 227-29.)

On February 2, 2015, Plaintiff submitted a complaint to NYMH about Dr. Santorelli's continued presence in her unit. (*Id.* ¶ 244.) NYMH's Director of Employee Relations responded on February 5, 2015 by warning Plaintiff of "chronic misuse of the Hospital's complaint procedure," and stating that employees who "fil[e ] frivolous or unfounded allegations" "may be subject to immediate discipline." [*11] (*Id.* ¶ 245.) Plaintiff submitted another complaint regarding this response and Defendant Torres's conduct to NYMH on February 10, 2015. (*Id.* ¶ 250.)

On February 10, 2015, Plaintiff consulted with her psychotherapist, who diagnosed Plaintiff with general anxiety disorder, and recommended that Plaintiff not work for one week. (*Id.* ¶ 251.) On the same date, Plaintiff received urgent care and was diagnosed with anxiety, chronic depression, and insomnia, for which she was prescribed Xansa and Paxil. (*Id.*)

On February 17, 2015, Plaintiff resigned from her employment at NYMH. (*Id.* ¶ 252.)

## *DISCUSSION*

## I. <u>Legal Standard on a Motion to Dismiss</u>

To withstand a motion to dismiss pursuant to FRCP 12(b)(6), a complaint must plead facts sufficient "to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. In evaluating a FRCP 12(b)(6) motion, a district court must accept the factual allegations set forth in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *Id.* at 555-56; *see Nielsen*, 746 F.3d at 62; *Cleveland*, 448 F.3d at 521. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 557). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. A complaint

should be dismissed [*12] where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. Of Educ. of City School Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678); *see also Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717-18 (2d Cir. 2013).

## II. Exhaustion of Title VII Claims Against NYMH[4]

Before commencing a Title VII suit in federal court, the claims forming the basis of the suit must first be presented in a complaint to the EEOC or the equivalent State agency within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1); *Williams v. N.Y.C. Housing Auth.*, 458 F.3d 67, 69 (2d Cir. 2006). The Court lacks jurisdiction [*13] over Title VII claims that do not meet this requirement or are not "reasonably related" to the claims made in the charge. *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003); *Zagaja v. Village of Freeport*, 10 CV 3660, 2015 U.S. Dist. LEXIS 72050, 2015 WL 3507353, at *13-14 (E.D.N.Y. June 3, 2015).

───────────────────

[4] Plaintiff clarified at a May 11, 2015 Court conference that she is not pursuing Title VII claims against Defendant Torres and Dr. Santorelli. (Dkt. 16 at 17.) It is well-established that Title VII does not contemplate personal liability for individuals. *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012); *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). Furthermore, while the Second Circuit has not explicitly decided whether Title VII permits suits against individuals in their official capacities, recent district court decisions have rejected Title VII official capacity claims as duplicative of a plaintiff's claims against her employer. *See, e.g., Jeune v. City of New York*, 11 CV 7424, 2014 U.S. Dist. LEXIS 2574, 2014 WL 83851, at *3 (S.D.N.Y. Jan. 9, 2014); *Pietri v. N.Y.S. Office of Court Admin.*, 936 F. Supp. 2d 120, 133 (E.D.N.Y. 2013); *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 410 (E.D.N.Y. 2010).

"A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Deravin*, 335 F.3d at 200-01 (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001)); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008) (claim is reasonably related where "administrative complaint can be fairly read to encompass the claims ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised"); *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 393 (E.D.N.Y. 2014) (claims not explicitly raised in a charge may be considered "when the facts in the charge lodged with the EEOC would have prompted the EEOC to investigate the unexhausted claim"). The focus of the inquiry into whether a claim pled in a civil action is "reasonably related" to an EEOC charge "'should be on the factual allegations made in the [EEOC] charge itself'" and on whether those allegations "gave [the EEOC] 'adequate notice to investigate'" the claims asserted in court. *Williams*, 458 F.3d at 70 (quoting *Deravin*, 335 F.3d at 201-02). This exception to Title VII's exhaustion requirement is understood to be "essentially an allowance of [*14] loose pleading . . . based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination" claimed by a plaintiff. *Deravin*, 335 F.3d at 201 (quoting *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993)).

Defendants presently seek to dismiss as unexhausted Plaintiff's Title VII claims against NYMH insofar as they are premised on (1) conduct that occurred more than three years before Plaintiff filed her EEOC Charge, and (2) conduct of medical professionals or NYMH personnel other than Dr. Santorelli or Defendant Torres. (Dkt. 20 at 12-13, 18-21.) Plaintiff filed a charge of discrimination with the EEOC on April 1, 2014, alleging sexual harassment and retaliation. (Compl. ¶ 6; Dkt. 18-2

at 3-4 ("Charge").)[5] In her Charge, Plaintiff specified that February 3, 2014 was the earliest date on which discrimination took place, and the latest date of discrimination was March 21, 2014, but that discrimination was "continuing." (Dkt. 18-2 at 3.) Plaintiff included a narrative of the alleged discrimination, which states in part:

> I began my employment in 1992 as a Nurse Assistant. In 2000 I became a Medical Assistant assigned to the Endoscopy Unit. I performed [*15] my job functions satisfactorily. I have been the victim of harassment and have been working under a hostile work environment by Yvelise Torres, Director of Endoscopy. I have been the victim of sexual harassment by Doctor Stanley Santorelli for approximately 3-years. I have complained to Ms. Torres about each incident and inappropriate comments that were sexually explicit and unwelcomed. Each time Ms. Torres ignored my complaints and did nothing about it. To this day Dr. Santorelli continues to constantly make inappropriate comments and sexual gestures even though I asked him to stop.

(Id.) Plaintiff also indicated that on March 7, 2014, Dr. Santorelli approached Plaintiff and said, "look at her with her legs crossed," and "wouldn't she like for me to leave here[.]" (Id. at 4.)[6] Plaintiff further reported that "Dr. Santorelli continues to harass"

---

[5] The Charge may be considered in connection with Defendants' motion to dismiss because, for purposes of FRCP 12, "the complaint is deemed to include any . . . statements or documents incorporated in it by reference . . . matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner. Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Here, paragraphs 6 and 7 of the Complaint incorporate the Charge by reference. *See Briggs v. New York State DOT*, 233 F. Supp. 2d 367 (N.D.N.Y. 2002).

[6] There is a four-day discrepancy between the Charge and Complaint regarding the exact date on which this conduct occurred. (*Compare* Dkt. 18-2 at 4 *with* Compl. ¶¶ 167-68.) Insofar as the exact date is material to Plaintiff's claims, this factual discrepancy may [*17] be resolved by further discovery.

her and that "the harassment and hostile work environment has increased[.]" In addition, Plaintiff stated that a nurse manager and patients have complained about Dr. Santorelli's "unwelcome behavior." Plaintiff indicated that Defendant Torres and other staff members witnessed Dr. Santorelli's behavior, but that "everyone just laughs[.] Plaintiff further [*16] stated that she reported Dr. Santorelli's "inappropriate behavior" to the Director of Employee Relations, and to another doctor who was Dr. Santorelli's "boss." Plaintiff alleged that Defendant Torres spoke negatively about Plaintiff to other staff members, instructed people not to socialize with her, and tried to isolate Plaintiff. (Id.) Plaintiff also reported that Defendant Torres "wrote [Plaintiff] up for insubordination" after Plaintiff refused to train a new RN. (Id. at 3.)

Taken together, Plaintiff's allegations in her Charge were sufficient to exhaust at least part of her Title VII hostile work environment claim. Plaintiff's assertion that she had been sexual harassed by Dr. Santorelli for approximately three years, coupled with her allegation regarding Dr. Santorelli's March 7, 2014 conduct, were sufficient to put the EEOC on notice to investigate sexual misconduct involving Dr. Santorelli over the three years preceding the April 1, 2014 Charge. In addition, Plaintiff's allegations that Defendant Torres and other supervising staff at NYMH failed to take corrective action to remedy Plaintiff's complaints of sexual harassment, and that Plaintiff had been working under a hostile work environment under Defendant Torres, provided the EEOC with sufficient information for the agency to investigate a claim that NYMH condoned a hostile working environment in the Department of Endoscopy. Thus, Plaintiff has clearly exhausted her hostile work environment claim based on sexual harassment by Dr. Santorelli after April 1, 2011, and the failure of NYMH management, including but not limited to Defendant Torres, to respond to her complaints [*18] of harassment.[7]

---

[7] That Plaintiff's Complaint describes more egregious conduct by Dr. Santorelli than in her Charge, including overtly sexualized

As Defendants correctly observe, however, Plaintiff's Complaint "dramatically expand[s] the time period referenced in her Charge" and the "identity of the alleged participants presented to the EEOC for investigation." (Dkt. 20 at 10.) Plaintiff's Complaint contains allegations of a hostile work environment over a far more expansive time period than the three years asserted in the Charge, claiming instead that it began decades earlier in 1993. (*E.g.*, Compl. ¶¶ 19-24.) The Charge also failed to mention any of Dr. Santorelli's pre-April 2011 behavior that is now asserted in [*19] her Complaint. Given the Charge's specification of a three-year time frame during which the alleged sexual harassment occurred, the Complaint's allegations of a hostile work environment spanning over 21 years—well beyond the three years alleged in the Charge—do not reasonably fall within the scope of the EEOC's investigation. *See Robinson v. Getinge/Castle, Inc.*, 02 CV 6049, 2005 U.S. Dist. LEXIS 4000, 2005 WL 272964, at *5 (W.D.N.Y. Feb. 2, 2005) (since plaintiff limited her hostile work environment claim to a specific time period, allegations that stretch back to 30 years before that period were not within the scope of the agency's investigation); *Lumhoo v. Home Depot USA, Inc.*, 229 F. Supp. 2d 121, 133-35 (E.D.N.Y. 2002) (where plaintiff's claims of a hostile work environment alleged in the charge were limited to a particular time frame, hostile work environment claims that predated that time frame were not "reasonably related" to the charged claims).

Similarly, though Plaintiff's Complaint includes allegations of sexual misconduct by various non-defendants, nothing in the Charge could have alerted the agency to investigate sexual harassment by individuals other than Dr. Santorelli for which NYMH could be held liable. *See Deras v. Metro.*

*Transp. Auth.*, 11 CV 5912, 2013 U.S. Dist. LEXIS 40456, 2013 WL 1193000, at *5 (E.D.N.Y. Mar. 22, 2013). The EEOC cannot be expected to meaningfully investigate generalized [*20] allegations of misconduct, unadorned by factual detail that would provide a clue as to the acts that contributed to the alleged hostile work environment or the identities of personnel who were allegedly involved. *See Briggs*, 233 F. Supp. 2d at 376 (while a plaintiff "need not list every detail of her alleged discriminatory treatment [therein], a charge . . . needs to provide sufficient specifics to afford the EEOC a reasonable opportunity to fulfill its obligations to investigate the complaint and attempt to mediate a resolution"); *Samborski v. West Valley Nuclear Servs. Co.*, 99 CV 213E, 2002 U.S. Dist. LEXIS 12745, 2002 WL 1477610, at *4 (W.D.N.Y. 2002) (allegations of "sexual harassment" that created a "hostile environment" are boilerplate terms that fail to inform the EEOC of any specific instances of harassment). Were the courts to permit "vague, general allegations, quite incapable of inviting a meaningful EEOC response, to . . . predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate[,] and Title VII's investigatory and mediation goals would be defeated." *Butts*, 990 F.2d at 1403. Accordingly, because Plaintiff's allegations regarding conduct that precede April 2011 or sexual harassment by individuals other than Dr. Santorelli are neither contained [*21] in her Charge nor reasonably related thereto, she has failed to exhaust her administrative remedies with respect to these claims, and they are dismissed.[8]

## III. Timeliness of Plaintiff's NYSHRL and
## _____

---

statements, sexual favors and gestures, and physical exposure and contact (*see* Dkt. 20 at 19), does not alter this conclusion. The Court views these additional allegations as amplification and support for Plaintiff's properly exhausted hostile work environment claims against NYMH. *DeBerry*, 11 F. Supp. 3d at 396 ("[T]here is a difference between new unexhausted claims and factual allegations that are pled in a complaint but omitted from an EEOC charge which only serve to amplify and support the properly exhausted claims.").

