UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MARCUS ANDRE DODD,                          :
                Plaintiff,                    :
                                            :
v.                                          :
                                            :      **<u>OPINION AND ORDER</u>**
MY SISTERS' PLACE, INC.; KAREN              :
CHEEKS-LOMAX, Individually; THOMAS          :      21 CV 10987 (VB)
RICE, Individually; and ROBERT R.           :
GHEEWALLA, Individually,                     :
                Defendants.                  :
--------------------------------------------------------------x

<u>Briccetti, J.</u>:

      Plaintiff Marcus Andre Dodd, proceeding <u>pro se</u> and <u>in forma pauperis</u>, brings this

employment discrimination action under Title VII of the Civil Rights Act of 1964 ("Title VII"),

Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), the Americans with Disabilities

Act of 1990 ("ADA"), and the New York State Human Rights Law ("NYSHRL"). Plaintiff

claims defendants My Sisters' Place, Inc. ("MSP"), MSP's Chief Executive Officer ("CEO")

Karen Cheeks-Lomax, and MSP Board of Directors members Thomas Rice and Robert R.

Gheewalla, unlawfully discriminated against him based on his race and disabilities when he was

MSP's Chief Financial Officer ("CFO"), and terminated him in retaliation for complaining about

such discrimination.

      MSP brings counterclaims against plaintiff for conversion and breach of the duty of

loyalty.

      Now pending is defendants' motion for summary judgment on all of plaintiff's claims

and on MSP's counterclaims. (Doc. #99).

      For the following reasons, the motion is GRANTED.

      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

# BACKGROUND

The parties have submitted memoranda of law and defendants have submitted a statement of undisputed material facts pursuant to Local Civil Rule 56.1,[1] along with supporting declarations and exhibits.  Together, along with limited portions of plaintiff's amended complaint as indicated below, these submissions reflect the following relevant background.

## I.   Plaintiff's Employment at MSP

From November 9, 2020, to July 20, 2021, plaintiff, an African American man, was employed as CFO at MSP, a not-for-profit corporation headquartered in White Plains, New York, whose mission is to provide services to victims of domestic violence and human trafficking.  MSP is funded based solely on federal and state grants and donations from members of the community.

As CFO, plaintiff reported directly to defendant Cheeks-Lomax, an African American woman and MSP's CEO.  Plaintiff provided regular updates to the Finance Committee of MSP's Board of Directors, which included defendants Gheewalla, a male of Indian and white heritage and MSP's secretary, and Rice, a white male and MSP's co-chair.  Plaintiff was also tasked with

---

[1]     Plaintiff did not respond to defendants' Rule 56.1 statement, despite being on notice of his obligation to do so.  (See Docs. ##107, 109).  Thus, the Court may deem the facts in the Rule 56.1 statement to be undisputed.  See Local Civil Rule 56.1(c).  Nonetheless, plaintiff is proceeding pro se, so the Court must be "satisfied that the facts as to which there is no genuine dispute show that the moving party is entitled to summary judgment as a matter of law."  Jackson v. Jackson, 2021 WL 981849, at *4 (S.D.N.Y. Mar. 16, 2021).  Accordingly, the Court has independently reviewed the factual record with respect to each of defendants' statements of undisputed material fact.

Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Plaintiff will be provided copies of all unpublished cases cited in this opinion.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009) (per curiam).

overseeing MSP's fiscal policies, "serving as both an expert on the budget itself and as an advisor to the rest of the executive staff as they develop departmental budgets," and "managing all contracts on an ongoing basis, ensuring accuracy of costs and billing."  (Doc. #101-11 at ECF 2).[2]

II.      Defendants' Allegedly Discriminatory Behavior

In early January 2021, plaintiff led his first Finance Committee meeting, at which there was a discussion of employee salary increases.  Rice questioned plaintiff about the salary history of a particular employee, which plaintiff perceived as "probing" and "less than warm."  (Doc. #101-1 at 68).  After the meeting, plaintiff spoke to Cheeks-Lomax about Rice's questioning of him, but plaintiff did not indicate to Cheeks-Lomax that he perceived Rice's questioning to be because of his race.

On January 24, 2021, plaintiff emailed Rice regarding his interest in MSP's investment strategy, and Rice suggested plaintiff present his ideas to MSP's Investment Committee.  (Doc. #101-15 at ECF 11).  Plaintiff asserts this email exchange was the start of Rice's discriminatory treatment of him.  (Doc. #101-1 at 127–28).  On January 28, 2021, plaintiff and Rice emailed about MSP's investment portfolio and agreed to discuss the topic further at a previously-scheduled, in-person meeting.  Plaintiff sent Rice a PowerPoint with his ideas, and Rice responded with several paragraphs of background information on MSP's investment strategy. (Doc. #101-15 at ECF 2–3).

On March 5, 2021, the Finance Committee received an email containing MSP's balance sheet.  On March 6, Rice emailed plaintiff's colleague, Peter Cutaia, copying plaintiff, stating a

---

[2]      "ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

footnote on the balance sheet was wrong and needed to be corrected.  (Doc. #101-10 at ECF 2). After further discussion between Cutaia, Rice, and plaintiff, the footnote was corrected and the balance sheet was recirculated to the Finance Committee.  Following this exchange, plaintiff expressed concern to Cheeks-Lomax about Rice's email, and on March 9, Rice apologized for "how [plaintiff] took the email."  (Doc. #101-16 at ECF 2).  Plaintiff responded he was appreciative Rice reached out and scheduled a meeting for the two of them "to discuss how and why the error occurred, in my opinion, and what can and should be done to avoid errors in the future."  (Id.).