[8] The Court also concludes, and Defendants apparently do not dispute, that Plaintiff's remaining Title VII claims for retaliation and constructive discharge are properly exhausted. Plaintiff's allegations of retaliation in her EEOC Charge are reasonably related to those in her Complaint in that they describe the same incidents of retaliatory conduct, or constitute "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir. 2003) (quoting *Butts*, 990 F.2d at 1402-03).

## NYCHRL Claims

Defendants further contend that Plaintiff's NYSHRL and NYCHRL claims are time-barred to the extent that they are premised on incidents pre-dating April 2011. (*See* Dkt. 20 at 7-8, 13-18.)[9] With certain limited exceptions as set forth below, the Court disagrees.

Under the NYSHRL and NYCHRL, the statute of limitations is three years. *See* N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d); *see also Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248-49 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013). However, the limitations period is tolled during the pendency of a complaint before the EEOC. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 207 (E.D.N.Y. 2014); *see also DeNigris v. N.Y.C. Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 192 (S.D.N.Y. 2012) ("Claims brought under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, which [*23] is tolled for the period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue letter.").

Here, Plaintiff filed her Charge on April 1, 2014, and filed her Complaint on March 11, 2015. The Complaint and motion papers before the Court do not set forth how long Plaintiff's claim was pending before the EEOC, or attach the notice of right to sue letter. Thus, absent the applicability of any tolling or exceptions, all claims accruing after March 11, 2012—three years prior to the filing of the Complaint—are timely under the NYSHRL and NYCHRL. For reasons that are not wholly clear to the Court, Defendants fail to reference the March 11, 2012 statutory date, and limit their timeliness arguments to conduct prior to April 2011—three years prior to the filing of her EEOC Charge. (*See, e.g.*, Dkt. 20 at 8, 11 ("Defendants do not presently challenge Plaintiff's ability to pursue claims based on allegations concerning 2011 and thereafter . . .").) Since Defendants do not contest the timeliness of NYSHRL and NYCHRL claims based on conduct post-dating April 2011, the Court focuses its analysis on the alleged conduct prior to April 2011.

Plaintiff argues that her hostile work [*24] environment claims premised on pre-April 2011 conduct are saved by the continuing violation doctrine. (Dkt. 23 at 9-14.) Ordinarily, a plaintiff may not recover for claims of discrimination based on discrete acts such as "termination, failure to promote, denial of transfer, or refusal to hire" that occurred outside the statutory time period, even if other acts of discrimination occurred within the statutory time period. *See AMTRAK v. Morgan*, 536 U.S. 101, 105, 122, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) ("[A] Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period"). By contrast, the continuing violation doctrine provides that if a plaintiff files a complaint that is timely as to any incident of discrimination in furtherance of an ongoing policy of discrimination, all claims of discrimination under that policy will be timely even if they would be untimely standing alone. *Morgan*, 536 U.S. at 122 ("A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."); *Patterson*, 375 F.3d at 220; *Emmons*, 715 F. Supp. 2d at 412. The continuing violation

---

[9] Because the Court has determined that Plaintiffs' Title VII hostile work environment claims based on conduct prior to April 2011 are not exhausted and must be dismissed on that ground, the Court need not address Defendants' alternative argument that [*22] such claims must also be dismissed as untimely under Title VII's 300—day limitations period. *See* 42 U.S.C. § 2000e-5(e)(1) (plaintiff seeking to bring claims pursuant to Title VII must file a complaint with the EEOC or equivalent State agency within 300 days of the alleged discriminatory act). Furthermore, Defendants did not raise the argument that Title VII claims based on conduct after April 2011 but prior to June 5, 2013-300 days prior to her April 1, 2014 Charge—may also be untimely under Title VII. (*See* Dkt. 20 at 11 (limiting timeliness arguments to allegations prior to 2011).) In any event, for the reasons set forth in this section, the Court views Plaintiff's post-April 2011 allegations as part of Plaintiff's timely hostile work environment claim, and accordingly would find Plaintiff's Title VII claims based on these allegations timely under the continuing violation doctrine.

doctrine is available with respect to harassment and [*25] hostile work environment claims because "[t]heir very nature involves repeated conduct. The 'unlawful employment practice' . . . cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Morgan*, 536 U.S. at 115; *see also McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) (provided that "an act contributing to [the] hostile [work] environment takes place within the statutory time period", "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability") (quoting *Morgan*, 536 U.S. at 105). In deciding whether alleged sexual harassment that occurs both before and after the time-barred date are part of the same violation, courts are required "to make an individualized assessment of whether incidents and episodes are related" such that they can be considered "part of the same actionable hostile work environment practice." *McGullam*, 609 F.3d at 76-77.

Courts are divided on whether the narrower definition of the continuing violation doctrine under *Morgan*, or a prior, more generous standard that focuses on whether the discriminatory practice had a continuing [*26] impact on the complainant, applies to discrimination claims under the NYSHRL and NYCHRL. *See Kalola v. Int'l Bus. Machines Corp.*, 13 CV 7339, 2015 U.S. Dist. LEXIS 27444, 2015 WL 861718, at *9 (S.D.N.Y. Feb. 3, 2015) (noting split in authority as to whether analysis of a continuing violation under New York law should proceed according to a broader standard).[10] But, although time-barred

discrete acts can be considered timely under a more lenient standard for State law claims, a plaintiff must still show that "specific and related instances of discrimination [were] permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Dimitracopoulos*, 26 F. Supp. 3d at 212 (quoting *Fitzgerald*, 251 F.3d at 359).

Here, regardless of which continuing violation doctrine is applied, the result is the same. Plaintiff asserts that her pre-April 2011 allegations "demonstrate a consistent pattern of sexually offensive conduct, [*27] as well as a practice of condoning such conduct dating back to 1993" and are part of Defendants' continuing practice of subjecting Plaintiff to a discriminatory hostile work environment. (Dkt. 23 at 10-12). The Court agrees that Plaintiff's hostile work environment claims permit consideration of the large majority of conduct alleged prior to April 2011. Plaintiff's timely, *i.e.*, post-April 2011, allegations describe, *inter alia*, sexual remarks and gestures by Dr. Santorelli, as well as Defendant Torres' dismissive or threatening responses to Plaintiff's repeated complaints of inappropriate sexual conduct. (*See, e.g.*, Compl. ¶¶ 99-102, 103-16, 119-25, 130-32, 167-69.) Her pre-April 2011 allegations are similar in nature to the timely allegations, both focusing on sexually inappropriate comments and conduct by the same harasser, Dr. Santorelli, and the failure of the same supervisor, Defendant Torres, to address Plaintiff's complaints. *See McGullam*, 609 F.3d at 78 (considering same type of harassing acts committed by the same harasser both before and after the limitations period "as part of the same hostile work environment claim) (citation omitted). Based on the similarity of the conduct, perpetrated by the [*28] same actors, Plaintiff has sufficiently alleged that the pre-April 2011 conduct was part and parcel of a single pattern and course of harassing conduct that began before and continued into the statute of limitations periods.

---

[10] *Compare Sotomayor*, 862 F. Supp. 2d at 250 (applying *Morgan* to NYSHRL claims), *and Bermudez v. City of New York*, 783 F. Supp. 2d 560, 574 (S.D.N.Y. 2011) ("The standard for applying the continuing-violation doctrine to claims under the NYCHRL and the NYSHRL is also governed by *Morgan*"), *with Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) ("New York courts have held that the pre-*Morgan*, more generous

continuing violations doctrine continues to apply to discrete acts of employment discrimination under NYCHRL.") (citing *Williams*, 872 N.Y.S.2d at 35).

Defendants contend that the continuing violation doctrine is inapplicable because the pre-April 2011 allegations are generic, punctuated by large gaps in time, and implicate actors other than Dr. Santorelli and Defendant Torres. The Court disagrees. First, the pre-April 2011 allegations are hardly generic. Indeed, Plaintiff's Complaint details the context and content of Dr. Santorelli's sexual comments, and specifically describe Dr. Santorelli's behavior. (*See, e.g., id.* ¶¶ 29 (alleging that in 2002, Dr. Santorelli requested a "blow job" from Plaintiff in the presence of another doctor), 35 (alleging that in 2003, Dr. Santorelli again requested oral sex, stating that he "would love" to have Plaintiff's lips on him), 38-49 (alleging that throughout 2003 and 2006, Dr. Santorelli requested "blow jobs" from Plaintiff, simulated the performance of oral sex, remarked that Plaintiff deserved to be "screwed all night[,]" and commented that he "would love to squeeze" Plaintiff's [*29] breasts)), 50 (alleging that in 2007, Dr. Santorelli told Plaintiff, "wouldn't I love to have those lips on me giving me a blow" while demonstrating the movements); 63-66 (alleging that in 2008, Dr. Santorelli simulated masturbation with a filled syringe, and squirted liquid on Plaintiff's chest, right shoulder, and face, stating that "Ahh, I just came all over you"), 77-78 (alleging that throughout 2009 and 2010, Dr. Santorelli moaned and said "Mama" to Plaintiff), 81 (alleging that in 2011, Dr. Santorelli told Plaintiff that she must be "great in bed").) Plaintiff's Complaint also includes particular phrases and actions used by Defendant Torres in response to Plaintiff's complaints. (*See, e.g., id.* ¶¶ 27-28, 30, 37, 41, 47, 54, 56, 60, 69-70.) In sum, these allegations provide ample notice of the factual underpinnings of Plaintiff's claims of harassment for the Court to conclude that the pre-April 2011 conduct is related to the timely alleged conduct.