On Saturday, May 15, 2021, plaintiff emailed Rice, Gheewalla, and Cheeks-Lomax regarding an adjustment to MSP's employee retirement plan which needed to be approved by mid-week.  Rice responded a few minutes later, indicating he would review.  On Sunday, May 16, at 4:08 a.m., Rice responded to the group with a list of comments and questions.  (Doc. #101-21 at ECF 2–4).

On May 24, 2021, plaintiff emailed MSP's fiscal year 2022 budget to the Finance Committee, "requested[ing] that everyone reserve their questions until Wednesday's meeting." (Doc. #101-48 at ECF 2).  Approximately thirty minutes later, Rice responded he would hold his questions but requested additional documents and information to aid in his review.  On May 25, plaintiff emailed the Finance Committee requesting the budget meeting be postponed to June 9 because plaintiff required additional time to prepare the information the committee members requested.  Rice expressed concerns about pushing the meeting back for fear there would not be sufficient time to incorporate changes to the budget before the end of the fiscal year on June 30. When Rice asked if plaintiff could be prepared to discuss the budget at the original meeting time, plaintiff simply responded "No."  (Doc. #101-22 at ECF 2).

On June 1, 2021, plaintiff emailed Cheeks-Lomax complaining of "the ongoing trauma and racism which Tom Rice has been expressing toward me." (Doc. #101-29 at ECF 3). Plaintiff referenced past conversations with Cheeks-Lomax and others about how "the Finance Committee, and Tom in particular, have been extra hard upon me because I am not Betsy, the former white woman CFO, who was never subjected to the scrutiny I am now." (Id.).

On June 2, 2021, plaintiff began to feel unwell and was diagnosed with high blood pressure and costochondritis (chest wall pain caused by cartilage inflammation). Plaintiff's doctor advised that he avoid stress, and, as a result, he was out of work from June 2 to July 6, except that he returned for a single day on June 14. On June 3, the Finance Committee cancelled the June 9 budget meeting indefinitely given plaintiff's medical leave.

On June 7, 2021, MSP retained Tracey Levy of Levy Employment Law, PLLC, to investigate the concerns plaintiff raised in his June 1 email. (Doc. #101-33 at ECF 2). On June 14, Rice recused himself from any "update sessions" on "the status, progress and conclusion of the investigation" into plaintiff's complaint. (Doc. #101-34 at ECF 2). Plaintiff was interviewed about his complaint on July 8. On July 19, Levy shared the results of her investigation with plaintiff. Levy did not find any evidence Rice engaged in race discrimination toward plaintiff.

III.   Plaintiff's Requested Salary Increase

In October 2020, when plaintiff accepted the CFO position at MSP, his offer letter indicated his annual salary would be $150,000. (Doc. #101-7 at ECF 2). Although plaintiff attempted to negotiate an annual salary of $175,000, Cheeks-Lomax explained $150,000 was the maximum CFO salary under MSP's current fiscal budget.

On May 27, 2021, plaintiff sent Cheeks-Lomax an email attaching a payroll change form reflecting a salary increase from $150,000 to $175,000. The same day, Cheeks-Lomax responded she was "not able to approve this request," but sought to set up a meeting to discuss

5

"the importance of [plaintiff's] work for MSP." (Doc. #101-28 at ECF 2). Plaintiff had been employed at MSP for approximately six months at the time of this request and was the second highest paid member of MSP's executive team. Plaintiff alleges several other employees received salary increases in 2021. (Doc. #37 ("Am. Compl.") ¶ 142). However, those employees had worked at MSP for at least four years. (Doc. #104 ¶ 45).

IV.    Plaintiff's Use of MSP Resources

On May 12, 2021, plaintiff listed a job request on Upwork, an online freelancing platform where users can post requests for services with third-party vendors. The job request sought a consultant to update plaintiff's "resume and LinkedIn page." (Doc. #101-38 at ECF 2). Plaintiff retained two consultants to perform this work. He told one consultant: "I would like next [to] work as CFO or CFO/COO for a larger not-for-profit organization in the Arts or Human Services space." (Doc. #101-39 at ECF 2). Plaintiff also requested the consultant "[i]dentify 3 Not-For-Profit CFO jobs within the NY area" and "[t]ailor a resume and cover letter for more than one if necessary to meet the specific needs of the identified jobs." (Id. at ECF 4). On May 24, plaintiff said he found a "specific position" for which he would like to apply with a June 7, 2021, application deadline. (Doc. #101-40 at ECF 5).

As the default administrator of MSP's Upwork account, plaintiff's company credit card was connected to the account, and the company credit card was linked to MSP's Operating Account at The Westchester Bank. As CFO, plaintiff was the only Upwork administrator who could assign a project to a third-party vendor, and his company credit card was automatically linked and charged for every project. In total, the consultant fees for the updates to plaintiff's resume, cover letter, and LinkedIn profile amounted to $1,715. (See Doc. #101-42).

MSP's Fiscal Policies and Procedures require both the CEO and CFO to approve contracts with consultants and other third parties. (Doc. #101-13 at ECF 22). Cheeks-Lomax,

6

MSP's CEO, did not approve the retention of the Upwork consultants plaintiff engaged to update his professional materials.  Plaintiff asserts the charge was "an ordinary expense for any executive."  (Doc. #101-1 at 266).

V.      Plaintiff's Termination

 On July 16, 2021, Maria Faustino, the Grants and Contracts Manager at MSP, emailed Cheeks-Lomax expressing concern that Upwork consulting expenses totaled $41,000 for the period between April and June 2021.  Cheeks-Lomax directed Faustino to gather the necessary invoices to support the charges, and Faustino discovered charges for a project regarding updating plaintiff's resume and LinkedIn profile.  Cheeks-Lomax reviewed the chat history relating to this Upwork project.