Second, although some of the specifically alleged pre-April 2011 incidents are separated by time gaps,[11] Plaintiff has sufficiently alleged that sexual harassment persisted "on a continual basis" throughout the pre-limitations period and [*30] was regular enough to conclude, at least at this juncture, that they may have been part of the same pattern of discrimination described in Plaintiff's timely allegations. (*See, e.g., id.* ¶¶ 25, 29, 35, 38-39, 43, 45, 48-50, 64-66, 76-779, 81-83); *see Scott-Iverson v. Indep. Health Ass'n*, 13 CV 0451, 2014 U.S. Dist. LEXIS 91933, 2014 WL 3107289, at *4 (W.D.N.Y. July 7, 2014); *Anderson v. Davis Polk & Wardwell LLP*, 850 F. Supp. 2d 392, 406 (S.D.N.Y. 2012). Contrary to Defendants' position, "[t]he fact that there may be gaps of . . . years between some allegations is not necessarily fatal; an 'incident-free interval does not preclude relatedness,' although it may 'render[] less plausible' the possibility that several comments or acts are related." *Scott-Iverson*, 2014 U.S. Dist. LEXIS 91933, 2014 WL 3107289, at *4 (quoting *McGullam*, 609 F.3d at 78). Where, as here, the purported disparate acts are numerous and of the same nature, the "incident-free interval[s]" do not undermine Plaintiff's claim. Plaintiff alleges that certain conduct, including Dr. Santorelli's requests for oral sex, occurred "on multiple occasions," "throughout" the years, and continued unremedied for a significant period of time. (*E.g.*, Compl. ¶¶ 35, 38, 48, 50, 79); *cf., Norman v. Metro. Transit Auth.*, 13 CV 1183, 2014 U.S. Dist. LEXIS 130510, 2014 WL 4628823, at *4 (E.D.N.Y. Aug. 1, 2014), *report and recommendation adopted*, 2014 U.S. Dist. LEXIS 129010, 2014 WL 4628848 (E.D.N.Y. Sept. 15, 2014) (three-year discontinuity between defendant's comments precluded application of continuing violation rule where the allegations [*31] did not appear to reflect an ongoing policy, and plaintiff failed to adequately plead that the challenged actions were allowed to continue for a significant period); *Lugo v. City of New York*, 08 CV 5250, 2012 U.S. Dist. LEXIS 110282, 2012 WL 3202969, at *3 (E.D.N.Y. Aug.

---

[11] *See Weeks v. New York State*, 273 F.3d 76, 84 (2d Cir. 2001) ("Absent unusual circumstances, a two-year gap is a discontinuity

that defeats use of the continuing violation exception."), [*32] *abrogated on other grounds by Morgan*, 536 U.S. at 122; *Deras*, 2013 U.S. Dist. LEXIS 40456, 2013 WL 1193000, at *6 (three-year gap between incidents belies the notion that the incidents were connected or ongoing in nature).

3, 2012) (no available facts suggested that acts separated by two years were connected to one another). Furthermore, this is not a case where Plaintiff's problems were ameliorated during the intervening incident-free periods. *See Kalola*, 2015 U.S. Dist. LEXIS 27444, 2015 WL 861718, at *10. Given the severity and regularity of the other comments and acts that Plaintiff alleges, Plaintiff is entitled, at this stage of the litigation, to the reasonable inferences that the sexual harassment occurred with sufficient frequency prior to April 2011 to support a cause of action under the NYSHRL and NYCHRL for hostile work environment. In reaching this conclusion, the Court is mindful that "there is no precise test for determining whether conduct is severe or pervasive enough to constitute a hostile work environment", and as such, this is a fact-bound area of law that is particularly ill-suited to dismissal at the pleading stage. *Scott-Iverson*, 2014 U.S. Dist. LEXIS 91933, 2014 WL 3107289, at *5 (quoting *Williams*, 154 F. Supp. 2d at 822).

Third, the inclusion of allegations regarding individuals other than Dr. Santorelli and Defendant Torres does not alter the Court's conclusion that the pre-April 2011 allegations were part of a single actionable hostile work environment claim. Plaintiff's allegations that certain non-defendant individuals were present during Dr. Santorelli's harassing conduct provide relevant context to Plaintiff's claims that a hostile work environment existed, unchecked by NYMH. (*E.g.*, Compl. ¶¶ 29, 43, 51, 61.) The few allegations regarding the encouraging behavior or affirmative misconduct by non-Defendants also provide relevant background regarding the environment and the conduct tolerated at NYMH. (*E.g., id.* ¶¶ 48, 55-56, 73-75.)

Nevertheless, the Court agrees with Defendants that the conduct alleged in 1993 and 1996 are insufficiently related to the conduct within the statutory time period. The alleged conduct involved different perpetrators and occurred while Plaintiff was in the Department of Nursing, before she was transferred to the hospital's Department [*33] of

Endoscopy, where she was allegedly subjected to harassment by Dr. Santorelli and supervised by Defendant Torres. (*Id.* ¶¶ 19-26). Plaintiff has not alleged that the individuals involved in the 1993 or 1996 again harassed her after she was transferred. In view of the differing environment and actors implicated, the 1993 and 1996 conduct cannot be considered part of the "continuing" hostile work environment in the Department of Endoscopy. *See McGullam*, 609 F.3d at 78 (concluding that conduct within statutory time period was not sufficiently related to alleged conduct prior to the statutory period in part because the prior conduct occurred in another department); *Anderson*, 850 F. Supp. 2d at 406 (earlier episodes were time barred under the NYSHRL and NYCHRL because they involved wholly different employees. Even so, these time-barred claims may serve "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113; *see Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 545 (E.D.N.Y. 2014) (time-barred incidents that are not independently actionable events still may be considered as relevant background evidence); *Ramirez v. N.Y. Presbyterian Hosp.*, 129 F. Supp. 2d 676, 680 (S.D.N.Y. 2001) ("[C]learly established precedent dictates that '[a] discriminatory act which is not made the basis for a timely charge' can still be 'relevant background'. . . .").[12]

---

[12] Neither Plaintiff's Complaint nor her opposition [*34] to Defendants' motion appears to assert a claim for retaliation prior to April 2011 based on a continuing violation theory. (*See* Dkt. 23 at 5-8, 9-13.) Nor would such a claim survive. The sole instance of retaliatory conduct that occurred outside the limitations period involved a 2002 negative performance evaluation by Defendant Torres. (*See* Compl. ¶¶ 32-34 (alleging that Defendant Torres noted on Plaintiff's 2002 performance review that she "needed to be more patient, and less critical, of her co-workers").). This negative evaluation is a discrete act that is time-barred under *Morgan*. *Valtchev v. City of New York*, 400 Fed. Appx. 586, 589 (2d Cir. 2010) (holding that negative evaluations are discrete acts which do not trigger the continuing violation exception); *Kalola*, 2015 U.S. Dist. LEXIS 27444, 2015 WL 861718, at *4 (E.D.N.Y. Feb. 3, 2015) ("[A] negative performance evaluation is a discrete act."). Even applying the more liberal continuing violation doctrine, the 2002 performance evaluation cannot be construed as part of a course of retaliatory conduct that continued into the limitations period because it does not directly bear on, or relate to, Plaintiff's timely allegations,

## IV. Dr. Santorelli's Individual Liability Under the NYSHRL and NYCHRL

Defendants also move to partially dismiss Plaintiff's NYSHRL and NYCHRL claims against Dr. Santorelli in his individual capacity.[13] Unlike Title VII, the NYSHRL and NYCHRL provide for the imposition of liability on individual defendants, either directly, or as an aider and abettor of unlawful discrimination or retaliation. *See Lore*, 670 F.3d at 169; *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012). Plaintiff alleges that Dr. Santorelli is responsible under the NYSHRL and NYCHRL for gender discrimination, hostile work environment, and retaliation, and aiding and abetting the same.

### A. Direct Liability for Discrimination and Hostile Work Environment

The NYCHRL provides a broad basis for direct individual liability under Section 8-107(1)(a), which makes it "an unlawful discriminatory practice" for "an employer *or an employee or agent thereof*, because of the . . . gender . . . of any person, . . . to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a) (emphasis added); *see also Malena*, 886 F. Supp. 2d at 366. Defendants concede that Plaintiff properly asserts a claim against Dr.

Santorelli under Section 8-107(1)(a) of the NYCHRL, and do not seek dismissal of that claim. (Dkt. 20 at 22, n.3)

By contrast, an individual is subject to liability for discrimination under Section 296(1) of the NYSHRL only when that individual qualifies as an employer. *Townsend v. Benjamin Enters.*, Inc., 679 F.3d 41, 57 (2d Cir. 2012). "An individual qualifies as an 'employer' when that individual has an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'" *Id.* (quoting *Patrowich v. Chem. Bank*, 63 63 N.Y.2d 541, 473 N.E.2d 11, 12, 483 N.Y.S.2d 659 (N.Y. 1984) (*per curiam*)); *see also Dantuono v. Davis Vision, Inc.*, 07 CV 2234, 2009 U.S. Dist. LEXIS 122119, 2009 WL 5196151, at *10 (E.D.N.Y. Dec. 29, 2009) (employees or agents cannot be held liable unless they have an ownership interest, or powers to do more than carry out [*37] personnel decisions made by others, thus making them "employers"). Here, Plaintiff has not alleged that Dr. Santorelli had an employer-employee relationship with Plaintiff, or an ownership interest in NYMH, Plaintiff's employer. Nor has Plaintiff alleged that Dr. Santorelli had authority over the terms of Plaintiff's employment, such as the ability to hire and fire her or other NYMH employees, control their work schedules, or determine their rate or method of payment, or maintained employment records for any NYMH employees. *Griffin v. Sirva, Inc.*, 11 CV 1844, 2014 U.S. Dist. LEXIS 73306, 2014 WL 2434196, at *11 (E.D.N.Y. May 29, 2014) (to determine whether an individual defendant has sufficient authority to be considered an employer, courts balance "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records" ) (quoting *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 371 (E.D.N.Y. 2012)). Accordingly, Plaintiff's claim against Dr. Santorelli under Section 296(1) of the NYSHRL is dismissed.

---

a decade later, of a policy of retaliation and ostracization for her submission of complaints outside the Department of Endoscopy. *See Dimitracopoulos*, 26 F. Supp. 3d at 212 (negative rating by a [*35] prior supervisor was not part of the same continuing pattern of discriminatory conduct as later evaluations and letters by separate individuals). Accordingly, the 2003 performance evaluation is not part of Plaintiff's retaliation claim, but is only relevant as potential evidence of Defendant Torres's alleged failure to appropriately respond to Plaintiff's complaints of sexual harassment in 2002.

[13] As part of their motion, Defendants submitted an undated declaration signed by Dr. Santorelli (Dkt. 19). The Court disregards the declaration since Plaintiff did not incorporate it in her Complaint, nor rely upon it to [*36] formulate her claims. *See Chambers*, 282 F.3d at 153.