On July 19, 2021, Cheeks-Lomax notified executive committee members, excluding Rice, that she intended to terminate plaintiff's employment for the improper use of MSP funds. The executive committee members agreed Gheewalla would join Cheeks-Lomax in a meeting with plaintiff the following day.

On July 20, 2021, Cheeks-Lomax, Gheewalla, and plaintiff attended a meeting at which Cheeks-Lomax informed plaintiff his employment was terminated due to his use of MSP funds to pay Upwork consultants to update his professional materials, in violation of MSP's fiscal policies and procedures.

Plaintiff told Cheeks-Lomax and Gheewalla he used the consultants to update his materials for an application he had submitted to speak at the upcoming Office of Victim Services ("OVS") conference.  However, the deadline to apply for a speaker position was April 30, 2021 (Doc. #101-1 at 268; Doc. #101-36 at ECF 5)—approximately two weeks before plaintiff posted the job request on Upwork.  Plaintiff did not subsequently submit any of the materials drafted by the Upwork consultants to OVS in furtherance of his application.  (Doc. #101-1 at 291).

On August 5, 2021, MSP retained AlixPartners to provide financial advice regarding the fiscal programs implemented by plaintiff during his tenure as MSP's CFO.

## DISCUSSION

I.  <u>Standard of Review</u>

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  <u>Id</u>.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  <u>Wilson v. Nw. Mut. Ins. Co.</u>, 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  <u>Zalaski v. City of Bridgeport Police Dep't</u>, 613 F.3d 336, 340 (2d Cir. 2010).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  <u>Dallas Aerospace, Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor, on the issue on which summary judgment is sought, summary judgment is improper.  <u>Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1988). The burden to proffer evidence admissible pursuant to the Federal Rules of Evidence applies "equally to pro se litigants." Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at *4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)). Bald assertions, unsupported by admissible evidence, are thus not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

Although courts must afford a pro se litigant special solicitude on a motion for summary judgment and read his submissions "to raise the strongest arguments that they suggest," such solicitude "does not relieve [a] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." Jorgensen v. Epic/Sony Recs., 351 F.3d 46, 50 (2d Cir. 2003).

II.   Race Discrimination Claims

Defendants argue plaintiff fails to establish a prima facie case of race discrimination under Title VII, Section 1981, or the NYSHRL, and even if he could establish a prima facie case, defendants have put forth legitimate reasons for the adverse employment actions and plaintiff has not identified any evidence from which a reasonable jury could conclude defendants' reasons were pretextual.

The Court agrees.

A.   Legal Standard

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

The NYSHRL similarly prohibits discrimination against an employee based on that employee's "age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence."  N.Y. Exec. Law § 296(1).

Section 1981 "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment."  Patterson v. County of Oneida, 375 F.3d 206, 224 (2d Cir. 2004); 42 U.S.C. § 1981(a).

When, as here, a plaintiff's Title VII, Section 1981, or NYSHRL discrimination claims are based on circumstantial evidence of discriminatory intent, the claims are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Alvarado v. United Hospice, Inc., 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (collecting cases under all three statutes); see Porter v. Dartmouth-Hitchcock Med. Ctr., 92 F.4th 129, 149 (2d Cir. 2024) (explaining the McDonnell Douglas framework applies only in the absence of direct evidence).

Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of discrimination by showing "(i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination."  Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002).  Plaintiff's "burden of establishing a prima facie case is not onerous, and has been frequently described as minimal."  Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998).

Once a plaintiff presents a prima facie case, the defendant then bears the burden of articulating a legitimate, non-discriminatory reason for the employment action.  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  If a defendant meets this burden, the plaintiff

must point to evidence that would be sufficient to permit a rational factfinder to conclude the employer's explanation is merely a pretext for actual discrimination.  Id.

To satisfy the burden of showing pretext on summary judgment, a plaintiff "need only show that the employer's stated reason—even if true or factually accurate—was not the real reason, in the sense that it was not the <u>entire</u> reason due to a coexisting impermissible consideration."  <u>Bart v. Golub Corp.</u>, 96 F.4th 566, 575 (2d Cir. 2024).  Plaintiff must "produce admissible evidence showing circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  <u>Id.</u> at 576.  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  <u>Weinstock v. Columbia Univ.</u>, 224 F.3d at 42.  Indeed, "[a] plaintiff's evidence at the third step of the <u>McDonnell Douglas</u> analysis must be viewed as a whole rather than in a piecemeal fashion."  <u>Walsh v. N.Y.C. Hous. Auth.</u>, 828 F.3d 70, 76 (2d Cir. 2016).

B.    <u>Analysis</u>

Assuming, without deciding, that plaintiff has made out a <u>prima facie</u> case of racial discrimination, defendants have proffered legitimate, non-discriminatory reasons for the alleged adverse employment actions, and plaintiff points to no evidence from which a reasonable jury could conclude defendants' reasons were pretextual.

Plaintiff alleges two adverse employment actions with respect to his race-based discrimination claims:  (i) the denial of his requested salary increase, and (ii) his termination.

First, defendants state they denied plaintiff's requested salary increase from $150,000 to $175,000 because plaintiff requested the increase only six months after he started the job and the maximum allowable annual salary for the CFO under MSP's budget was $150,000.  Defendants' proffered budgetary concern constitutes a legitimate, non-discriminatory reason for denying

11

plaintiff's requested salary increase.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469 (2d Cir. 2001).