## B. Direct Liability for Retaliation

The NYSHRL and NYCHRL both permit individual liability of *any person* for retaliatory acts regardless of whether the individual can be considered an employer. [*38] N.Y. Exec. Law § 296(7) (providing that it is "an unlawful discriminatory practice for *any person* engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under [the NYSHRL]") (emphasis added); *see* NYCHRL § 8-107(1)(7)[14] (providing that "[i]t shall be an unlawful discriminatory practice for *any person* engaged in any activity to which [the NYCHRL] applies to retaliate or discriminate in any manner against any person because such person has [] opposed any practice forbidden by [the NYCHRL]") (emphasis added); *see also Malena*, 886 F. Supp. 2d at 366. However, as is clear from the text of the NYSHRL and the NYCHRL retaliation provisions, individual liability under these provisions is limited to cases where "an individual defendant . . . 'actually participates in the conduct giving rise to' the plaintiff's retaliation claim." *Hozer v. Pratt Indus. (USA)*, 10 CV 3874, 2012 U.S. Dist. LEXIS 78811, 2012 WL 2049498, at *1 n.1 (E.D.N.Y. June 6, 2012) (internal quotation marks and citation omitted); *see also Edwards v. Jericho Union Free Sch. Dist.*, 904 F. Supp. 2d 294, 306 (E.D.N.Y. 2012).[15] Here, Plaintiff's claims must be dismissed because her allegations do not give rise to a plausible inference

that Dr. Santorelli participated in any retaliatory conduct. Plaintiff alleges only that Dr. Santorelli sexually harassed her, but not that [*39] he retaliated against her for complaining about the harassment. Plaintiff's retaliation allegations are limited to Defendant Torres and personnel other than Dr. Santorelli. (Compl. ¶ 333 (alleging that Defendants retaliated against Plaintiff by "reassigning the work of other employees to her, by making baseless attacks upon her work performance, refusing to allow her to take vacation time[,]" "ostracizing her socially," "verbally abusing her," "calling her names, such as 'viper' and 'pain in the ass,'" "writing her up for 'chronic misuse of [NYMH's] complaint procedure,'" "warning her that [NYMH] 'will not tolerate the filing of frivolous or unfounded allegations,'" and "failing to follow [NYMH's] procedures for investigating complaints"); *see id.* at ¶¶ 102, 126, 160, 163-64176, 219231, 233, 239, 240, 245.) Plaintiff has not alleged that Dr. Santorelli had any role in the retaliatory actions alleged in the Complaint. Tellingly absent from the Complaint are any allegations that Dr. Santorelli had the authority to take any action that would affect the terms, conditions, and privileges of Plaintiff's employment. Accordingly, Dr. Santorelli may not be held directly liable, in his individual [*40] capacity, for retaliation under the NYSHRL and NYCHRL.

## C. Aider and Abettor Liability for Discriminatory or Retaliatory Conduct by Others

In addition to direct liability, the NYSHRL and NYCHRL each provide for individual liability for aiding and abetting discrimination or retaliation. *See* N.Y. Exec. Law § 296(6) (stating that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article [including discrimination and retaliation], or to attempt to do so"); NYCHRL § 8-107(6) (providing that "[i]t shall be an unlawful discriminatory [*41]

---

[14] Plaintiff erroneously cites to 8-107(1)(a) as NYCHRL's retaliation provision. (Dkt. 23 at 15.) Contrary to Defendants' suggestion (Dkt. 21 at 13), the Court does not view this error to constitute abandonment of Plaintiff's NYCHRL retaliation claim.

[15] "To state a claim for retaliation [under NYSHRL or NYCHRL] . . ., a plaintiff must plead facts that would tend to show that: (1) she participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging her; and (3) there exists a causal connection between the protected activity and the adverse action." *See Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citing *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004)).

practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so"); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc.*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). Since the language of the NYSHRL and NYCHRL is virtually identical, both statutes are analyzed according to the same standard. *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 687-88 (S.D.N.Y. 2012); *see also Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 658-59 (E.D.N.Y. 2015).[16]

The aider and abettor provisions of the NYSHRL and NYCHRL create a broad source of personal liability that is not limited to employers. *Stanley v. Guardian Sec. Servs., Inc.*, 800 F. Supp. 2d 550, 557 (S.D.N.Y. 2011). An individual need not have supervisory or hiring/firing power to be subject to suit under these provisions, so long as he actually participated in the conduct giving rise to the discrimination claim. *See Feingold*, 366 F.3d at 158 (individual liability may be imposed on a coworker who "actually participates in the conduct giving rise to a [*42] discrimination claim . . . even though that co-worker lacked the authority to either hire or fire the plaintiff") (quoting *Tomka*, 66 F.3d at 1317). But, "before an individual may be considered an aider and abettor," liability "must first be established as to the employer." *Sowemimo v. D.A.O.R. Sec., Inc.*, 43 F. Supp. 2d 477, 490-91 (S.D.N.Y.1999); *see also Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, 13 CV 4467, 2015 U.S. Dist. LEXIS 130116, 2015 WL 5692860, at *32 (E.D.N.Y. Sept. 28, 2015) ("liability as an aider and abettor under section 296(6) can only attach when liability has been established as to the employer or another individual").

In this case, Defendants' motion does not test the sufficiency of Plaintiff's allegations that NYMH, as her employer, and/or Defendant Torres, as her supervisor, may be liable for gender discrimination, hostile work environment, and retaliation. (*See* Dkt. 20 at 8.) The predicate liability of Plaintiff's employer is therefore uncontested. Defendants instead contend that Dr. Santorelli, as the person who committed the allegedly unlawful acts that produced the hostile work environment, cannot be held liable for aiding and abetting his own acts of discrimination. (*Id.*)

As Defendants correctly point out, district courts in this Circuit are not in agreement on whether an individual can be held liable for aiding and abetting his own conduct. [*43] *See, e.g., Fontecchio v. ABC Corp.*, 12 CV 6998, 2015 U.S. Dist. LEXIS 7892, 2015 WL 327838, at *10 (S.D.N.Y. Jan. 23, 2015) (recognizing a disagreement between district courts and citing cases); *Romero v. City of New York*, 839 F. Supp. 2d 588, 635 (E.D.N.Y. 2012); *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 115 (E.D.N.Y. 2011); *see also Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) (finding that "[a]n individual cannot aid and abet his own alleged discriminatory conduct" under Executive Law § 296(6)") (citation omitted)); *DeWitt v. Lieberman*, 48 F. Supp. 2d 280, 293 (S.D.N.Y. 1999) (dismissing NYSHRL claims against an individual because of the "requirement that liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor") (citation omitted). However, the Second Circuit held in *Tomka*, 66 F.3d at 1317, that a plaintiff's allegation that each of the individual defendants assaulted her and thereby created a hostile work environment was sufficient to satisfy the standard for aider and abettor liability under the NYSHRL. Since *Tomka* is the law in this Circuit, the Court agrees with the decisions holding that an individual can be held liable as an aider and abettor even though it was primarily his actions that make the employer liable—in effect, that he can aid and abet his own actions. *See, e.g., Conklin v. County of*

---

[16] Defendants correctly point out that Plaintiff's opposition carelessly omits any discussion of the NYCHRL's aiding and abetting provision. (Dkts. 21 at 13; 23 at 14-15.) However, since this provision is subject to the same analysis as the NYSHRL's parallel provision, the Court declines to find that Plaintiff abandoned her claim that Dr. Santorelli is liable under NYCHRL as an aider and abettor of unlawful conduct.

*Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012) ("[T]he law in this Circuit seems clear that a defendant may be held liable for aiding and abetting allegedly unlawful discrimination by her employer even [*44] where her actions serve as the predicate for the employer's vicarious liability."); *Anand v. N.Y. State Dep't of Taxation & Fin.*, 10 CV 5142, 2012 U.S. Dist. LEXIS 85744, 2012 WL 2357720, at *10 (E.D.N.Y. June 18, 2012) (holding that individual defendants may be liable in their individual capacities for aiding and abetting their own conduct); *Tully-Boone v. N. Shore-Long Island Jewish Hosp. Sys.*, 588 F. Supp. 2d 419, 427 (E.D.N.Y. 2008); *Maher v. All. Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 262-63 (E.D.N.Y. 2009).

In this case, Plaintiff's Complaint is replete with assertions that Dr. Santorelli "actually participated" in the alleged discriminatory conduct that produced the alleged hostile work environment. *See Johnson v. N.Y. County of Nassau*, 10 CV 06061, 2014 U.S. Dist. LEXIS 133175, 2014 WL 4700025, at *12, 25 (E.D.N.Y. Sept. 22, 2014); *Maher*, 650 F. Supp. 2d at 262-63. Furthermore, unlike cases where courts, including this Court, refused to find that an individual can aid and abet his own discriminatory acts, Dr. Santorelli's actions are not the sole predicate for NYMH's liability under the NYSHRL and NYCHRL for fostering a hostile work environment. Plaintiff alleges that other doctors and personnel in the Department of Endoscopy participated in or condoned harassing behavior towards Plaintiff. (*See, e.g.*, Compl. ¶¶ 48, 55, 74-75, 89-90, 95, 98, 118, 121, 211, 214-16, 224-29.); *cf. Setelius v. Nat'l Grid Elec. Servs. LLC*, 11 CV 5528, 2014 U.S. Dist. LEXIS 134789, 2014 WL 4773975, at *35 (E.D.N.Y. Sept. 24, 2014) (individual cannot be held liable under § 296(6) of the NYSHRL "in the absence of liability of the employer or another individual" [*45] who "contributed to the creation of an allegedly hostile work environment"); *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012) (no aider and abetter liability where only one individual is alleged to have participated in the discriminatory

conduct); *Sanchez-Vazquez v. Rochester City Sch. Dist.*, 11 CV 6590, 2012 U.S. Dist. LEXIS 96301, 2012 WL 2856824, at *6 (W.D.N.Y. July 11, 2012) (plaintiff did not assert a NYCHRL claim against anyone other than alleged aider and abettor), *aff'd*, 519 F. App'x 63 (2d Cir. 2013). Thus, the Court finds that Dr. Santorelli is subject to aider and abetter liability under the NYCHRL and NYSHRL with respect to Plaintiff's hostile work environment claim.

On the other hand, the Complaint does not contain allegations sufficient to support Dr. Santorelli's individual liability for retaliation on an aider and abettor theory. As previously set forth, the Complaint is devoid of any allegation that Dr. Santorelli actually participated in the retaliatory conduct alleged by Plaintiff. *See Conklin*, 859 F. Supp. 2d at 437 (claim under NYSHRL 296(6) failed because individual defendant "did not participate in any of the alleged retaliatory actions" and "had no supervisory role and no control over the terms of the [p]laintiff's employment"); *cf. Vaigasi v. Solow Mgmt. Corp.*, 11 CV 5088, 2014 U.S. Dist. LEXIS 42277, 2014 WL 1259616, at *7 (S.D.N.Y. Mar. 24, 2014) (plaintiff sufficiently alleged that co-employees were individually subject to [*46] suit where complaint alleged that they actively participated in plaintiff's demotion and the alteration of his job responsibilities). Accordingly, the NYSHRL and NYCHRL retaliation claims against Dr. Santorelli are dismissed.

## IV. Motion to Strike

FRCP 12(f) provides that the Court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "[M]otions to strike 'are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation.'" *Crespo v. N.Y. City Transit Auth.*, 01 CV 0671, 2002 U.S. Dist. LEXIS 2977, 2002 WL 398805, at *11 (E.D.N.Y. Jan.7, 2002) (quoting *Lennon v. Seaman*, 63 F.