Plaintiff points to no evidence that would allow a reasonable jury to conclude these legitimate, non-discriminatory justifications were pretextual.  Although he identifies several other employees who received salary increases in 2021 as evidence of pretext, it is undisputed those employees were each employed at MSP for significantly longer periods of time than plaintiff—four or more years (Doc. #104 ¶ 45)—and thus are not similarly situated comparators from which discrimination may be inferred.  See Bramble v. Moody's Corp., 2024 WL 705955, at *3 (2d Cir. Feb. 21, 2024) (summary order) (finding no discriminatory animus or pretext when plaintiff failed to show coworkers were similarly situated to plaintiff "in all material respects").

Second, defendants state plaintiff was terminated because defendants discovered plaintiff misappropriated $1,715 of MSP's funds to pay third-party contractors to update his professional materials in preparation for his anticipated job search, in violation of MSP's fiscal policies and procedures.  "There can be no doubt that misappropriation of fund[s] is a permissible and sufficient reason for plaintiff's discharge."  Gorley v. Metro-North Commuter R.R., 2000 WL 1876909, at *6 (S.D.N.Y. Dec. 22, 2000).

Again, the burden shifts to plaintiff to present admissible evidence giving rise to an inference of discrimination, but plaintiff fails to do so.  Although plaintiff points to several email exchanges between himself and Rice in January, March, and May 2021 as evidence of discriminatory animus, the emails do not make reference to plaintiff's race, and the tone, timing, and content of the messages, considered individually or as a whole, are not otherwise derogatory toward plaintiff.  (See Docs. ##101-15, 101-10, 101-21, 101-22, 101-23, 101-48).  Plaintiff's

"feelings and perceptions of being discriminated against" alone are not evidence of discrimination.  Bickerstaff v. Vassar Coll., 196 F.3d 435, 456 (2d Cir. 1999).

Accordingly, defendants are entitled to summary judgment on plaintiff's Title VII, Section 1981, and NYSHRL race discrimination claims.

III.    Disability Discrimination Claims

Defendants argue plaintiff fails to establish a prima facie case of disability discrimination under the ADA or NYSHRL, and that even if plaintiff did establish a prima facie case, defendants have articulated a legitimate reason for plaintiff's termination and plaintiff has not presented any evidence that the reason was pretextual.

The Court agrees.

A.    Legal Standard

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to," among other things, the "discharge of employees." 42 U.S.C. § 12112(a).  Disability discrimination claims based on indirect evidence of discrimination are evaluated under the same McDonnell Douglas burden-shifting framework discussed above.  See McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009); Williams v. MTA Bus Co., 44 F.4th 115, 125 (2d Cir. 2022) (applying McDonnell Douglas to NYSHRL claims).

To establish a prima facie case under the ADA, a plaintiff must show:  "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).  "[T]he same elements that must be proven to establish an ADA claim must be also demonstrated to prove claims under the

13

NYSHRL." Kinneary v. City of New York, 601 F.3d 151, 158 (2d Cir. 2010). However, the definition of disability under the NYSHRL is "significantly broader than the ADA definition." Anyan v. New York Life Ins. Co., 192 F. Supp. 2d 228, 245 (S.D.N.Y. 2002). Under both statutes, making out a prima facie case requires plaintiff to make only a de minimis showing. Katz v. Adecco USA, Inc., 845 F. Supp. 2d 539, 547 (S.D.N.Y. 2012).

At the second step of the McDonnell Douglas analysis, the employer bears the burden of putting forth a legitimate, non-discriminatory reason for plaintiff's termination. McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d at 96. At the third step, a plaintiff must present sufficient admissible evidence from which a rational finder of fact could infer the defendant's reason is pretextual, and his disability was the "but-for cause" of the adverse employment action. See Natofsky v. City of New York, 921 F.3d 337, 348 (2d Cir. 2019).

B.    Analysis

Here, plaintiff brings disability discrimination claims based on two alleged disabilities: (i) costochondritis and (ii) high blood pressure. Assuming, without deciding, that plaintiff has met his de minimus burden of establishing a prima facie case of disability discrimination, the Court again finds defendants have proffered a legitimate reason for plaintiff's termination, and plaintiff has not raised a triable issue of fact as to whether defendants' proffered reason was pretextual. (See supra Section II.B). Defendants provided a legitimate reason for terminating plaintiff's employment—plaintiff used MSP funds to update his resume, cover letters, and LinkedIn profile in preparation for his anticipated job search. With respect to pretext, plaintiff makes only one passing reference to his disability discrimination claims in his opposition (Doc. #110 ("Pl. Opp.") at ECF 5), and points to no evidence that would allow a reasonable trier of fact to infer that either of his alleged disabilities was the but-for cause of his termination. Indeed, the undisputed evidence shows defendants accommodated plaintiff's alleged disabilities by allowing

14

him a one month leave of absence, from which plaintiff returned just before MSP discovered

plaintiff's improper use of its funds.  (See Docs. ##101-30, 101-31).

Accordingly, defendants are entitled to summary judgment on plaintiff's ADA and

NYSHRL disability discrimination claims.

IV.     Retaliation Claims

Defendants argue plaintiff fails to establish his retaliation claims under Title VII, Section

1981, or the NYSHRL because there is no evidence of a causal connection between plaintiff's

complaints and the adverse employment actions.

The Court agrees.