Supp. 2d 428, 446 (S.D.N.Y. 1999)); *see also OTG Brands, LLC v. Walgreen Co.*, 13 CV 09066, 2015 U.S. Dist. LEXIS 42629, 2015 WL 1499559, at *5 (S.D.N.Y. Mar. 31, 2015) (a party seeking to strike allegations mush show that evidence in support of the allegation would be inadmissible, the allegations have no bearing on relevant issues, and permitting the allegations to stand would result in prejudice to the movant). As the Second Circuit has noted, "courts should not tamper with the pleadings unless there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). "Simply because a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) does not mean that allegations in support of that claim may as a matter of course be struck as immaterial, impertinent, [*47] or scandalous." *Anderson*, 850 F. Supp. 2d at 417; *see also Barcher v. New York Univ. Sch. of Law*, 993 F. Supp. 177, 181 (S.D.N.Y. 1998) (granting motion to dismiss sexual harassment and retaliation claims and denying motion to strike allegations regarding sexual harassment).

Defendants move to strike all allegations of pre-April 2011 conduct that are time-barred or unexhausted. Defendants' request is denied. As previously discussed, the majority of Plaintiff's pre-April 2011 allegations are timely under the NYSHRL and NYCHRL and therefore relevant to Plaintiff's claims under those statutes. Additionally, the time-barred hostile work environment claims based on the 1993 and 1996 incidents need not be stricken, since these allegations may still serve "as background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113. For the same reason, Plaintiff's time-barred retaliation claim based on the 2002 performance evaluation need not be stricken.

Defendants also seek to strike references to non-defendant individuals in the Complaint, including striking names in allegations post-dating April 2011, on the ground that these allegations are "of a scandalous and salacious nature", "ultimately cannot form the basis of timely or actionable claims", and serve "no legitimate purpose" except

to "harm the personal and [*48] professional reputations" of referenced individuals. (Dkt. 20 at 8-9, 26 n.4-5.) It cannot be said, however, that the allegations concerning the non-defendant individuals can have no bearing on Plaintiff's action, as the crux of Plaintiff's claim is that she endured a hostile work environment at the Department of Endoscopy, where these non-defendant individuals worked. Although Plaintiff is not advancing any claims against these individuals, the fact that they were present and may have encouraged or implicitly condoned Dr. Santorelli's harassment, or perpetrated harassment themselves, are certainly relevant to Plaintiff's hostile work environment claims. Accordingly, Defendants' motion to strike is denied.

## CONCLUSION

In conclusion, Defendants' partial motion to dismiss certain claims pursuant to FRCP 12(b)(6) (Dkt. 17) is DENIED in part and GRANTED in part.

Defendants' motion is GRANTED with respect to Plaintiff's unexhausted Title VII hostile work environment claims based on (1) conduct that precedes April 1, 2011, and (2) sexually harassing conduct by individuals other than Dr. Santorelli. Defendants' motion is DENIED with respect to Plaintiff's exhausted Title VII hostile work environment claims [*49] based on (1) sexual harassment by Dr. Santorelli that occurred after April 1, 2011, and (2) the failure of NYMH management, including Defendant Torres, to respond to Plaintiff's complaints of harassment.

Defendants' motion to dismiss Plaintiff's NYSHRL and NYCHRL hostile work environment claims premised on pre-April 2011 conduct as untimely is DENIED, with the exception of alleged conduct in 1993 and 1996.

In addition, Defendants' motion to dismiss is GRANTED with respect to claims against Dr. Santorelli in his individual capacity: (1) under the NYSHRL for (a) direct discrimination and hostile

work environment (§ 296(1)), (b) direct retaliation (§ 296(7)), and (c) aiding and abetting retaliation (§ 296(6)); and (2) under the NYCHRL for (a) direct retaliation (§ 8-107(1)(7)) and (b) aiding and abetting retaliation (§ 8-107(1)(6)). Defendants' motion is DENIED with respect to Plaintiff's claims against Dr. Santorelli in his individual capacity for (1) aiding and abetting discrimination and hostile work environment under the NYSHRL (§ 296(6)) and NYCHRL (§ 8-107(1)(6)), and (2) under the NYCHRL for direct discrimination and hostile work environment (§ 8-107(1)(a)).

Finally, Defendants' motion to strike certain allegations pursuant to FRCP 12(f) is DENIED in its entirety.

SO ORDERED: [*50]

/s/ Pamela K. Chen

PAMELA K. CHEN

United States District Judge

Dated: January 7, 2016

Brooklyn, New York

---

 Positive
As of: April 4, 2022 8:12 PM Z

# Vosburgh v. Am. Nat'l Red Cross

United States District Court for the Northern District of New York

October 27, 2009, Decided; October 27, 2009, Filed

5:08-CV-00653 (NPM/GHL)

**Reporter**

2009 U.S. Dist. LEXIS 99826 *; 2009 WL 3644196

CHERYLL VOSBURGH, Plaintiff, -v.- AMERICAN NATIONAL RED CROSS; AMERICAN RED CROSS OF TOMPKINS COUNTY; JENNIFER YARBROUGH, Executive Director of American Red Cross of Tompkins County; CYNTHIA GORDINEER; LINDA ANDREI; SUSAN BACKSTROM; DAWN DARBY; ANNE DIGIACOMO; MARY DORMAN; THOMAS DORMAN; GEOFF DUNN; JANE DUNNICK; SARAH JANE ELLSWORTH; MARTHA MAPES; WILLIAM MAXWELL; MICHAEL PINNISI; GEORGE TABER; PATRICIA WILLIAMS; and MICHAEL YEHL, Defendants.

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by, Dismissed by, in part Vosburgh v. Am. Nat'l Red Cross, 2014 U.S. Dist. LEXIS 137000 (N.D.N.Y, Sept. 29, 2014)

**Counsel:** [*1] For Plaintiff: EDWARD E. KOPKO, OF COUNSEL, WIGGINS & KOPKO, LLP, Ithaca, New York.

For Defendants: LAURI F. RASNICK, ERIC B. TOPEL, OF COUNSEL, EPSTEIN BECKER & GREEN, P.C., New York, New York.

**Judges:** Neal P. McCurn, Senior United States District Judge.

**Opinion by:** Neal P. McCurn

# Opinion

Neal P. McCurn, Senior District Judge

## *MEMORANDUM, DECISION and ORDER*

### *I. Introduction*

Presently before the court in this employment discrimination action is a motion by defendants to dismiss or in the alternative for summary judgment and for sanctions. Plaintiff, Cheryll Vosburgh ("Plaintiff") opposes, and the moving defendants reply. Oral argument was heard in Syracuse, New York on October 6, 2009. Decision was reserved.

### *II. Procedural Background*

By her amended complaint, Plaintiff alleges claims against defendants American National Red Cross ("Red Cross"); American Red Cross of Tompkins County ("the Chapter"); Jennifer Yarbrough, Executive Director of American Red Cross of Tompkins County ("Yarbrough"); Cynthia Gordineer, Regional Director ("Gordineer"); and fifteen individually named board members of the Chapter ("Board Members") [1] (collectively,

_____

[1] The board members named on the face of the Amended Complaint are: Linda Andrei, Susan Backstrom, Dawn Darby, Anne Digiacomo, Mary Dorman, Thomas Dorman, Geoff Dunn, Jane Dunnick, Sarah Jane Ellsworth, Martha Mapes, William Maxwell, Michael Pinnisi, George Taber, Patricia Williams and Michael Yehl. See Dkt. No. 21. Summonses were initially executed as to Yarbrough and Gordineer as well as board members Andrei, Backstrom, Darby, T. Dorman, Mapes and Yehl. Pursuant to stipulation of all parties, Maxwell and Taber later waived service. See Dkt. No. 46. To date, the remaining board members, Digiacomo, M. Dorman, Dunn, Dunnick, Ellsworth, Pinnisi and Williams, have

"Defendants") pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. [*2] ("FMLA") and New York Human Rights Law, N.Y. EXEC. LAW § 296. et seq. ("NYHRL"). Specifically, Plaintiff purports to set forth claims for retaliation and interference under the FMLA; and claims for age discrimination, disability discrimination, and retaliation under the NYHRL.

Defendants seek dismissal of all claims against the Red Cross for lack of personal jurisdiction and insufficient service of process pursuant to Federal Rules of Civil Procedure 12(b)(2) and (5), respectively. Defendants further seek dismissal for failure to state claims upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to all claims against the Board Members, all claims predicated on Plaintiff's alleged June 6, 2008 termination, and all claims predicated on Plaintiff's allegation that her reassignment was in retaliation for exercising her rights under the FMLA. Finally, [*4] Defendants seek sanctions, attorneys' fees and costs pursuant to this court's inherent power and 28 U.S.C. § 1927. At oral argument, counsel for Defendants agreed to accept service for the Red Cross. Accordingly, that portion of Defendants' motion is denied as moot.

One day before Plaintiff's opposition papers were due, counsel for Plaintiff asked this court for "guidance" regarding the scope of Plaintiff's opposition to the pending motion, and notified the

court that it must, as a threshold matter, determine which standard shall be applied to Defendants' motion, to wit, whether the motion shall be considered as a motion to dismiss under Rule 12(b)(6), or a motion for summary judgment under Rule 56. See Dkt. No. 40. Despite the court clearly notifying Plaintiff that after due consideration of all papers submitted regarding the pending motion, it would decide whether to convert the motion to dismiss to a motion for summary judgment and if it decided to treat the motion as a motion for summary judgment, it would notify the parties of same and give them a reasonable opportunity to present all materials pertinent to such a motion, Plaintiff nonetheless opposed the motion solely as a motion [*5] to dismiss instead of also addressing the motion in the alternative for summary judgment. In response, Defendants asked the court to convert the pending motion to a motion for summary judgment in order to prevent the wasting of further judicial resources. The court concurred with Defendants and gave both parties the opportunity to submit all materials pertinent to a motion for summary judgment. Thereafter, Plaintiff opposed, and Defendants replied.

### III. Factual Background

The following facts are uncontested unless noted.

According to Plaintiff, she began her employment with the Chapter in 1995. By 2008, she was earning approximately $ 48,000 per year as Director of Human Resources and Development. Yarbrough became the Executive Director of the Chapter in December 2007, replacing Gordineer, who had been interim Executive Director for the Chapter, and is now a Regional Director for the Red Cross.

In February 2008, Plaintiff states that she called the Red Cross's Concern Connection Line ("CCL") to "report . . . acts of inappropriate conduct and age discrimination perpetuated by Yarbrough and Gordineer." Aff. of Cheryll Vosburgh, Nov. 17, 2008, P 19, Dkt. No. 50 ("Vosburgh Aff."). About a [*6] week later, Yarbrough told Plaintiff that she knew who made the CCL complaint. In March

---

not been served. Pursuant to Federal Rule of Civil Procedure 4(m), where, as here, "a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service [*3] be made within a specified time. However, if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Fed. R. Civ. P. 4(m). As more than 120 days have elapsed since the filing of the Amended Complaint, and Plaintiff has failed to show good cause for the lack of service, all claims against the remaining board member defendants, Digiacomo, M. Dorman, Dunn, Dunnick, Ellsworth, Pinnisi and Williams are dismissed.

2008 an investigator from Red Cross headquarters was sent to the Chapter to investigate the CCL complaint. While the investigator was at the Chapter, Plaintiff's name was revealed to Yarbrough, Gordineer and Darby, a member of the Chapter's board of directors. Thereafter, according to Plaintiff, "Yarbrough, Gordineer and Darby began an escala[t]ing campaign of offensive, threatening, intimidating and belligerent behavior toward [Plaintiff] in retaliation" for the CCL complaint. Id. P 24.