A.      Legal Standard

Plaintiff's claims for retaliation under Title VII, Section 1981, and the NYSHRL are also

governed by the aforementioned McDonnell Douglas burden-shifting framework.  See Alvarado

v. United Hospice, Inc., 631 F. Supp. 3d at 116 (collecting cases).  To make out a prima facie

case of retaliation under Title VII, Section 1981, and the NYSHRL, a plaintiff must show he

(i) "engaged in protected activity," (ii) "the defendant was aware of that activity," (iii) he "was

subjected to a retaliatory action" that was "materially adverse," and (iv) "there was a causal

connection between the protected activity and the materially adverse action."  Carr v. N.Y.C.

Transit Auth., 76 F.4th 172, 180 (2d Cir. 2023); Said v. NYC Health & Hosp. Corp., 2024 WL

1769317, at *3 (E.D.N.Y. Apr. 24, 2024) (listing elements of a prima facie case under the

NYSHRL as "similar [in] form to Title VII").[3]

---

[3]     Although previously the same standard applied to Title VII and NYSHRL retaliation
claims, in 2019, the NYSHRL was amended to relax the standard for retaliation claims.  Everett
v. N.Y.C Dep't of Educ., 2023 WL 5629295, at *14 (S.D.N.Y. Aug. 31, 2023).  "While New
York courts have not yet produced any substantive analysis of how this amendment changes
standards of liability under the NYSHRL, courts in this District have interpreted the amendment

A "protected activity" entails "action taken to protest or oppose statutorily prohibited discrimination." Jarrell v. Hosp. for Special Care, 626 F. App'x 308, 311 (2d Cir. 2015) (summary order). Therefore, complaints of unfair treatment or "generalized grievances about an unpleasant or even harsh work environment, without more . . . fail to rise to the level of protected activity." Green v. Mount Sinai Health Sys., Inc., 826 F. App'x 124, 125 (2d Cir. 2020) (summary order). "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class." Aspilaire v. Wyeth Pharms., Inc., 612 F. Supp. 2d 289, 308–09 (S.D.N.Y. 2009).

To establish an adverse employment action for purposes of a retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

For purposes of a retaliation claim, causation can be established: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus against the plaintiff by the defendant." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d. Cir 2000). Moreover, the plaintiff must establish "proof that the unlawful retaliation would not have occurred in the

---

as rendering the standard for claims closer to the [broader] standard of the" New York City Human Rights Law ("NYCHRL"). Kaye v. N.Y.C. Health & Hosps. Corp., 2023 WL 2745556, at *17 (S.D.N.Y. Mar. 31, 2023). The Court "need not resolve the impact of these amendments here" because plaintiff's "claims fall short even under the NYCHRL's more liberal standards." Cooper v. Franklin Templeton Invs., 2023 WL 3882977, at *3 (2d Cir. June 8, 2023) (summary order).

absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). Thus, Title VII, Section 1981, and NYSHRL retaliation claims require evidence that the desire to retaliate was the "but-for cause" of the adverse employment action. See Gordon-Mallet v. Mt. Sinai Hosps. Grp., Inc., 2024 WL 1513910, at *18 (S.D.N.Y. Apr. 8, 2024) (applying but-for causation standard to retaliation claims under Title VII, Section 1981, and the NYSHRL).

Temporal proximity between the adverse action and the protected activity may be sufficient to establish a prima facie element of causation on its own. Parron v. Herbert, 768 F. App'x 75, 77 (2d Cir. 2019) (summary order). But when "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Chung v. City Univ. of New York, 605 F. App'x 20, 23 (2d Cir. 2015) (summary order).

"Once a prima facie case of retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013). "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." Id.

B.    Analysis

Here, liberally construing plaintiff's assertions, plaintiff predicates his retaliation claims on three adverse employment actions: (i) the denial of his request for a salary increase; (ii) his termination; and (iii) MSP's retention of AlixPartners to investigate MSP's fiscal policies after plaintiff's termination.

First, with respect to the denial of plaintiff's salary increase, plaintiff's alleged protected activity—his June 1, 2021, email to Cheeks-Lomax complaining of Rice's "racist behavior" (Doc. #101-29 at ECF 3)[4]—occurred <u>after</u> Checks-Lomax's denial of plaintiff's request for a salary increase on May 27, 2021.  (<u>See</u> Doc. #101-28).  As such, plaintiff cannot establish a causal connection between the protected activity and this adverse employment action.

Second, the crux of plaintiff's retaliation claims is that he was terminated in retaliation for complaining about Rice's treatment of him.  Plaintiff asserts the temporal proximity between the conclusion of the third-party investigation into his June 1, 2021, complaint on July 19, and his termination on July 20, shows his termination was retaliatory.  (<u>See</u> Pl. Opp. at ECF 6).  But "temporal proximity between [plaintiff's] protected activity and the [defendant's] adverse actions, without more, is . . . insufficient to survive summary judgment."  <u>Hale v. Vidal</u>, 2023 WL 7211909, at *1 (2d Cir. Nov. 2, 2023) (summary order).  Plaintiff also argues the standard process for disciplinary action was not followed with respect to his termination as he was not afforded an opportunity to explain the Upwork charges before his employment was terminated. (Pl. Opp. at ECF 4–5).  Yet plaintiff fails to present any evidence of the standard practices followed by MSP in similar circumstances, and regardless, "deviation from [a] standard practice" does not show "it is more likely than not that defendant discriminated against plaintiff." <u>Bucknell v. Refined Sugars, Inc.</u>, 82 F. Supp. 2d 151, 158 (S.D.N.Y. 2000).