Both parties agree that on May 7, 2008 at approximately 1:00 p.m., a meeting occurred between Plaintiff and Yarbrough. See id. P 28; Decl. of Jennifer Yarbrough, Sept. 23, 2008, P 3, Dkt. No. 3 ("Yarbrough Decl."). Plaintiff states that board member Patricia Williams was also present at the meeting. Plaintiff admits that during the 1:00 p.m. meeting, she was notified that she was terminated as the Director of Human Resources and Development, and she was offered a new position as Volunteer Coordinator, at less than half her then current salary. See Vosburgh Aff. PP 28-29. According to Plaintiff, Yarbrough gave her [*7] until May 9, 2008 to decide whether to accept the new position. See id. PP 33-34.

Plaintiff states that she asked for, and was granted by Yarbrough, permission to leave work early on May 7 after the meeting concluded. Plaintiff states that she was "profoundly upset and sickened" and went directly to see her physician, who ordered her to take a medical leave from work. Id. PP 39-40.

According to Yarbrough, on May 7, 2008 at 4:18 p.m., she sent an email message to Plaintiff that "effective immediately your job responsibilities have been reassigned to the Volunteer Recruitment Coordinator position." Yarbrough Decl., P 4, Ex. A. At 4:30 p.m., according to Yarbrough, or at 4:15 p.m., according to Plaintiff, Plaintiff delivered a leave request to Yarbrough, wherein she sought leave from May 7, 2008 through July 30, 2008. See id. P 5, Ex. B; Vosburgh Aff. P 42.

Thereafter followed a series of written correspondence between Yarbrough and Vosburgh. One letter from Yarbrough addressed to Plaintiff contains language upon which Plaintiff bases her contention that she was terminated on June 6, 2008. See Vosburgh Aff. PP 47-48, 57. Plaintiff contends that she received this undated letter on May 21, [*8] 2008. In the letter, Yarbrough confirmed receipt of Plaintiff's request for Personal and Family Leave, but informed Plaintiff that the Chapter had discontinued its Family Medical Leave benefit effective May 16, 2008. Yarbrough went on to explain that nonetheless, Plaintiff had accrued 156 hours of leave, and therefore, Plaintiff was granted twenty-one days of leave, from May 8 through June 6, 2008. Yarbrough further informed Plaintiff as follows:

> If you are unable to return to work on June 6, 2008, you may apply for Leave Without Pay (LWOP). Decisions whether to grant requests for LWOP are made on a case-by-case basis and will be evaluated on a variety of factors, including but not limited to, business needs, workload, and staffing considerations. Reinstatement at the conclusion of LWOP is not guaranteed. Unless you have applied and been approved for LWOP (or have made other arrangements for additional leave directly with me), failure to return to work on June 6, 2008 will be considered a voluntary separation, and your employment will be terminated.

Id. P 47. See also Yarbrough Decl. P 7. In response, on May 30, 2008, Plaintiff wrote a letter to Yarbrough informing her, among other things, [*9] that

> [y]our demand of my return to work next week, prior to release from my physician and therapist, or be terminated is creating additional severe mental and physical stress on me. I will return to my position at Red Cross as soon as my physician and therapist release me to go back to work. Until then I will expect my full pay as Director of Human Resources and Development while out on FMLA [leave] which is a federal right.

Yarbrough Decl. P 8, Ex. D; Vosburgh Aff. PP 53, 56 (emphasis omitted). According to Yarbrough, the Chapter interpreted this language to be a request for additional leave. See Yarbrough Decl. P 9. Plaintiff points out that nowhere in her letter did she ask for Leave Without Pay, but that she expected twelve weeks of paid leave pursuant to the Chapter's FMLA benefit which was in effect at the time her leave began. See Vosburgh Aff. P 55.

Plaintiff commenced this action on June 20, 2008. On June 23, 2008, the Amended Complaint was filed, and service was returned executed to several of the defendants, including Darby, Yarbrough and Gordineer on June 24, 2008.

On June 23, 2008, Yarbrough wrote another letter to Plaintiff, which Plaintiff contends she received on June 24, [*10] 2008. See id. P 58. In that letter, Yarbrough informed Plaintiff that her job responsibilities changed effective May 7, 2008 to the Volunteer Coordinator position. See Yarbrough Decl. P 10, Ex. E. Plaintiff disputes that this is the case, as she asked for, and was given until May 9, 2008 to decide whether to accept that position. See Vosburgh Aff. P 60.

Yarbrough also informed Plaintiff that her May 30, 2008 request was being treated as a request for personal leave, and that the Chapter was extending Plaintiff's leave until July 30, 2008, but that "[u]nless you have applied and been approved for additional leave, failure to return to work on July 30, 2008 will be considered a voluntary separation, and your employment will be terminated." Yarbrough Decl., Ex. E. See also Vosburgh Aff. PP 58-59. Yarbrough further clarified that beginning June 23, 2008 Plaintiff's leave status would convert to Leave Without Pay as Plaintiff would have exhausted her accrued paid leave by that time. See id., P 11.

On July 10, 2008, Plaintiff wrote to Yarbrough in response to the aforementioned letter, wherein Plaintiff stated, among other things, that Yarbrough previously established that Plaintiff was terminated [*11] as of June 6, 2008. See Vosburgh Aff. P 68, Ex. 8; Yarbrough Decl. P 12.

Counsel for Defendants, Erin Carney, contacted Plaintiff's counsel on July 17, 2008 via letter, wherein she stated that Plaintiff's "employment has not been terminated, and thus, there is no good faith basis for any claims based on her termination." Yarbrough Decl. P 13, Ex. F. By this same letter Ms. Carney demanded that Plaintiff withdraw those claims. See id., Ex. F.

The next day, July 18, 2008, Yarbrough again wrote to Plaintiff. See Vosburgh Aff. P 69; Yarbrough Decl. P 14, Ex. G. In her July 18 letter, as well as another letter dated July 25, 2008, Yarbrough explained that Plaintiff had been granted leave through July 30, 2008, and that should Plaintiff find she is unable to return to work on July 31, 2008, she should advise Yarbrough so that a determination may be made as to what, if any accommodation is appropriate. See id.; Yarbrough Decl. P 15, Ex. H. In her July 18, 2008 letter Yarbrough reiterated that Plaintiff had not been terminated. See Yarbrough Decl. G. In her July 25, 2008 letter, Yarbrough further informed Plaintiff that her "failure to report to work on July 31, 2008 or to contact [Yarbrough] [*12] prior to that date will be considered as a voluntary resignation." Id. Ex. H.

Counsel for Defendants, Ms. Carney, again contacted Plaintiff's counsel by mail on July 28, 2008, wherein she reiterated that Plaintiff had not been terminated on June 6, 2008 and that Plaintiff had been granted leave through July 30, 2008. See id. P 16, Ex. I.

On September 23, 2008, the present motion was filed.

## IV. Discussion

### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there

is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See also Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (internal quotation and citation omitted).

The movant has the burden to show that no genuine factual dispute exists. See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) [*13] (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L. Ed. 2d 142 (1970)). Moreover, when the court is deciding a motion for summary judgment, it must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. See id.

When deciding whether a material issue of fact is in dispute, the court is cognizant that a fact is "material" if "it might affect the outcome of the suit under governing law." White v. Haider-Shah, No. 9:05-CV-193, 2008 U.S. Dist. LEXIS 54800, 2008 WL 2788896, at *4-5 (N.D.N.Y. Jul. 17, 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). Also, "[a] material fact is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Id., quoting Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.

### B. Family Medical Leave Act

Plaintiff alleges claims for interference and retaliation under the FMLA. Defendants argue that these claims must fail because Plaintiff was provided all the leave she was due under the FMLA, and because Plaintiff was demoted prior to her request for FMLA leave. For the reasons that follow, Defendants' motion for summary judgment regarding Plaintiff's FMLA claims [*14] is granted.

Pursuant to the FMLA, eligible employees are entitled to twelve work weeks per year of *unpaid* leave because of, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)) (emphasis added). The Court of Appeals for the Second Circuit recognizes two types of claims under the FMLA: interference and retaliation. See Shark v. City of New York, No. 03-CV-2616, 2008 U.S. Dist. LEXIS 78982, 2008 WL 4444122, at *4, n.2 (S.D.N.Y. Sept. 29, 2008) (citing Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004)).

In order to establish a claim for retaliation under the FMLA a plaintiff must prove by a preponderance of the evidence that: (1) she exercised rights protected under the FMLA; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent. See Reilly v. Revlon, Inc., 620 F.Supp.2d 524, 537-38 (S.D.N.Y. 2009) (citing Potenza, 365 F.3d at 168).

In support of their motion, Defendants [*15] focus on the third and fourth elements of Plaintiff's retaliation claim, to wit, that Plaintiff suffered an adverse employment action which occurred under circumstances giving rise to an inference of retaliatory intent. Defendants note that while they dispute many of the remaining elements, they reserve the right to move for summary judgment in the future as to those elements, should they not prevail at this time.

Defendants argue that Plaintiff cannot prove that she suffered an adverse employment action which occurred under circumstances giving rise to an inference of retaliatory intent because she was reassigned before she requested leave, and she was not involuntarily terminated. Plaintiff counters that Defendants retaliated against her by involuntarily demoting her on May 7, 2008, terminating her

employment altogether on June 6, 2008, paying her a lower salary while she was on leave, and eliminating her FMLA benefit while she was on leave.

To be sure, it is clear from the record that Plaintiff's position as Director of Human Resources and Development was terminated prior to Plaintiff taking leave. In fact, despite counsel for Plaintiff's protestations to the contrary, Plaintiff admits [*16] as much in her affidavit. See Vosburgh Aff. P 28 ("On May 7, 2008 as approximately 1:00[ p.m.] I met with Yarbrough and Board Member Patricia Williams and was notified that I was terminated as the Director of Human Resources and Development.") While there may be a question of fact as to whether Plaintiff accepted the Volunteer Coordinator position which was offered at that time, such a question is immaterial to Plaintiff's FMLA retaliation claim, since the alleged retaliatory act, to wit, the termination of her then position as Director of Human Resources and Development occurred hours before Plaintiff sought FMLA leave.

Further, despite Plaintiff's repeated contention that she was involuntarily terminated on June 6, 2008, the facts due not support such a conclusion. As the court understands Plaintiff's argument, she contends that she was involuntarily terminated via Yarbrough's undated letter to Plaintiff, received on or about May 21, 2008. By said letter, Yarbrough informed Plaintiff that she was granted leave through June 6, 2008, and that if Plaintiff did not apply for and receive leave without pay or make other arrangements for leave prior to that date, Plaintiff's failure to return [*17] to work on June 6, 2008 would be "considered a voluntary separation" and Plaintiff's employment would be terminated. Despite Plaintiff's letter in response dated May 30, 2008, wherein Plaintiff makes clear her intention to return to her position at the Chapter when she is released to do so by her physician and therapist, but that until such time she remained on FMLA leave, Plaintiff nonetheless concludes that she was involuntarily terminated when she did not return to

work on June 6, 2008. Plaintiff's conclusion is counterintuitive, since her letter response to Yarbrough could reasonably be interpreted as a request for additional leave, and according to Yarbrough, was indeed interpreted as such, precluding Plaintiff's June 6, 2008 termination. To be sure, Yarbrough's letter to Plaintiff extending Plaintiff's leave through July 30, 2008, was not received by Plaintiff until June 24, 2008, several days after this action was commenced. [2] Nonetheless, it is clear at this time that Plaintiff was not, in fact, terminated on June 6, 2008.