---

[4]    Although the Court notes the June 1, 2021, email references prior discussions about how "the Finance Committee, and Tom [Rice] in particular, have been extra hard upon [plaintiff] because I am not Betsy, the former white woman CFO" (Doc. #101-29 at ECF 3), plaintiff fails to demonstrate that these unspecified conversations with Cheeks-Lomax constituted "protected activity" for purposes of his retaliation claims.  <u>See</u> <u>Green v. Mount Sinai Health Sys., Inc.</u>, 826 F. App'x at 125 (finding "generalized grievances about an unpleasant or even harsh work environment" do not constitute protected activity).

In addition, plaintiff points to no evidence of retaliatory animus on the part of Cheeks-Lomax or Gheewalla, who participated in the July 20, 2021, termination meeting.  Instead, plaintiff argues Rice "exert[ed] his racial animus" and improperly influenced Cheeks-Lomax to terminate him, invoking "Cat's Paw" liability.  (Pl. Opp. at ECF 2–3).  Under the theory of cat's paw liability, "a Title VII plaintiff is entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the decisionmaking process."  Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 272 (2d Cir. 2016).

Here, plaintiff points to no evidence suggesting Rice used his alleged racial bias to influence Cheeks-Lomax to terminate plaintiff's employment.  Indeed, it is undisputed that on June 14, 2021, Rice specifically requested to be excluded from all "update sessions or otherwise" regarding the investigation of plaintiff's complaint against him.  (Doc. #101-34 at ECF 2).  Plaintiff's conclusory argument that "the recusal does not impact Defendant Rice's ability to influence the Board's decision-making" (Pl's Opp. at ECF 3) is insufficient evidence to survive summary judgment.  See Edwards v. Rochester Inst. of Tech., 794 F. App'x 65, 67 (2d. Cir. 2019) (summary order) (finding no cat's paw liability when plaintiff adduced no evidence to suggest defendant influenced employer's termination decision, even when defendant was consulted by decision-maker about plaintiff's performance prior to plaintiff's termination).

Third, plaintiff alleges Cheeks-Lomax hired AlixPartners to investigate plaintiff's implementation of various fiscal policies "to try to find and create evidence to which would later be used to cover-up the retaliatory termination."  (Am. Compl. ¶ 82).  It is undisputed AlixPartners was hired on August 5, 2021—approximately two weeks after plaintiff was terminated.  As such, plaintiff cannot establish that the hiring of AlixPartners was an action

adversely affecting the terms of his employment caused by his protected activity because he was no longer employed at MSP.[5]

Accordingly, defendants are entitled to summary judgment on plaintiff's Title VII, Section 1981, and NYSHRL retaliation claims.

V.    Hostile Work Environment Claims

Defendants argue plaintiff fails to establish a hostile work environment claim under Title VII, Section 1981, the ADA, or the NYSHRL because plaintiff has not demonstrated the allegedly unequal treatment was based on his race or disability.

The Court agrees.

A.    Legal Standard

To demonstrate a hostile work environment claim under Title VII, Section 1981, and the ADA, "a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Littlejohn v. City of New York, 795 F.3d 297, 320–21 (2d Cir. 2015); see Gomez v. N.Y.C. Police Dep't, 191 F. Supp. 3d 293, 300–01 (S.D.N.Y. 2016) (applying same standards for hostile work environment claims under Title VII and the ADA). "[T]he test has objective and subjective elements:  the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014).

---

[5]      Plaintiff also argues defendants improperly used AlixPartners's expert report as the basis for his termination.  (Pl. Opp. at ECF 4).  But defendants did not rely on this expert report in their motion (Doc. #111 at 17), and it is undisputed AlixPartners was not retained until after plaintiff was terminated.

In considering whether a plaintiff has met this burden, courts should examine the totality of the circumstances, including: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d at 20. Moreover, "as a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002).

It is "axiomatic" however, that a plaintiff asserting a hostile work environment claim must show sufficient evidence that the at-issue conduct occurred because of the plaintiff's protected characteristic. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). An inference of discriminatory intent may be derived from a variety of circumstances, including, "invidious comments about others in the employee's protected group," or "the more favorable treatment of employees not in the protected group," or "the sequence of events leading to the plaintiff's discharge." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994).

To state such a hostile work environment claim under the NYSHRL's less stringent standard, a plaintiff must establish that he was "subjected to inferior terms, conditions, or privileges of employment because of [his] membership in one or more protected categories." Totorici v. Bus-Tev, LLC, 2021 WL 4177209, at *13 (S.D.N.Y Sept. 13, 2021). However, a claim for hostile work environment under the NYSHRL will not succeed if the offending actions are "nothing more than petty slights or trivial inconveniences." Magnoni v. Smith Laquercia, LLP, 701 F. Supp. 2d 497, 505 (S.D.N.Y. 2010).

B.    Analysis

Here, plaintiff's hostile work environment claims are predicated on: (i) Rice's questioning of plaintiff at the January 2021 Finance Committee meeting (Doc. #101-1 at 68);

(ii) a January 2021 email exchange between plaintiff and Rice regarding MSP's investment portfolio and strategy (Doc. #101-15); (iii) a March 2021 email exchange between plaintiff, Rice, and another MSP employee regarding an error in a balance sheet (Docs. #101-10); (iv) an early Sunday morning email Rice sent to plaintiff and the Finance Committee on May 16, 2021, regarding MSP's employee retirement plan (Doc. #101-21 at ECF 2–4); and (v) a May 24 and 25, 2021, email exchange between plaintiff and Rice regarding questions Rice had about plaintiff's proposed 2022 budget (Docs. ##101-22, 101-23, 101-48).