Even assuming Plaintiff alleges FMLA retaliation based on a July 30, 2008 termination, a reasonable fact finder could not conclude on this record that Plaintiff was involuntarily terminated. Yarbrough's June 23, 2008 letter to Plaintiff indicated that Plaintiff's leave was extended through July 30, but that unless Plaintiff applied for and received additional leave, her failure to return to work on July 30, 2008, would be deemed a voluntary separation and Plaintiff's employment with the Chapter would be terminated. Nowhere in the record is there evidence that Plaintiff sought additional leave, or that she returned to work by July 30, 2008. Under these circumstances, a reasonable fact finder could not conclude that Plaintiff's termination from employment with the Chapter was an adverse employment action.

Finally, Plaintiff's additional arguments that Defendants retaliated against her for taking FMLA leave by paying her a lower salary and eliminating her FMLA benefit while she was on leave do not support her FMLA retaliation claim. Again, the FMLA provides for twelve weeks of unpaid [*19] leave, which Plaintiff received. The issue of whether Plaintiff was entitled to paid leave in accordance with a policy of the Chapter or the amount of said pay, a benefit which is above and

---

[2] Any argument by Plaintiff that Yarbrough's June 23, 2008 letter was in response to this lawsuit is unfounded. The earliest that any defendant to this action [*18] was served was June 24, 2008, the date that Plaintiff herself admits she received Yarbrough's June 23 letter.

beyond that which is required by the FMLA, is not material to Plaintiff's FMLA claim. Accordingly, for the aforementioned reasons, Defendants' motion for summary judgment regarding Plaintiff's FMLA retaliation claim is granted.

Plaintiff also alleges a claim for interference under the FMLA. In order to establish such a claim, a plaintiff must prove by a preponderance of the evidence that: (1) she is an eligible employee under the FMLA; (2) defendants constitute an employer under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave notice to defendants of her intention to take leave; and (5) defendants denied her benefits to which she was entitled by the FMLA. See Reilly, 620 F.Supp.2d at 535 (citation omitted). According to regulations promulgated pursuant to the FMLA, an interference claim could arise where an employer refused to authorize FMLA leave, discouraged an employee from using such leave, or discriminated against an employee who has used such leave. See Potenza, 365 F.3d at 167 [*20] (citing 29 C.F.R. § 825.220(b)(c).

In support of their motion, Defendants focus on the fifth element of Plaintiff's interference claim, to wit, that Defendants denied Plaintiff benefits to which she was entitled by the FMLA. As with their retaliation claim, Defendants note that while they dispute many of the remaining elements, they reserve the right to move for summary judgment in the future as to those elements, should they not prevail at this time.

Defendants argue that Plaintiff cannot prove that she was denied benefits to which she was entitled under the FMLA because she was given the requisite twelve weeks of leave. In opposition to Defendants' motion for summary judgment as to Plaintiff's claim for interference under the FMLA, Plaintiff argues that Defendants interfered with her rights under the FMLA by involuntarily demoting and terminating her employment, reducing her benefits and eliminating her FMLA benefit altogether as well as failing to promptly notify her of her FMLA status after May 7, 2008. Defendants

reply that Plaintiff was not harmed by any lack of notification regarding her FMLA status or by the change in the Chapter's FMLA policy because Plaintiff was provided all [*21] benefits she was due under the FMLA.

To the extent Plaintiff's arguments mirror those in support of her FMLA retaliation claim, they are equally unavailing and fail to support her interference claim. Moreover, it is clear from the record that Plaintiff was given twelve weeks of leave, which is all that is required under the FMLA. See Sista, 445 F.3d at 174. See also Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 161 (2d Cir. 1999). To the extent Plaintiff seeks to base her interference claim on Defendants' failure to notify her of her FMLA status after May 7, 2008, where, as here, an employee has sought leave due to "a serious health condition that [made her] unable to perform the functions of [her] position" pursuant to 29 U.S.C. § 2612(a)(1)D), and has been given all of the benefits due under the FMLA, the failure of an employer to comply with notification requirements does not amount to interference as such failure in no way interferes with the employee's leave, benefits or reinstatement. See id., at 161-62. For the foregoing reasons, Defendants' motion for summary judgment as to Plaintiff's FMLA interference claim is granted.

Having dismissed Plaintiff's federal claims, [*22] the court nonetheless exercises its discretion to retain jurisdiction of the remaining state law claims. See 28 U.S.C. § 1367(c)(3). Although this case is at a relatively early stage of the litigation, the remaining state law claims do not present novel issues of law which would implicate principles of federalism and comity. Cf. Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305-06 (2d Cir. 2003). Accordingly, in the interests of judicial economy, the court will retain jurisdiction of Plaintiff's remaining NYHRL claims.

### C. NYHRL Claims

By her Amended Complaint, Plaintiff alleges claims of age discrimination, disability discrimination, and retaliation under the NYHRL. Defendants have made clear, both in their papers and at oral argument, that they seek summary judgment on Plaintiff's age discrimination and retaliation claims, limited solely to the extent said claims are based on Plaintiff's June 6, 2008 termination. Defendants also seek dismissal of Plaintiff's disability claim to the extent it is based on a June 6, 2008 termination, but also seek dismissal of said claim to the extent same relies on a failure to provide reasonable accommodation. As the court has previously determined that [*23] no rational fact finder could conclude on this record that Plaintiff was terminated on June 6, 2008, Defendants' motion for summary judgment is granted in this regard. Accordingly, the court will discuss Plaintiff's NYHRL claim solely regarding her claim for disability discrimination based on failure to provide a reasonable accommodation.

### *1. Disability Discrimination*

By the Amended Complaint, Plaintiff alleges that Defendants failed to provide her with a reasonable accommodation and terminated her because of her disability. Pursuant to NYHRL, "[i]t shall be an unlawful discriminatory practice for an employer . . ., to refuse to provide reasonable accommodations to the known disabilities of an employee . . . in connection with a job or occupation sought or held." N.Y. Exec. Law § 296.3(a) (McKinney 2008).

In order to establish a claim for failure to provide a reasonable accommodation, Plaintiff must establish that (1) she is an individual with a disability, (2) Defendants had notice of her disability, (3) she could perform the essential functions of her job with reasonable accommodation, and (4) Defendants failed to make such accommodations. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 216 (2d Cir. 2001); [*24] Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999); Romanello v. Shiseido Cosmetics Am.

Ltd., 00-Civ.-7201, 2002 U.S. Dist. LEXIS 18538, 2002 WL 31190169, at *7 (S.D.N.Y. Sept. 30, 2002), aff'd, 71 Fed. Appx. 880 (2d Cir. 2003).

Defendants argue that summary judgment is appropriate on Plaintiff's reasonable accommodation claim because Defendants granted Plaintiff twelve weeks of medical leave, Defendants advised Plaintiff that she may apply for additional leave or another accommodation if requested, and Plaintiff did not seek additional leave. Although Plaintiff's counsel failed to address this argument in Plaintiff's papers opposing summary judgment, at oral argument, counsel argued that Defendants failed to provide a reasonable accommodation because they failed to provide Plaintiff with paid leave at the salary of the Director of Human Resources and Development, and because they failed to inquire as to a reasonable accommodation as is required under the NYHRL.

As to Plaintiff's initial argument, that Defendants failed to provide her a reasonable accommodation because they failed to provide her with paid leave at the salary of the Director of Human Resources and Development, the record is [*25] clear, and Plaintiff admits, that she was terminated from that position before she sought leave due to a serious health condition. Moreover, as previously discussed, Defendants provided Plaintiff with twelve weeks of leave. Courts have held that a leave of absence may be considered a reasonable accommodation, although employers are not required to provide employees with indefinite periods of leave. See Starr v. Time Warner, Inc., No. 07-Civ.-5871(CD), 2007 U.S. Dist. LEXIS 88219, 2007 WL 4144627, at *4 (S.D.N.Y. Nov. 21, 2007) (citing Stamey v. NYP Holdings, Inc., 358 F.Supp.2d 317, 324 (S.D.N.Y. 2005); Powers v. Polygram Holding, Inc., 40 F.Supp.2d 195, 201 (S.D.N.Y. 1999)). Accordingly, Defendants' failure to provide paid leave to Plaintiff at a salary for a position she held but from which she was terminated prior to requesting leave, is not a failure to provide a reasonable accommodation.

As to the Plaintiff's second argument, counsel argued that the NYHRL differs from the Americans with Disabilities Act ("ADA") in that it puts the onus on the employer to inquire with the employee about the existence of a reasonable accommodation. However, it is clear that disability discrimination claims, whether brought under [*26] federal or state law, are subject to the same legal standard. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 n.3 (2d Cir. 2001). See also King v. Town of Wallkill, 302 F.Supp.2d 279, 289 (S.D.N.Y. 2004); D'Avilar v. Cerebral Palsy Ass'ns of New York, 851 N.Y.S.2d 63, 17 Misc.3d 1117[A], 2007 NY Slip Op 52045[U] (N.Y. Sup. Ct. 2007). Under both the ADA and the NYHRL, it is the employee who has the burden to identify an accommodation, but the employer is obliged to take affirmative steps to assist the employee in this process. See Jackan v. New York State Dep't of Labor, 205 F.3d 562, 566, 568 n.4 (2d Cir. 2000). The record here reflects that on July 18 and 25, 2008, Yarbrough notified Plaintiff that if she is unable to return to work on July 31, 2008, she should advise Yarbrough so that a determination may be made as to what, if any, accommodation is appropriate. See Yarbrough Decl. Exs. G & H. Again, the record is devoid of any evidence that Plaintiff sought an accommodation aside from her initial request for leave and her subsequent assertions that she would not return to work until her physician and therapist permitted her to do so. Accordingly, Defendants' motion for summary judgment as to [*27] Plaintiff's failure to accommodate claim is granted.

### D. Claims Against Board Members

By her Amended Complaint, Plaintiff alleges that the Board Members are individually liable on her NYHRL claims as aiders and abettors in the unlawful discriminatory actions alleged pursuant to N.Y. Exec. Law § 296(6) and on her FMLA claims.

Defendants seek dismissal of all claims against the Board Members, citing the following provision of the New York Not-For-Profit Corporation Law:

> [N]o person serving without compensation as a director, officer or trustee of a corporation, association, organization or trust described in section 501 (c)(3) of the United States internal revenue code shall be liable to any person other than such corporation, association, organization or trust based solely on his or her conduct in the execution of such office unless the conduct of such director, officer or trustee with respect to the person asserting liability constituted gross negligence or was intended to cause the resulting harm to the person asserting such liability.

N.Y. NOT-FOR-PROFIT CORP. LAW § 720-a (McKinney 1986). As an initial matter, because Defendants have been granted summary judgment on Plaintiff's FMLA claims, [*28] the court need not address the liability of the Board Members in that regard. As to the remaining claims, Defendants must first demonstrate that the Board Members are entitled to the benefit of § 720-a. However, should Plaintiff proffer evidence that the conduct of the Board Members constituted gross negligence or was intended to cause harm, then Plaintiff's claims may survive summary judgment.