It is undisputed that none of these interactions contains any explicit reference to plaintiff's race. Most of these interactions involve Rice asking plaintiff additional questions about his work, sometimes outside of normal business hours. But Rice asking questions and requesting additional work product is plainly insufficient to establish a hostile work environment based on plaintiff's race. See Montanez v. McDean LLC, 770 F. App'x 592, 595 (2d Cir. 2019) (summary order) (finding "additional work and inappropriate or wrongful reprimands are insufficient to establish a hostile work environment").

Although plaintiff attests that "every interaction I had with Tom had the cloud over it of his racism" and "[o]nly the victim can say whether or not [racism] happened" (Doc. #101-1 at 123, 294), plaintiff's subjective perceptions, without more, are insufficient to survive summary judgment on these claims. Alvarado v. United Hospice, Inc., 631 F. Supp. 3d at 120 ("[I]t is well established that a plaintiff's feelings and perceptions of being discriminated against are not evidence of discrimination."). Even drawing all inferences in plaintiff's favor, there is simply nothing in the record from which a reasonable jury could infer plaintiff was subjected to inferior treatment because of his race. See Ortiz v. Metro. Transp. Auth., 615 F. App'x 702, 203 (2d Cir.

2015) (summary order) (affirming grant of summary judgment when "complained-of conduct bears no apparent connection to [plaintiff's] sex, race, or national origin").

Similarly, there is no evidence from which a reasonable jury could conclude plaintiff was subject to inferior treatment based on his alleged disabilities.  All of the above-referenced interactions with Rice occurred before plaintiff notified MSP of his medical conditions on June 2, 2021.  To the extent plaintiff points to the July 15, 2021, email exchange between himself and Cheeks-Lomax as evidence of inferior treatment based on his disabilities (Doc. #101-35), this interaction also cannot sustain his hostile work environment claims.  Cheeks-Lomax requesting various information regarding plaintiff's 2022 budget proposal, without more, cannot give rise to an inference of inferior treatment based on plaintiff's health conditions.  See Williams v. Geiger, 447 F. Supp. 3d 68, 86 (S.D.N.Y. 2020) (granting summary judgment when "there is simply no nexus between the alleged hostility and [plaintiff's] disability").[6]

Accordingly, defendants are entitled to summary judgment on plaintiff's Title VII, Section 1981, ADA, and NYSHRL hostile work environment claims.[7]

## VI.   Counterclaim for Conversion

MSP argues it is entitled to summary judgment on its conversion counterclaim because there is no material dispute of fact that MSP had a possessory right to its money and plaintiff's use of the money was in derogation of MSP's possessory right.

---

[6]     Because the Court finds plaintiff has not established a hostile work environment under Title VII, it need not address MSP's affirmative defense based on its retention of a third-party investigator (Doc. #100 at 19), or plaintiff's argument that MSP's outdated employee handbook somehow contributed to the purported hostile work environment or prevented MSP from taking appropriate remedial action (Pl. Opp. at ECF 5).

[7]     Because the Court concludes defendants are entitled to summary judgment on the merits of all of plaintiff's claims, it need not decide whether defendants Cheeks-Lomax, Rice, and Gheewalla could be held individually liable.

The Court agrees.

A.      Legal Standard

Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  Colavito v. N.Y. Organ Donor Network, Inc., 8 N.Y.3d 43, 49–50 (2006).  "Conversion occurs when funds designated for a particular purpose are used for an unauthorized purpose."  World Ambulette Transp., Inc. v. Kwan Haeng Lee, 78 N.Y.S.3d 137, 140 (2d Dep't 2018).  Money that is "specifically identifiable and segregated" can be the subject of a claim for conversion.  Mfrs. Hanover Tr. Co. v. Chem. Bank, 559 N.Y.S.2d 704, 712 (1st Dep't 1990).  An "employee who participates in a conversion in the course of his employment may be held personally liable for his acts, notwithstanding innocent intent."  Coughlan v. Jachney, 473 F. Supp. 3d 166, 201 (E.D.N.Y. 2020).

B.      Analysis

As an initial matter, plaintiff does not present any opposition to MSP's motion for summary judgment on its counterclaims.  However, because plaintiff is proceeding pro se, the Court has independently reviewed the factual record with respect to each of defendants' statements of material fact pertaining to MSP's counterclaims.  See Jackson v. Jackson, 2021 WL 981849, at *4.

It is undisputed that plaintiff paid Upwork consultants $1,715 from MSP's Operating Account to update his professional materials.  Although plaintiff testified at his deposition that he used MSP funds to update his resume, cover letters, and LinkedIn profile in preparation for his application to speak at an upcoming conference, both the messages sent to the Upwork consultants and the timing of his requests with respect to the conference bely his assertions.  The Upwork messages between plaintiff and the consultants explicitly state plaintiff is seeking other

24

employment.  Plaintiff asks a consultant to "[i]dentify 3 Not-For-Profit CFO jobs within the NY area" and "[t]ailor a resume and cover letter (or more than one if necessary) to meet the specific needs of the identified jobs."  (Doc. #101-39 at ECF 4).  In addition, the deadline for plaintiff to apply to present at the OVS conference was April 30, 2021.  (Doc. #101-1 at 268).  But plaintiff did not solicit Upwork consultants to update is resume, cover letters, and LinkedIn until May 12, 2021.  (See Doc. #101-40).

Even if plaintiff had used the consultants for a proper work-related purpose, plaintiff failed to follow MSP's procedures for hiring and paying consultants and contractors.  MSP's Fiscal Policies and Procedures provide that all consulting and contractor arrangements must be approved by both the CEO and CFO before a contractor may be retained.  (Doc. #101-13 at ECF 22).  It is undisputed that plaintiff failed to obtain the approval of Cheeks-Lomax prior to using $1,715 from MSP's Operating Account to pay the Upwork consultants.  (Doc. #104 ¶ 73).  As such, the funds were used intentionally and without authority, notwithstanding plaintiff's asserted innocent intent.