Defendants argue that the Board Members are entitled to the benefits of this provision, and that Plaintiff has failed to allege or provide any evidence that the conduct of any of the Board Members amounted to gross negligence or that any of the Board Members acted with intention to cause Plaintiff harm. Accordingly, Defendants argue, all claims against the Board Members should be dismissed. Plaintiff counters that the Board Members are subject to individual liability under the NYHRL, and that her allegations in the Amended Complaint establish the gross negligence or intentional conduct of the Board Members. Accordingly, Plaintiff argues, her claims against the Board Members should go forward. Specifically, Plaintiff cites Paragraphs 14 through 16 of the Amended Complaint, wherein she alleges

[*29] that the Board Members are individually liable under the FMLA and NYHRL and that the Board Members conspired with Yarbrough and Gordineer as well as "personally and actually participated in the unlawful discriminatory practices set forth in [the Amended C]omplaint[.]" Am. Compl. PP 14-16.

As an initial matter, the court notes that it clearly notified Plaintiff that the pending motion has been converted to a motion for summary judgment prior to the submission of Plaintiff's opposition papers. Despite such notice, Plaintiff opposes the motion insofar as it relates to the Board Members as a motion to dismiss, relying solely on her allegations in the Amended Complaint. While the court is not obligated to undertake a review of the record in order to locate evidence of a factual dispute, see Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002), in the interest of judicial economy, it has done so.

To be sure, there is no dispute that the Chapter is a charitable organization under Section 501(c)(3) of the Internal Revenue Code and that its Board Members serve as volunteers without receiving compensation. See Pl.'s Resp. to Statement of Material Facts, at P 1, Dkt. No. 50. [*30] Thus, Defendants have met their burden to show that the Board Members are entitled to the benefit of § 720-a. The only apparent issue is whether Plaintiff has proffered enough evidence to create a question of fact regarding whether any of the Board Members acted with gross negligence or intent to cause her harm.

In her affidavit, which is the only evidence proffered by Plaintiff in opposition to the present motion, Plaintiff only mentions two individual Board Members by name -- Patricia Williams and Dawn Darby. To be sure, Williams has not been served and has therefore been dismissed from this action on that basis. However, even if Williams was a defendant to this action, Plaintiff's allegations regarding her involvement are limited to Williams's alleged presence as a witness and scribe at the May 7, 2008 meeting between Plaintiff and Yarbrough. See Aff. of Cheryll Vosburgh, November 17, 2008, PP 28, 34, 49 & 51, Dkt. No. 50. Accordingly, Plaintiff has failed to proffer any evidence that Williams acted with gross negligence, or an intent to cause her harm.

Regarding Darby's involvement, Plaintiff first alleges that Darby, who is a close personal friend of Yarbrough's, was aware that [*31] Plaintiff called the Red Cross Concern Connection Line ("CCL") to report "acts of inappropriate conduct and age discrimination perpetuated by Yarbrough and Gordineer." Vosburgh Aff. PP 19, 23. Thereafter, Plaintiff alleges, Darby, along with Yarbrough and Gordineer, "began an escala[t]ing campaign of offensive, threatening, intimidating, and belligerent behavior toward [Plaintiff] in retaliation" for the CCL complaint. Id. P 24. As an example of such behavior, Plaintiff alleges that Yarbrough and Gordineer, along with Darby and other unnamed members of the Board, "padded [Plaintiff's personnel file] with derogatory performance remarks, reprimands, written warnings and disparaging emails[.]" Id. P 25. Plaintiff also alleges generally that such "acts by Yarbrough, Gordineer, Darby and other members of the [B]oard . . . were a calculated effort to force [Plaintiff] to resign [her] position as retaliation for [the CCL complaint] and in furtherance of the age based discrimination of employees who had longevity with [the Chapter]." Id. P 43. Finally, Plaintiff alleges that her termination "was an act of age discrimination and retaliation by Gordineer, Yarbrough, and" unnamed members of the [*32] Board. Id. P 90.

To begin with, Plaintiff cannot survive summary judgment on her claims of individual liability against the Board Members by submitting evidence in the form of an affidavit that certain acts were undertaken by "other members of the Board". Such an allegation would not even survive a motion to dismiss. See Leykis v. NYP Holdings, Inc., 899 F.Supp. 986, 993-94 (E.D.N.Y. 1995) (purported NYHRL claim insufficient where specific facts

implicating individual defendants are lacking). To be sure, when asked at oral argument to identify any fact questions in the record regarding the remaining Board Members, Plaintiff's counsel made reference to a document regarding a certain board meeting and argued that further discovery is necessary to investigate the individual board members' actions. The court notes that counsel failed to submit said document as evidence. Moreover, even if the court had not converted Defendants' motion to dismiss to a motion for summary judgment, Plaintiff's allegations in the Amended Complaint are insufficient to state a claim against any of the Board Members other than Darby. In the Amended Complaint, Plaintiff merely alleges that the Board Members "personally [*33] and actually participated in the unlawful discriminatory practices set forth in [the Amended Complaint] in that they aided, abetted, incited, compelled, or coerced the doing of the acts forbidden by [the NYHRL]." Am. Compl. P 15. Plaintiff goes on to allege that "Yarbrough, Gordineer and the Board Members conspired to commit the acts and omissions described in [the Amended Complaint.]" P 16. Such conclusory allegations do not serve to notify the individual Board Members of the conduct which he or she participated in that would give rise to NYHRL liability. See Leykis, 899 F.Supp. at 994. While at oral argument, counsel alleged that the Board Members failed to exercise supervision over Yarbrough and allowed her to "run amok," such an allegation was not included in the Amended Complaint, and even if it were, it is questionable whether the failure to supervise an executive director translates into board member liability, to wit, gross negligence or intentional conduct.

Nonetheless, Plaintiff has submitted enough evidence to create a question of fact regarding whether the actions of individual board member Darby were grossly negligent, or were undertaken with intent to cause Plaintiff harm. [*34] "Gross negligence is the commission or omission of an act or duty owing by one person to a second party which discloses a failure to exercise slight diligence. In other words, the act or omission must be of an aggravated character as distinguished from the failure to exercise ordinary care." Kofin v. Court Plaza, Inc., 886 N.Y.S.2d 71, 23 Misc. 3d 1121[A], 2009 NY Slip Op 50876[U] (N.Y. Sup. Ct. 2009) (citing Weld v. Postal Tel. Cable Co., 210 N.Y. 59, 103 N.E. 957, 2 N.Y. L. Cas. 460 (1913)). One court found that evidence failed to show gross negligence where the infringement of plaintiff's copyrights by defendant organization and its members was not willful, and members acted within the scope of their authority in furtherance of the organization and its objectives. See Scanlon v. Kessler, 11 F.Supp.2d 444, 448 (S.D.N.Y. 1998). In sharp contrast, here, Plaintiff alleges by affidavit that Darby was personally involved in actions undertaken to retaliate against Plaintiff for reporting age discrimination on behalf of Yarbrough and Gordineer. In a state court action regarding a claim for wrongful discharge, the court found that plaintiff made a sufficient showing of gross negligence where he submitted evidence that a board member made accusations [*35] against Plaintiff "without conducting any investigation, presenting any proof, or informing those present at the meetings of the basis for her accusations." Brown v. Albany Citizens Council on Alcoholism, Inc., 605 N.Y.S.2d 577, 579, 199 A.D.2d 904, 906 (N.Y. App. Div. 1993). The evidence of Darby's actions here, similar to the actions of the board member in Brown, rise to the level of gross negligence, if not intentional conduct. Accordingly, Defendants' motion for summary judgment as to individual liability of board member Darby is denied, as Plaintiff has identified a question of fact regarding whether Darby is entitled to immunity under § 720-a. Defendants' motion for summary judgment as to the remaining Board Members is granted.

## E. Sanctions

Defendants seek sanctions against Plaintiff and her attorney pursuant to the court's inherent power and 28 U.S.C. § 1927 for failing to withdraw frivolous

claims, to wit, all claims predicated on Plaintiff's alleged June 6, 2008 termination, as well as attorneys' fees and costs associated with the filing of the present motion. A district court may impose sanctions "under [*36] its inherent power as a penalty for misconduct during the course of litigation." Page v. Monroe, No. 1:02-CV-0526, 2009 U.S. Dist. LEXIS 40456, 2009 WL 1347077, at *11 (N.D.N.Y. May 13, 2009) (citing Milltex Indus. Corp. v. Jacquard Lace Co., 55 F.3d 34, 37-38 (2d Cir. 1995)). Sanctions are authorized under 28 U.S.C. § 1927 "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose, and upon a finding of conduct constituting or akin to bad faith." Gollomp v. Spitzer, 568 F.3d 355, 368 (2d Cir. 2009) (citation and internal quotation omitted). "[S]anctions are not appropriate unless the challenged actions are (1) entirely without color and (2) motivated by improper purposes, such as harassment or delay." Page, 2009 U.S. Dist. LEXIS 40456, 2009 WL 1347077, at *11 (quoting Milltex Indus., 55 F.3d at 37-38. In addition to sanctions, 28 U.S.C. § 1927 provides that "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Id. quoting 28 U.S.C. § 1927.

According to Defendants, all [*37] claims that are predicated on Plaintiff's alleged June 6, 2008 termination are frivolous, unreasonable and vexatious, and that by bringing such claims, Plaintiff and her attorney wasted judicial resources as well as the expenditure of attorneys' fees and costs associated with responding to said claims.

In her papers in opposition to Defendants' motion for sanctions, Plaintiff fails to address the correct factual basis for the motion, which is the merit of Plaintiff's claims stemming from her alleged June 6, 2008 termination. Instead, Plaintiff focuses on her claims against the Board Members, and argues

that said claims were not brought in bad faith. Nonetheless, counsel was given an opportunity to address Defendants' motion for sanctions at oral argument, wherein he simply reiterated Plaintiff's argument that she was terminated on June 6, 2008.

At this time, the court is reluctant to conclude that counsel's actions in setting forth claims based on Plaintiff's alleged June 6, 2008 termination were motivated by improper purposes, and thus sanctionable. Accordingly, Defendants' motion for sanctions is denied.

### V. Conclusion

In accordance with the foregoing, it is ORDERED that the motion for [*38] summary judgment by defendants, see Dkt. No. 32, is GRANTED in part and DENIED in part; and it is further

ORDERED that defendants Linda Andrei, Susan Backstrom, Anne Digiacomo, Mary Dorman, Thomas Dorman, Geoff Dunn, Jane Dunnick, Sarah Jane Ellsworth, Martha Mapes, William Maxwell, Michael Pinnisi, George Taber, Patricia Williams, and Michael Yehl, are DISMISSED from this action; and it is further

ORDERED that defendants' motion for sanctions is DENIED.

The parties are hereby directed to promptly contact Magistrate Judge George H. Lowe to schedule a Rule 16 conference in this matter.

IT IS SO ORDERED.

DATED: October 27, 2009

Syracuse, New York

/s/ Neal P. McCurn

Neal P. McCurn

Senior U.S. District Judge