Accordingly, MSP is entitled to summary judgment on its counterclaim for conversion of $1,715 of MSP's funds.

VII.    Counterclaim for Breach of the Duty of Loyalty

MSP argues it is entitled to summary judgment on its breach of the duty of loyalty counterclaim because there is no material dispute of fact that plaintiff violated the core obligations of his role as CFO.

The Court agrees.

A.    Legal Standard

Under New York law, an employee "is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times

bound to exercise the utmost good faith and loyalty in the performance of his duties."
Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200 (2d Cir. 2003) (quoting
Western Elec. Co. v. Brenner, 41 N.Y.2d 291, 295 (1977)).  Under the duty of loyalty, an
employee "may not charge expenses to his employer, which were incurred while acting on behalf
of his own interest."  Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F.
Supp. 2d 489, 522 (S.D.N.Y. 2011).

"One who owes a duty of fidelity to a principal and who is faithless in the performance of
his services is generally disentitled to recover his compensation, whether commissions or
salary."  Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928 (1977).  Courts limit forfeiture to the
salary paid during the time period of disloyalty.  Design Strategy, Inc. v. Davis, 469 F.3d 284,
301 (2d Cir. 2006).  The employee must forfeit his salary during that period even when some
"services were beneficial to the principal or [when] the principal suffered no provable damage as
a result of the breach of fidelity by the agent."  Phansalkar v. Andersen Weinroth & Co., L.P.,
344 F.3d at 200.

To determine whether an employee's behavior warrants forfeiture of his salary, New
York courts use two alternative standards:  (i) whether the misconduct "permeates the
employee's service in its most material and substantial part," or (ii) whether the employee
"act[ed] adversely to his employer in any part of the transaction."  Id. at 201–02.  Here, MSP
moves for summary judgment under the first standard, which is met when an employee's
disloyalty occurs in one of his "primary areas of responsibility."  See id. at 201–02 & n.12.

B.     Analysis

As discussed above, it is undisputed that plaintiff used $1,715 from MSP's Operating
Account to pay Upwork consultants to update his resume, cover letters, and LinkedIn profile,
and it is clear he did so in preparation for specific job listings, which were being compiled by the

consultants.  (See Doc. #101-39).  As such, the Upwork consultant fees were incurred by

plaintiff "while acting on behalf of his own interest" in violation of plaintiff's duty of loyalty to

MSP.  Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, 813 F. Supp. 2d at 522.

Indeed, this misappropriation of MSP funds contravened one of plaintiff's principal areas of

responsibility as the CFO:  to "oversee the fiscal policies of [MSP]" (Doc. #101-1 at 55–56), and

"[d]esign and oversee the effectiveness of controls in all expenditure processes" (Doc. #101-11

at ECF 2).  Moreover, although plaintiff testified he considered the Upwork charges to be "an

ordinary expense for any executive" (Doc. #101-1 at 266), New York law does not "suggest that

a specific intent to defraud is necessary to render misconduct sufficient to warrant forfeiture."

Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d at 204.

It is undisputed that plaintiff began soliciting Upwork consultant services for his personal

benefit on May 12, 2021.  (See Doc. #101-38).  MSP argues the period of disloyalty ended on

July 20, when plaintiff was terminated.  (Doc. #100 at 31).  However, the exhibits attached to

defendants' motion show the last date of payment to Upwork consultants for plaintiff's personal

services was June 3.  (See Docs. ##101-40 at ECF 2, 101-42 at ECF 11).  Accordingly, the

period of disloyalty extends only from May 12 to June 3, 2021.  See Design Strategy, Inc. v.

Davis, 469 F.3d at 302 (affirming limitation of disloyalty period to dates of improper conduct,

not defendant's resignation).

Therefore, MSP is entitled to summary judgment on liability for its breach of the duty of

loyalty counterclaim, and plaintiff must forfeit the portion of his annual salary for the period of

May 12 to June 3, 2021, which is approximately three weeks.  "[C]ourts . . . routinely award

damages that are readily calculable based on the undisputed facts on summary judgment."  AEP

Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 740 (2d Cir. 2010).  It is

undisputed that plaintiff's annual salary was $150,000.  The Court calculates plaintiff's $150,000

annual salary prorated for three weeks is approximately $8,654.  As such, MSP is entitled to

$8,654 in damages on its breach of the duty of loyalty counterclaim.[8]

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.

All of plaintiff's claims are dismissed.

The Court directs the Clerk to enter a judgment that:

1.      Dismisses all of plaintiff's claims; and

2.      States defendant My Sisters' Place, Inc., is entitled to judgment against plaintiff in

        the amount of $1,715 on its counterclaim for conversion, and $8,654 on its

        counterclaim for breach of the duty of loyalty, for a total of $10,369.

The Clerk is further instructed to terminate the motion (Doc. #99) and close this case.

Dated:  June 17, 2024
        White Plains, NY

                                SO ORDERED:

                                _____
                                Vincent L. Briccetti
                                United States District Judge

---

[8]      MSP requests interest on its damages and punitive damages for both of its counterclaims.
(Doc. #32 at 35–36).  However, MSP does not specify whether it seeks pre- or post-judgment
interest on damages, nor does it present evidence or argument supporting a claim for interest or
punitive damages in its motion papers or supporting documents.  Accordingly, the Court
concludes the readily calculable damages on summary judgment do not include any interest or
punitive damages.